IN THE SUPREME COURT OF NORTH CAROLINA

Nos. 271A18 and 401A18

Filed 11 December 2020

STATE OF NORTH CAROLINA ex rel. UTILITIES COMMISSION; DUKE ENERGY PROGRESS, LLC, Applicant; and DUKE ENERGY CAROLINAS, LLC, Applicant

v.

ATTORNEY GENERAL JOSHUA H. STEIN; PUBLIC STAFF – NORTH CAROLINA UTILITIES COMMISSION; NORTH CAROLINA JUSTICE CENTER, NORTH CAROLINA HOUSING COALITION, NATURAL RESOURCES DEFENSE COUNCIL, SOUTHERN ALLIANCE FOR CLEAN ENERGY, and NORTH CAROLINA SUSTAINABLE ENERGY ASSOCIATION; and SIERRA CLUB, Intervenors

Consolidated appeals as of right pursuant to N.C.G.S. § 62-90 and N.C.G.S. § 7A-29(b) from final orders of the North Carolina Utilities Commission entered on 23 February 2018 in Docket Nos. E-2, Sub 1131, 1142, 1103, and 1153, and on 22 June 2018 in Docket Nos. E-7, Sub 1146, 819, 1152, and 1110. Heard in the Supreme Court on 11 March 2020.

*Troutman Sanders LLP, by Kiran H. Mehta, Molly McIntosh Jagannathan, and Christopher G. Browning, Jr., for Duke Energy Carolinas, LLC, and Duke Energy Progress, LLC.*

*Attorney General Joshua H. Stein, by Assistant Attorney General Margaret A. Force, Solicitor General Matthew W. Sawchak, Deputy Solicitor General James W. Doggett, Solicitor General Fellow Matt Burke, and Special Deputy Attorneys General Jennifer T. Harrod and Teresa L. Townsend.*

*Lewis & Roberts, PLLC, by Matthew D. Quinn, and Bridget M. Lee and Dorothy E. Jaffee, for appellant Sierra Club.*

*Southern Environmental Law Center, by Gudrun Thompson and David Neal, for North Carolina Justice Center, North Carolina Housing Coalition, Natural Resources Defense Council, and Southern Alliance for Clean Energy, and North*

*Carolina Sustainable Energy Association, by Benjamin W. Smith and Peter H. Ledford, intervenor-appellants.*

*Public Staff – NCUC, by Chief Counsel David T. Drooz and Staff Attorneys Chris Ayers, Layla Cummings, Megan Jost, and Nadia Luhr, intervenor-appellant.*

*North Carolina Department of Justice, Environmental Division, by Special Deputy Attorney General Marc Bernstein and Senior Deputy Attorney General Daniel S. Hirschman, for North Carolina Department of Environmental Quality, amicus curiae.*

ERVIN, Justice.

These cases arise from appeals taken from orders entered by the North Carolina Utilities Commission addressing applications filed by Duke Energy Progress, LLC, and Duke Energy Carolinas, LLC, both of which are wholly owned subsidiaries of Duke Energy Corporation, by various intervenors representing the utilities' consumers that focus upon the lawfulness of the Commission's decisions concerning the extent to which the utilities are entitled to reflect costs associated with the storage, disposal, and removal of ash resulting from the production of electricity in coal-fired electric generating units in the cost of service used to establish the utilities' North Carolina retail rates. Among other things, various intervenors assert that the Commission erred by allowing the deferral of certain coal ash remediation costs and the inclusion of those costs in the cost of service used to establish the utilities' North Carolina retail rates, that the Commission erred by allowing the utilities to earn a return upon the unamortized balance of the deferred coal ash

remediation costs, and that the Commission erred by approving an increased Basic Facilities Charge for Duke Energy Carolinas' North Carolina retail residential customers. After careful consideration of the parties' challenges to the Commission's orders, we conclude that the challenged orders should be affirmed, in part, and reversed and remanded, in part.

## I. Factual Background

## A. Substantive Facts

In the early part of the twentieth century, when the utilities began providing electric service in North Carolina, they used coal as the primary means of generating electric power. The burning of coal produces by-products known as coal combustion residuals, which include fly ash, bottom ash, boiler slag, and flue gas desulfurization material.[1] At present, Duke Energy Progress owns eight coal-fired electric generating facilities and nineteen unlined coal ash basins, while Duke Energy Carolinas owns eight coal-fired electric generating facilities and seventeen unlined coal ash basins.

In the early years during which the utilities operated coal-fired electric generating facilities, coal ash was either emitted through generating facility smokestacks or stored in on-site landfills. In the 1950s, the utilities began to store coal ash in unlined basins located at generating facility sites. As part of this process,

---

[1] The term "coal ash" is used throughout the remainder of this opinion to refer to coal combustion residuals and the by-products resulting from the combustion of coal in electric generating facilities.

the utilities mixed coal ash with water to form a "sluice," which would be piped from the generating facility to these unlined basins. The practices that the utilities employed in disposing of coal ash during this time were consistent with contemporaneous standard industry practices and with the concept of least cost planning as currently embodied in state law. *See* N.C.G.S. § 62-2(a)(3a) (2019).

The harmful effects of coal ash on human and environmental health were not fully understood at the time that the utilities began to dispose of it in unlined basins. Over time, however, pollutants emanating from the unlined coal ash basins began to contaminate nearby groundwater. In the 1970s, concerns developed about the manner in which coal ash was handled and stored. For that reason, the United States Environmental Protection Agency began to regulate unlined coal ash basins in accordance with the Clean Water Act and initiated a permitting program known as the National Pollutant Discharge Elimination System, pursuant to which the EPA delegated authority to the states to issue permits allowing the discharge of a specific amount of pollutants into nearby water sources, subject to certain terms and conditions, and authorizing the processing, incineration, placement in a landfill, or other beneficial uses of contaminated sludge. *See* 33 U.S.C. § 1251 *et seq*. (1972). In 1979, the North Carolina Department of Environmental Quality[2] adopted Groundwater Classification and Standards (2L Rules) requiring the taking of

---

[2] The Department of Environmental Quality was known as the Department of Environmental and Natural Resources in the 1970s.

preventative and corrective measures relating to groundwater contamination associated with coal ash. *See* 15A N.C. Admin. Code 02L §§ .0100–.0515.

In the aftermath of a 2008 incident, during which more than five million cubic yards of coal ash spilled into the Emory River from the Tennessee Valley Authority's Kingston Fossil Plant, the effect of storing coal ash in unlined basins upon human and environmental health became a focus of additional attention at the EPA and in the electric power industry. On 17 April 2015, the EPA promulgated the Hazardous and Solid Waste Management System—Disposal of Coal Combustion Residuals from Electric Utilities (CCR Rule), *see* 80 Fed. Reg. 21301 (April 17, 2015), which established a "maximum contaminant level" for certain contaminants, prohibited "[a]n increase in the concentration of that substance in the ground water where the existing concentration of that substance exceeds" a prescribed maximum level, and required that groundwater monitoring be undertaken at existing coal ash basins by no later than 17 October 2017, with reporting of the results to begin by no later than 31 January 2018. 40 C.F.R. § 257.3–4; § 257.90(b), (e) (2019).

On 2 February 2014, a stormwater pipe that ran beneath an unlined coal ash basin located at Duke Energy Carolinas' Dan River generating facility burst, resulting in the emission of approximately 27,000 million gallons of wastewater and between 30,000 and 39,000 tons of coal ash into the Dan River, affecting river conditions for up to sixty miles below the discharge site. The utilities entered pleas of guilty in federal court to nine criminal violations of the Clean Water Act relating

to the Dan River facility and four additional power plants. In accordance with their plea agreements, the utilities agreed to pay a $68 million fine and were placed on probation for a five-year period pursuant to 18 U.S.C. § 3561(c)(2).

On 20 September 2014, the General Assembly enacted the North Carolina Coal Ash Management Act, N.C. Sess. L. 2014-122, which was subsequently amended in the Mountain Energy Act, N.C. Sess. L. 2015-110, and the Drinking Water Protection/Coal Ash Cleanup Act, N.C. Sess. L. 2016-95. CAMA, as amended, required a comprehensive assessment of groundwater and surface water discharges at coal ash basins, the taking of corrective action to address such discharges, and the closure of all of the utilities' unlined coal ash basins by no later than 2029 in accordance with a statutorily prescribed timeline. N.C.G.S. §§ 130A-309.211–.214 (2019). The utilities began closing their unlined coal ash basins pursuant to the requirements of the CCR Rule and CAMA in 2015.

## B. Procedural History

At the beginning of the closure process, the utilities estimated that their collective coal ash cleanup costs would exceed $4.5 billion. On 21 December 2015, Duke submitted a letter to the Commission outlining the manner in which the utilities intended to account for ongoing and anticipated coal ash management and basin closure costs. In this letter, Duke explained that the utilities planned to create an Asset Retirement Obligation, which is an account associated with the retirement of a tangible long-lived asset, on their balance sheets in accordance with their

understanding of Financial Accounting Standards Board (FASB) Accounting Standards Codification for Asset Retirement Environmental Obligations (ASC) 410-20, Federal Energy Regulatory Commission (FERC) General Instruction No. 25, and Generally Accepted Accounting Principles (GAAP). According to Duke, the creation of these Asset Retirement Obligations was triggered by the fact that the CCR Rule and CAMA required the closure of the utilities' unlined coal ash basins. Although Duke initially estimated that these Asset Retirement Obligations would involve approximately $2.13 billion for Duke Energy Progress and $1.84 billion for Duke Energy Carolinas, it noted that the utilities' actual compliance costs might be "materially different from these estimates based on the timing and requirements of the final regulations."

In accordance with fundamental principles of double-entry accounting, the utilities planned to record their coal ash management and ash basin closure costs as both a liability and an asset. In the event that these costs were associated with generating facilities that were still in active service, the costs, inclusive of associated depreciation expense, would be placed in the relevant property, plant and equipment account. In the event that these costs were associated with a retired facility, they would be placed in a regulatory asset account. After noting that "[t]he Commission ha[d]," in prior matters, "issued orders allowing the [utilities] to defer all impacts of establishing an [Asset Retirement Obligation] until these costs [could] be considered in future rate making decisions," Duke stated that, since "actual costs incurred to

comply with the federal and state regulations regarding closure of ash basins are being deferred," "all associated coal ash [Asset Retirement Obligation] deferrals [are being excluded] for earnings surveillance reporting," and that the utilities "are funding these expenditures with its debt and equity capitalization" and "are recording a debt and equity return (carrying charge) on the aforementioned net asset for regulatory purposes" given that "GAAP requires the equity return to be deferred . . . until rate recovery has begun." Finally, Duke pointed out that this letter had been sent for purely informational purposes and expressed the intention of "bring[ing] this matter before the Commission for ultimate disposition" after "sufficient clarity in North Carolina regarding the closure of ash basins"[3] had been obtained.

On 28 March 2016, the Commission determined that there was "good cause to establish formal dockets for [the utilities] in this matter" and "place[d] a copy of Duke's letter in each" of these dockets. Although it took no further action at that time, the Commission noted that its "inaction should not be construed as agreement or disagreement with the substance of Duke's analysis or the conclusions [that] Duke [had] reache[d]" and that it "reserve[d] the right, once a record [had been] established, to agree or disagree in whole or in part" with Duke's proposed accounting practices.

---

[3] Subsequently, Duke explained that "the [utilities] did not file a deferral request at [this] time due to significant [unresolved] litigation and reconsiderations related to CAMA, the now-defunct Coal Ash Management Commission, and numerous other outstanding issues."

On 30 December 2016, the utilities filed a joint petition seeking the entry of an accounting order "authorizing the [utilities] to defer in a regulatory asset account (until the [their] next base rate cases) certain costs incurred in connection with compliance with federal and state environmental requirements" relating to coal ash management and coal ash basin closures. More specifically, Duke "request[ed] that the Commission allow [the utilities] to establish a regulatory asset account for the deferral of all non-capital costs as well as the depreciation expense and cost of capital at the weighted average cost of capital for all capital costs related to activities required under [the CCR Rule and CAMA]" and deferral of "a cost of capital on the deferred costs at the weighted average cost of capital" for costs incurred from 1 January 2015 until the approval of new rates in the utilities' next general rate cases.

As of 30 September 2016, Duke Energy Progress had recorded an Asset Retirement Obligation of $2.4 billion and Duke Energy Carolinas had recorded an Asset Retirement Obligation of $2.1 billion, while acknowledging that its actual compliance costs might be "materially different" based upon the timing and requirements of the final environmental regulations. In addition, Duke pointed out that Duke Energy Progress had already incurred $291.9 million in coal ash management and coal ash basin closure costs and that Duke Energy Carolinas had already recorded $434.4 million in such costs, with these costs including monies associated with engineering and regulatory compliance, mobilization for and the

commencement of the closure process, the construction of rail infrastructure for coal ash excavation, dewatering activities, ash excavation, and plant closure.

Duke asserted that "noteworthy circumstances" justified the entry of the proposed accounting order and alleged that, "absent approval of this request, [both utilities'] return on equity for [their] North Carolina retail operations [was] expected to be well below the return last authorized by the Commission." More specifically, Duke alleged that the authorized return on equity that had been established in the utilities' last general rate cases was 10.2 percent and that, in the absence of the requested accounting order, Duke Energy Progress' earned return on equity would fall to 7.47 percent and that Duke Energy Carolinas' earned return on equity would fall to 7.61 percent. After emphasizing that the utilities were not seeking a rate change at that time, Duke stated that each utility intended to file a general rate case application within the next twelve months and pointed out that none of the fines, penalties, or costs associated with the Dan River spill had been included in the costs that either utility had deferred to date or would be included in the costs upon which any future general rate increase request would be predicated.

Duke asserted that "[c]losing ash basins is part of the life cycle of the [utilities'] coal plants," that "compliance with state and federal regulatory requirements is part of the normal operation of a utility," and that "[c]osts related to the operation of a power plant, including decommissioning costs, are typically paid for by customers." In light of the "extraordinary and unprecedented" "magnitude, scope, duration and

complexity of compliance," the utilities requested the Commission to enter the requested accounting order "so that all complexities may be adequately reviewed by the Commission and stakeholders at an appropriate time." Duke claimed that "[a]pproval of this deferral request [would] benefit the [utilities] and the customers by helping to assure investor confidence in" both utilities and ensuring that "needed capital [would be available] on reasonable terms." Unless the Commission approved its request, Duke argued that "the [utilities] may have to write off billions of dollars of costs for accounting purposes, which . . . would severely impair the [utilities'] financial stability and ability to attract capital on reasonable terms."

Various parties[4] submitted comments in response to Duke's filing. The Attorney General argued that the public interest would not be served by deciding the issues raised by Duke's filing outside the context of a general rate case. The Public Staff asserted that the relevant costs "generally satisfy the criteria for deferral for regulatory accounting (but not necessarily ratemaking) purposes" and reserved the right to litigate the amount of deferred costs used to set the utilities' rates in future general rate cases, the method that would be used to include the relevant costs in North Carolina retail rates, the length of any applicable amortization period, and the

---

[4] The parties submitting comments in response to Duke's filing included the North Carolina Waste Awareness and Reduction Network, Inc.; Appalachian State University; the Cities of Concord and Kings Mountain; the Carolina Utility Customers Association, Inc.; the Attorney General; and the Public Staff. The utilities and the Sierra Club submitted reply comments.

extent to which an equitable sharing of these costs between the ratepayers and shareholders should be implemented. Other parties contended that costs should be fully analyzed and categorized before the amount of deferred costs to be included in North Carolina retail rates was established.

## 1. General Rate Case Applications

### a. Duke Energy Progress

On 1 June 2017, Duke Energy Progress filed an application requesting authorization to adjust and increase its North Carolina retail rates and the entry of an accounting order approving the establishment of certain regulatory assets and liabilities. In its application, Duke Energy Progress sought additional annual North Carolina retail revenues of approximately $477.5 million,[5] resulting in an overall increase of approximately 14.9 percent. Duke Energy Progress requested that rates be established based upon coal ash basin closure costs of approximately $66 million per year for a period of five years and ongoing coal ash-related compliance costs of approximately $129 million per year. In addition, Duke Energy Progress sought the establishment of "a regulatory asset [and] liability for coal ash basin closure costs over or under the amount established in this proceeding and for those costs incurred between the cut-off date for this rate case and the effective date of new rates." A

---

[5] In subsequently filed supplemental testimony and exhibits, Duke Energy Progress reduced its proposed rate increase to $425.6 million.

number of entities intervened in the proceeding initiated by the filing of Duke Energy Progress' application.[6]

On 20 June 2017, the Commission entered an order in which it: (1) declared that the application filed by Duke Energy Progress had initiated a general rate case pursuant to N.C.G.S. § 62-137; (2) suspended the proposed rates for a period of up to 270 days pursuant to N.C.G.S. § 62-134; and (3) established the applicable test year as the twelve-month period ending 31 December 2016. On 10 July 2017, the Commission entered an additional order consolidating the utilities' request to defer environmental compliance costs in Docket No. E-2 Sub 1103, and Duke Energy Progress' request to defer incremental storm damage expenses in Docket No. E-2, Sub 1131, with Duke Energy Progress' general rate proceeding. On 12 July 2017, the Commission entered an order requiring Duke Energy Progress to provide public notice of the filing of its application and the schedule of public hearings to be held in

---

[6] The Public Staff intervened as a matter of right pursuant to N.C.G.S. § 62-15(d) and Commission Rule R1-19, while the Attorney General's intervention was recognized pursuant to N.C.G.S. § 62-20. The Commission allowed additional intervention petitions filed by the Carolina Utility Customers Association, Inc.; the Carolinas Industrial Group for Fair Utility Rates II; the North Carolina Waste Awareness and Reduction Network, Inc.; the North Carolina Sustainable Energy Association; the Fayetteville Public Works Commission; the Commercial Group; the North Carolina Electric Membership Corporation; the Environmental Defense Fund; the Kroger Company; the Sierra Club; Haywood Electric Membership Corporation; the United States Department of Defense and All Other Federal Executive Agencies; the Rate-Paying Neighbors of Duke Energy Progress, LLC's Coal Ash Sites; the North Carolina Farm Bureau Federation, Inc.; the North Carolina Justice Center, the North Carolina Housing Coalition, the Natural Resources Defense Council, and the Southern Alliance for Clean Energy, jointly (collectively, the Justice Center, et al.); and the North Carolina League of Municipalities.

connection with that proceeding. A number of hearings were held before the Commission between 12 September to 7 December 2017, at which interested members of the public were allowed to testify and the parties were given the opportunity to present the testimony of various expert witnesses.

### b. Duke Energy Carolinas

On 25 August 2017, Duke Energy Carolinas filed an application requesting authorization to increase its North Carolina retail rates and the entry of an accounting order authorizing the establishment of certain regulatory assets and liabilities. In its application, Duke Energy Progress sought additional annual North Carolina retail revenues of approximately $611 million,[7] which resulted in an overall increase of approximately 12.8 percent, and the approval of an increase in the residential Basic Facilities Charge from $11.80 to $17.79 per month. Duke Energy Carolinas also requested that rates be established based upon coal ash basin closure costs of approximately $135 million per year for a period of five years and ongoing coal ash-related compliance costs of approximately $201 million per year. In addition, Duke Energy Carolinas sought the establishment of a "regulatory asset [and] liability for coal ash basin closure costs over or under the amount established in this proceeding and for those costs incurred between the cut-off date for this rate case and

---

[7] Subsequently, Duke Energy Carolinas filed supplemental testimony and exhibits changing its proposed rate increase to an annual amount of approximately $701 million.

the effective date of new rates." A number of other entities intervened in the proceeding resulting from the filing of Duke Energy Carolinas' application.[8]

On 19 September 2017, the Commission entered an order in which it: (1) declared that Duke Energy Carolina's application had initiated a general rate case pursuant to N.C.G.S. § 62-137; (2) suspended the proposed rates for a period of up to 270 days pursuant to N.C.G.S. § 62-134; and (3) established that the applicable test year would be the twelve-month period ending 31 December 2016. On 13 October 2017, the Commission entered an order requiring Duke Energy Carolinas to provide public notice of the filing of its application and the times, dates, and locations at which hearings for the receipt of public witness testimony would be held. A number of hearings were held before the Commission between 16 January to 22 March 2018, at which interested members of the public were allowed to testify and the parties were given the opportunity to present the testimony of various expert witnesses.

---

[8] Once again, the Public Staff intervened as a matter of right pursuant to N.C.G.S. § 62-15(d), while the Attorney General's intervention was recognized pursuant to N.C.G.S. § 62-20. The Commission allowed additional intervention petitions filed by the North Carolina Sustainable Energy Association; the Environmental Defense Fund; the North Carolina Waste Awareness and Reduction Network; the Carolina Utility Customers Association, Inc.; the Carolinas Industrial Group for Fair Utility Rates III; the Rate-Paying Neighbors of Duke Energy Carolinas, LLC's Coal Ash Sites; the North Carolina Farm Bureau Federation, Inc.; the Sierra Club; the Kroger Company; the North Carolina League of Municipalities; Appalachian State University; Piedmont Electric Membership Corporation; Rutherford Electric Membership Corporation; Haywood Electric Membership Corporation; Blue Ridge Electric Membership Corporation; the Commercial Group; Apple, Inc., Facebook, Inc., and Google, Inc., jointly; the Cities of Concord and Kings Mountain; the City of Durham; and the North Carolina Justice Center, the North Carolina Housing Coalition, the Natural Resources Defense Council, and the Southern Alliance for Clean Energy (collectively, the Justice Center, et al.).

## 2. The Commission's Orders

## a. Duke Energy Progress

On 23 February 2018, the Commission entered an order allowing Duke Energy Progress to include $232.39 million in net additional coal ash-related costs, less a $30 million mismanagement penalty, to be amortized to North Carolina retail rates over a five-year period in its North Carolina retail cost of service and authorizing Duke Energy Progress to recover a return on the unamortized balance of these costs. In its order, the Commission found as fact that:

> 51. [Duke Energy Progress] expects to incur substantial costs related to [coal ash] in future years. It is just and reasonable to allow deferral of those costs, with a return at the overall cost of capital approved in this [o]rder during the deferral period. Ratemaking treatment of such costs will be addressed in future rate cases.
>
> . . . .
>
> 53. Since its last rate case, [Duke Energy Progress] has become subject to new legal requirements relating to its management of coal ash. These new legal requirements mandate the closure of the 19 coal ash basins at [Duke Energy Progress'] coal-fired power plants. Since its last rate case, [Duke Energy Progress] has incurred significant costs to comply with these new legal requirements.
>
> 54. On a North Carolina retail jurisdiction basis, the actual coal ash basin closure costs [that Duke Energy Progress] has incurred (netted against the amount already included in [Duke Energy Progress'] rates following its last rate case) during the period from January 1, 2015, through August 31, 2017, amount to $241,890,000. [Duke Energy Progress] is entitled to recover these coal ash basin closure

costs, less a disallowance of $9.5 million, for a total amount of $232,390,000. . . . The actual coal ash basin closure costs incurred by [Duke Energy Progress], less the $9.5 million, are known and measurable, reasonable and prudent, and used and useful in the provision of service to [Duke Energy Progress'] customers. [Duke Energy Progress] is entitled to recover these costs through rates. Further, [Duke Energy Progress] proposes that these costs be amortized over a five-year period and that it earn a return on the unamortized balance. Under normal circumstances, the five-year amortization period proposed by [Duke Energy Progress] is appropriate and reasonable, and absent any management penalty should be approved, and under normal circumstances [Duke Energy Progress] is entitled to earn a return on the unamortized balance.

55. Under the present facts, a mismanagement penalty in the approximate sum of $30 million is appropriate with respect to [Duke Energy Progress'] [coal ash] remediation expenses accounted for in the earlier established asset retirement obligation . . . with respect to costs incurred through the end of the test year, as adjusted. Through its use of available ratemaking mechanisms, the Commission is effectively implementing an estimated $30 million penalty by amortizing the $232,390,000 over five years with a return on the unamortized balance and then reducing the resulting annual revenue requirement by $6 million for each of the five years.

56. [Duke Energy Progress] further proposes that it recover on an ongoing basis $129,115,000 in annual coal ash basin closure costs, subject to true-up in future rate cases. The amount sought by [Duke Energy Progress] is based upon its actual test year (2016) spend. [Duke Energy Progress'] proposal to recover these ongoing costs as a portion of the rates approved in this [o]rder is not approved. Rather, [Duke Energy Progress] is authorized to record its September 1, 2017, and future [coal ash] costs in a deferral account until its next general rate case.

In discussing the evidentiary support for these findings of fact, the Commission noted that cost deferral "is a recognized practice that allows recovery of expenditures that might otherwise constitute impermissible retroactive ratemaking," that the regulations requiring Duke Energy Progress to remediate the environmental risks associated with its unlined coal ash basis "were not in effect ten or fifteen years ago," that these regulations "[have] arisen in 2014 and 2015," and that Duke Energy Progress "is taking appropriate actions to comply" with all such requirements.

The Commission determined that it "[could not] agree with the ultimate positions of any party" with respect to the manner in which coal ash-related costs should be included in the cost of service used to establish Duke Energy Progress' North Carolina retail rates. In rejecting a proposal advanced by Public Staff witness Jay Lucas, who suggested that $88,000 in legal expenses associated with litigation relating to alleged coal ash-related environmental violations and $6.7 million in groundwater extraction and treatment costs, most of which related to the utility's Sutton facility, should be excluded from the company's North Carolina retail cost of service, citing *State ex rel. Utilities Commission v. Public Staff*, 317 N.C. 26, 343 S.E.2d 898 (1986) (*Glendale Water*) (holding that legal fees incurred as a result of the utility's failure to provide adequate service "could have been avoided" and should have been excluded from the utility's operating expenses for ratemaking purposes), the Commission noted that, in this instance, unlike the situation at issue in *Glendale Water*, there had been no finding or admission that any violation had occurred. In

addition, the Commission pointed to the testimony of Duke Energy Progress witness James Wells that not all 2L Rule exceedances result in NPDES permit violations and that DEQ had never issued a notice of violation directed toward Duke Energy Progress based upon groundwater testing results. Instead, the Commission noted that Mr. Wells had testified that "the 2L [R]ules' correct[ive] action provisions are designed around the idea that older facilities, built before liners were a regulatory obligation, were likely to have associated groundwater impacts, that such impacts were not the result of regulatory noncompliance, and that they should be addressed in a measured process." According to Mr. Wells, the utility's use of unlined coal ash basins was "consistent with the industry standard" and "considered by the EPA to be the best available control technology" at the time that the facilities in question were constructed. The Commission added that, even though Duke Energy Progress had agreed to incur certain groundwater extraction and treatment costs pursuant to a settlement agreement with DEQ, that agreement "merely accelerated work that would have been required under CAMA" given that, unlike the 2L Rules, "CAMA's groundwater assessment and corrective action provisions are triggered by *exceedances*—not *violations*—of the 2L [Rules]."

The Commission stated that it was not persuaded by the Public Staff's contention that Duke Energy Progress should have "tak[en] steps that were not in accord with steps most of the industry was following," such as lining ash ponds or creating dry coal ash basins, while "disregarding responsibility of paying for that

which [the Public Staff]—in 20/20 hindsight—wish[ed that Duke Energy Progress] had done" or by the arguments advanced by several intervenors that Duke Energy Progress "should have done more than just comply with the current environmental regulations" given the testimony of Attorney General witness Dan Wittliff that "the definition of industry standards is compliance with the law." In addition, the Commission determined that the actions suggested by the Public Staff would have "cost money which would have been charged to customers" or exposed Duke Energy Progress "to credible claims of 'gold-plating,' and therefore cost disallowance, which would have prevented [Duke Energy Progress] from moving forward with these suggested improvements in the first place." In the Commission's view, the extent to which "seeps" constituted a violation of the law or required the issuance of an NPDES permit remained unresolved by DEQ.

The Commission rejected the Public Staff's contention that the Commission should disallow $109.8 million relating to the costs of off-site transportation and disposal of coal ash from the Sutton and Asheville plants on the theory that the coal ash in question should have been placed in on-site facilities given that acting in such a fashion would not have been feasible given the basin closure deadlines imposed by CAMA. In the Commission's view, "once CAMA became law, prudent planning required [Duke Energy Progress] to meet 'real world' difficulties as and when they arose, to ensure that the legislatively fixed . . . deadline would be met," and, "[h]ad [Duke Energy Progress] not arranged for off-site disposal, it would have been

required" to undertake transportation measures which would have involved an "unreasonable task," with one exception.[9]

The Commission stated that the Public Staff's proposed "equitable sharing" arrangement, pursuant to which Duke Energy Progress' coal ash basin closure costs would be amortized to rates over a twenty-six year period without the inclusion of any return on the unamortized balance, resulting in a fifty-fifty sharing of those costs between the ratepayers and the shareholders, rested upon "[Duke Energy Progress'] alleged past failures . . . to prevent environmental contamination from its coal ash basins" and "an asserted [Commission] 'history of approval of sharing of extremely large costs that do not result in any new generation of electricity for customers.' " However, the Commission determined that the Public Staff had "provid[ed] insufficient justification" for its proposal, that it lacked "[a] 'determining principle' or prudency standard," and that, if "the Commission [were] to adopt it, the Commission very well could be found to be acting arbitrarily and capriciously, and subject itself to reversal."

In addition, the Commission determined that the Public Staff's argument that the Commission had the authority to institute its equitable sharing proposal rested upon an "overly broad" view of the Commission's authority that lacked support in the

---

[9] Duke Energy Progress "essentially agreed" that an adjustment in the amount of $9.5 million relating to the increased coal ash moving expenses at its Asheville plant associated with a contract involving Waste Management, Inc., should be made.

applicable legal authorities. In rejecting the Public Staff's argument that the applicable legal support for its equitable sharing proposal could be found in this Court's decision in *State ex rel. Utilities Commission v. Thornburg*, 325 N.C. 463, 476–81, 385 S.E.2d 451, 458–61 (1989) (*Thornburg I*) (affirming a Commission decision that nuclear plant abandonment costs constituted a utility "expense" for purposes of N.C.G.S. § 62-133(b)(3) and N.C.G.S. § 133(c) and that a decision to allow the amortization of these abandonment costs without a return upon the unamortized balance was permitted by N.C.G.S. § 62-133(d)), the Commission noted that the present case involved " 'reasonable and prudent' and 'used and useful' expenditures by [Duke Energy Progress]" rather than " 'abandoned plant' or cancellation costs." Instead, the Commission relied upon this Court's decision in *State ex rel. Utilities Commission v. Thornburg*, 325 N.C. 484, 486, 385 S.E.2d 463, 464 (1989) (*Thornburg II*) (reversing a Commission decision providing for an equitable sharing between customers and shareholders of approximately $570 million in construction costs associated with a new unit even though some portion of the relevant costs had been incurred in connection with the construction of certain abandoned facilities), and determined that the adoption of the Public Staff's equitable sharing proposal would be "unfairly punitive."

The Commission concluded that its determination that the relevant coal ash disposal costs were "used and useful" and "prudent and reasonable" was consistent with its own earlier decision in Docket No. E-22, Sub 532, which addressed costs that

had been incurred for the "identical purpose" and rested upon a determination that such costs were "used and useful." In rejecting the Public Staff's argument that Duke Energy Progress should have put the relevant costs into rate base rather than "cho[osing]" to defer these costs and attempt to have them amortized to rates, the Commission determined that Duke Energy Progress had treated these costs as "[w]orking [c]apital" and that "no party [had] taken the position that [this] inclusion . . . was inappropriate." Similarly, in rejecting the Attorney General's assertion that Duke Energy Progress had "failed to request in advance permission to create a deferred account," the Commission found that Duke Energy Progress "had no choice in the matter" in light of the applicable regulatory accounting rules, that "it is not necessary that something be classified as 'plant' in order to be properly included in rate base," and that, instead, "the issue is the source of the funds," citing *Utilities Commission v. Virginia Electric & Power Co.*, 285 N.C. 398, 206 S.E.2d 283 (1974) (*VEPCO*). In view of the fact that the relevant funds had been provided by investors, the Commission held that the funds were "used and useful" even though they did not result in "plant in service," so that Duke Energy Progress was "entitled to earn a return on those funds over the period in which the costs are amortized." In addition, the Commission held that, even if the costs in question did not relate to "used and useful" property, "the Commission would nevertheless approve [Duke Energy Progress'] cost recovery proposal in all respects, and would exercise its discretion to achieve that result" pursuant to N.C.G.S. § 62-133(c) and N.C.G.S. § 62-133(d).

The Commission further determined that the "disallowance methodologies" proposed by the intervenors "fail[ed] to comply with the Commission's prudence framework," in which a utility's costs "are presumed reasonable and prudent unless challenged" and any prudence-related challenges "must (1) identify specific and discrete instances of imprudence; (2) demonstrate the existence of prudent alternatives; and (3) quantify the effects by calculating imprudently incurred costs," citing its prior decisions in Docket No. E-2, Sub 537 and E-2, Sub 333. According to the Commission, the proposed disallowances would be "unjust and unreasonable," with a decision to place the entire cost of coal ash disposal upon shareholders having the ultimate effect of harming ratepayers given the increased capital costs that would result from such an action. In the same vein, the Commission rejected the Sierra Club's contention that the coal ash disposal costs that Duke Energy Progress sought to have included in the cost of service resulted from unlawful discharges and had to be disallowed pursuant to N.C.G.S. § 62-133.13 (providing that a utility is not entitled to have "costs resulting from an unlawful discharge to the surface waters of the State from a coal combustion residuals surface impoundment" included in the cost of service used to establish the utility's rates) on the grounds that the relevant costs related to "compl[iance] with the federal CCR [R]ule and CAMA." The Commission also rejected intervenor-proposed disallowances related to expenditures incurred to meet CAMA deadlines on the grounds that "[t]he Commission is unable to recreate the past and

place a price tag on remediation costs that might have been incurred in anticipation of environmental requirements."

On the other hand, after determining that it was "unable to conclude that [Duke Energy Progress] mismanagement [was] the primary cause of CAMA," the Commission concluded that it was also "unable to conclude that [the] mismanagement to which [Duke Energy Progress] admitted in the federal criminal court proceeding was not at least a contributing factor" to the incurrence of the relevant coal ash disposal costs. In light of its "admi[ssion] to pervasive, system-wide shortcomings such as improper communication among those responsible for oversight of coal ash management," the Commission concluded that Duke Energy Progress "ha[d] placed its consumers at risk of inadequate or unreasonably expensive service" by failing to "assur[e] safe operation of its coal-burning facilities so as not to render the environment unsafe," "result[ing] in cost increases greater than those necessary to adequately maintain and operate its facilities." As a result, the Commission imposed a $30 million mismanagement penalty "arising primarily from [Duke Energy Progress'] admissions of mismanagement in the federal criminal case."

Commissioner ToNola D. Brown-Bland dissented from the Commission's decision "that [Duke Energy Progress] is entitled to full recovery of all coal ash expenses subject to a one-time mismanagement penalty." In Commissioner Brown-Bland's view, the imposition of a $30 million mismanagement penalty did "not reasonably assure that the rates fixed for [Duke Energy Progress'] service are 'fair to

both the public utilit[y] and to the consumer,' and that the rate set by the Commission and to be received by [Duke Energy Progress] is just and reasonable," quoting N.C.G.S. § 62-133(a) and citing N.C.G.S. § 62-131(a). According to Commissioner Brown-Bland, when Duke Energy Progress was notified that NPDES permit violations and unlawful groundwater exceedances had occurred in 2007, Duke Energy Progress was placed "on notice" that its existing unlined coal ash basins "were not compliant with the environmental regulations of the day," that their contents were leaching into the groundwater, and that Duke Energy Progress "had available to it a number of specific alternative actions that represented reasonable optional pathways to coal ash management compliance." As a result, Commissioner Brown-Bland determined that Duke Energy Progress' decision to store additional coal ash in unlined basins after 2007 was imprudent and resulted in a situation in which the company was required to handle a considerable quantity of coal ash twice—once when it was initially stored in an unlined basin and again when it was excavated and moved to a lined facility. As a result, Commissioner Brown-Bland concluded that it was "not fair to burden the consumers with rates that include costs attributable to [Duke Energy Progress'] imprudence" in dewatering, excavating, and moving coal ash waste that had been produced in or after 2007 and that the prudently incurred portion of Duke Energy Progress' coal ash costs should be amortized over a seven year period, with the unamortized balance being included in rate base.

Similarly, Commissioner Daniel G. Clodfelter concurred, in part, and dissented, in part. After stating that that he "[could not] concur" in the Commission's decision to impose a $30 million mismanagement penalty while simultaneously allowing Duke Energy Progress to earn a return on the unamortized balance of the relevant coal ash disposal costs, Commissioner Clodfelter described the mismanagement penalty imposed by the Commission as lacking "any clear connection between the amount selected for the penalty . . . and any particular actions or omissions by [Duke Energy Progress]." Instead, Commissioner Clodfelter would have disallowed certain costs which had, in his view, been imprudently incurred at the Sutton, Asheville, H.V. Lee, and Cape Fear facilities and would have placed certain costs incurred at the Mayo and Roxboro facilities into a regulatory asset account for consideration in Duke Energy Progress' next general rate case. After noting that the record did not allow a determination as to "what portion, if any, of [Duke Energy Progress'] future coal ash disposal expenditures may require an increase in investor-provided working capital," Commissioner Clodfelter concluded that he could not "support the accrual of a rate of return on amounts recorded to the regulatory asset account for future coal ash disposal costs."

On 2 April 2018, the Public Staff filed a motion seeking clarification "with respect to whether the unamortized balance of deferred coal ash costs is 'entitled' to a return as a matter of law, or is 'eligible' for a return as a matter of Commission discretion." More specifically, the Public Staff sought clarification concerning: (1)

the Commission's conclusion that Duke Energy Progress' coal ash compliance costs constituted investor-funded working capital for purposes of this Court's decision in *VEPCO*; (2) the Commission's conclusion that Duke Energy Progress was "entitled to earn a return on those funds over the period in which the costs are amortized"; and (3) the Commission's statement that "costs placed in an [Asset Retirement Obligation] account are eligible for deferral and amortization and for earning on the unamortized balance" and that, "even if the remediation costs are [Asset Retirement Obligation] expenditures, they are eligible for ratemaking treatment as though they are used and useful assets." On 17 April 2018, the Commission entered an order stating that:

> [The Public Staff's concern] is a misinterpretation of the Commission's order when viewed in the context of the entirety of the order. The *holding* of the order is that but for a management penalty, the Commission in its discretion would have allowed amortization of historical deferred [coal ash] costs over five years with full return on the unamortized balance, but to implement the penalty, the return is to be reduced by $30 million. Relying on this logic, the Commission could have imposed a different penalty that could have reduced the return further or eliminated it altogether. As such the holding belies the Public Staff's reading of the order to be that the deferred [coal ash] costs are to be included in rate base with a return to be paid as a matter of law. The holding is not based on a determination that [Duke Energy Progress] is authorized to earn a return on the deferred balance of the [coal ash] historical remediation costs as a matter of law. Consequently, even if use of the word "entitled" were precedent setting, in a legislative ratemaking order, which it is not . . . , as the holding is not dependent on the interpretation of the word as the Public Staff reads it, the

Public Staff's concerns are misplaced. In the context of the order taken as a whole, the Commission does not use the word "entitled" in contradistinction with the word "eligible" as the Public Staff reads it, nor, as the Commission stated in its February 23, 2018 order, does the Commission find it necessary to resolve the dispute between [Duke Energy Progress] and the Public Staff as to whether the deferred [coal ash] costs at issue in this case "may" vs. "must" be added to rate base as a matter of law and earn a return. Such determination is not necessary in establishing rates in this case.[10]

### b. Duke Energy Carolinas

On 22 June 2018, the Commission entered an order allowing Duke Energy Carolinas to include $545.7 million, less a $70 million mismanagement penalty, in the cost of service used to establish its North Carolina retail rates; allowing Duke Energy Carolinas to recover a return on the unamortized balance of the deferred coal ash costs; and increasing its residential Basic Facilities Charge from $11.80 to $14.00 per month. In its order, the Commission found as fact that:

> 36.     [Duke Energy Carolinas] shall increase the monthly [Basic Facilities Charge] for the residential rate class (Schedules RS, RT, RE, ES, and ESA) to $14.00. The increase in the [Basic Facilities Charge] for the residential rate class schedules is just and reasonable. The [Basic Facilities Charge] for other rate schedules shall be left unchanged from the current rates.
>
>             . . . .

---

[10] Commissioner Clodfelter dissented from the Commission's clarification order on the grounds that the portions of the rate order to which the Public Staff's motion was directed were the same portions of the order with which he expressed disagreement in his partial dissent. For that reason, Commissioner Clodfelter would have allowed the Public Staff's clarification motion.

66.　[Duke Energy Carolinas] expects to incur substantial costs related to [coal ash] in future years. It is just and reasonable to allow deferral of those costs, with a return at the net-of-tax overall cost of capital approved in this Order during the deferral period. Ratemaking treatment of such costs will be addressed in future rate cases.

. . . .

69.　Since its last rate case, [Duke Energy Carolinas] has become subject to new legal requirements relating to its management of coal ash. These new legal requirements mandate the closure of the coal ash basins at all of [Duke Energy Carolinas'] coal-fired power plants. Since its last rate case, [Duke Energy Carolinas] has incurred significant costs to comply with these new legal requirements.

70.　On a North Carolina retail jurisdiction basis, the actual coal ash basin closure costs [Duke Energy Carolinas] has incurred during the period from January 1, 2015, through December 31, 2017, amount to $545.7 million. [Duke Energy Carolinas] is eligible to recover these coal ash basin closure costs. The actual coal ash basin costs incurred by [Duke Energy Carolinas] are known and measurable, reasonable and prudent, and, to the extent capital in nature, used and useful in the provision of service to the Company's customers. Further, [Duke Energy Carolinas] proposes that these costs be amortized over a five-year period, and that it earn a return on the unamortized balance. Under normal circumstances, the five-year amortization period proposed by [Duke Energy Carolinas] is appropriate and reasonable, and absent any management penalty, should be approved, and under normal circumstances the Commission within its discretion would allow [Duke Energy Carolinas] to earn a return on the unamortized balance.

71.  Under the present facts, a management penalty in the approximate sum of $70 million is appropriate with respect to [Duke Energy Carolinas'] [coal ash] remediation expenses accounted for in the earlier established Asset Retirement Obligation . . . with respect to costs incurred through the end of the test year, as adjusted.  Through its use of available ratemaking mechanisms, the Commission is effectively implementing an estimated $70 million penalty by amortizing the $545.7 million over five years with a return on the unamortized balance and then reducing the resulting annual revenue requirement by $14 million for each of the five years.

72.  [Duke Energy Carolinas] further proposes that it recover on an ongoing basis $201 million in annual coal ash basin closure costs, subject to true-up in future rate cases.  The amount sought by [Duke Energy Carolinas] is based upon its actual test year (2016) spend.  [Duke Energy Carolinas] proposal to recover these ongoing costs as a portion of the rates approved in this [o]rder is not appropriate.  Rather, it is appropriate to allow [Duke Energy Carolinas] to record its January 1, 2018, and future [coal ash] costs in a deferral account until its next general rate case.

In support of these findings, the Commission noted that an increase in the residential Basic Facilities Charge from $11.80 to $14.00 would be "just and reasonable and [would] strike[ ] the appropriate balance [by] providing rates that more clearly reflect actual cost causation" given that "[t]he increase . . . minimizes subsidization and provides more appropriate price signals to customers in the rate class, while also moderating the impact of such increase on low-income customers to the extent that they are high-usage customers such as those residing in poorly insulated manufactured homes."  The Commission further stated that a failure to

"properly recover customer-related cost via a fixed monthly charge provides an inappropriate price signal to customers and fails to adequately reflect cost causation" and that "shifting customer-related cost to kWh energy rate further exacerbates these concerns." The Commission determined that Duke Energy Carolinas' proposal to increase the residential Basic Facilities Charge to $17.79, which reflects approximately fifty percent of the difference between the current rate and the purported $23.78 customer-related cost identified in Duke Energy Carolinas' cost of service study lacked sufficient support in the utility's cost-of-service study and that, while the evidence "would support a higher charge" than $14.00 per month, "cost causation analyses are inherently subjective," so that "selecting a charge within the range advocated [by the parties] based on differing cost causation models [would be] appropriate." After acknowledging the effect that this increase would have upon customers, "especially low-income households," the Commission noted that Duke Energy Carolinas used "other means to address the financial needs of low-income customers which are more effective than biasing the rate design." The Commission left the basic facilities charges applicable to non-residential rate schedules "unchanged" on the grounds that non-residential rate schedules "are more complex" and "allow[ ] for the minimization of cost-subsidization issues" while "ensuring greater consistency with cost causation and allocation principles" and that "a greater amount of fixed costs in the residential rate schedule, as opposed to non-residential rate schedules, presently are recovered through variable energy rates, which is

inconsistent with basic cost allocation principles that fixed costs should be recovered through fixed charges, whereas variable costs should be recovered through variable charges."

The Commission further noted that Duke Energy Carolina's request to defer the costs associated with the remediation of conditions at the existing unlined coal ash basins "was generally unopposed" and had the support of the Public Staff. The Commission also concluded "that deferral in a regulatory asset for previously incurred coal ash environmental costs [was] consistent with the Commission's criteria for deferrals and [was] reasonable" in light of the fact that the costs "were extraordinary when incurred," "were not being recovered in rates in effect at the time incurred," and would be difficult to quantify until a later time, when the costs were better understood.

In the Commission's view, N.C.G.S. § 62-133 "requires the Commission to determine the utility's rate base," which is defined as "the reasonable original cost of the public utility's property used and useful . . . less that portion of the cost . . . recovered by depreciation expense," "its reasonable operating expenses," "and a fair rate of return on the [utility's] capital investment" before multiplying the rate base by the rate of return and adding the operating expenses to produce the utility's "revenue requirement," quoting *Thornburg I*, 325 N.C. at 467 n.2, 385 S.E.2d at 453. The Commission held that, once a utility has demonstrated that "the costs it seeks to recover are (1) 'known and measurable'; (2) 'reasonable and prudent'; and (3) where

included in rate base 'used and useful' in the provision of service to customers," quoting Jonathan A. Lesser & Leonardo R. Giacchino, *Fundamentals of Utility Regulation* 39, 41–43 (Pub. Utils. Reports, Inc., ed., 2007) (Lesser & Giacchino), "the utility should have the opportunity to recover the costs so incurred" in order to avoid "an unconstitutional taking."

The Commission stated that the "seminal treatment of 'reasonable and prudent' costs" was set forth in its 1988 order in Docket Nos. E-2, Sub 537 and E-2, Sub 333, in which it determined that "the standard for judging prudence is 'whether management decisions were made in a reasonable manner and at an appropriate time on the basis of what was reasonably known or reasonably should have been known at the time," with this determination to "be based on a contemporaneous view of the action or decision under question," so that "[p]erfection . . . [was] not [ ] required," and with "[h]indsight analysis—the judging of events based on subsequent developments— . . . not [being] permitted." In the Commission's view, "[a] decision cannot be imprudent if it represents the only feasible way to accomplish a necessary goal," so that, "if expenditures . . . support and provide service to customers, the costs are 'used and useful,' " citing our decisions in *Thornburg II* and *State ex rel. Utilities Commission v. Carolina Water Service*, 335 N.C. 493, 439 S.E.2d 127 (1994) (*Carolina Water*).

In rejecting the Attorney General's contention that Duke Energy Carolinas "bore the burden of quantifying the disallowances [that] the [Attorney General]

deems appropriate" given the utility's alleged "fail[ure] to act appropriately before 2015," the Commission stated that a utility need not "disprove [i]ntervenor allegations unsupported by evidence" and that, on the contrary, "the [Attorney General] must quantify what the costs of the actions not taken should have been." The Commission further concluded that "most of the costs being challenged are questioned on the theory that [Duke Energy Carolinas] is in breach of a standard classified as a 'duty to exercise due care,'" a standard that is more appropriately utilized in the tort context and which environmental regulators and courts of general jurisdiction are better positioned than the Commission to apply. The standard typically employed by the Commission in resolving cost recovery challenges "has elements qualitatively and quantitatively distinct and more rigorous than a tort standard of due care," with the "[t]he expert witnesses sponsored [by the intervenors] in this case" having "failed to show what [Duke Energy Carolinas] should have done differently," "when it should have acted," or "what the cost of such alternative conduct should have been." In the Commission's view, "[a]ttempts to identify years-old hypothetical past costs" would be a "fruitless endeavor" that created an "insurmountable obstacle" to acceptance of the intervenors' positions, particularly given the lack of "statutory or regulatory standards and guidelines to follow" in determining which actions should have been taken. In view of the fact that "[i]ntervenors may not rest merely on arguments and theories" and "must adduce actual evidence challenging some aspect of [Duke Energy Carolinas'] cost recovery

case," the Commission determined that the intervenors had failed to successfully challenge the reasonableness of Duke's coal ash costs.

In addition, the Commission concluded that Duke Energy Carolinas had "met its burden—both the *prima facie* burden of production and the ultimate burden of persuasion"—of demonstrating that its coal ash costs should be included in the cost of service for ratemaking purposes and that it should be allowed to earn a return upon these costs. In reaching this conclusion, the Commission placed substantial reliance upon the testimony of Duke Energy Carolinas witness Jon Kerin, who asserted that Duke Energy Carolinas' historic coal ash management practices "generally comported with industry practices and then-applicable regulations." After noting that Mr. Wittliff had admitted that the costs that Duke Energy Carolinas had incurred in complying with the CCR Rule were prudent, the Commission rejected the Attorney General's contention that Duke Energy Carolinas should not be permitted to include the costs associated with CAMA compliance—a statute which, in the Attorney General's view, required "a more aggressive coal ash basin closure schedule for certain of [Duke Energy Carolinas'] basins than would have been set under the CCR Rule alone"—given that Mr. Wittliff "did not identify any specific costs that could have been lower or should be disallowed" and did not "know quantitatively" which costs would have eventually been required by the CCR Rule and CAMA in the absence of mismanagement "because [he] didn't do that kind of analysis." Furthermore, the Commission determined that there was "no evidence" that Duke

Energy Carolinas' mismanagement was the "direct cause of CAMA"; that, even if it was, "such direct causation alone is not sufficient legal basis for disallowing otherwise recoverable costs" given that CAMA "operates within the context of [N.C.G.S. §] 62-133"; and that, "had [the General Assembly] intended to disavow the routine cost recovery standard, it can be expected that the legislature would have had to do so explicitly."

The Commission rejected the Public Staff's equitable sharing proposal, which was similar to the proposal that it had advocated in the Duke Energy Progress case with the exception of the use of a twenty-seven, rather than a twenty-six year amortization period, for essentially the same reasons that it had cited in rejecting the Public Staff's equitable sharing proposal in that case. According to the Commission, the record contained "[n]o persuasive evidence" that any of the allegedly imprudent actions or inactions "caused discrete expenditures" by Duke Energy Carolinas and that "identification of an imprudent action or inaction is not by itself sufficient; rather, there must be a demonstration of the economic impact."

The Commission further noted that, because the relevant coal ash costs had been covered by investor-supplied, rather than ratepayer-supplied, funds, such funds are, "under principles of equity, law and fairness," "eligible for a return" because to hold otherwise would "deprive[ ]" "the investor supplying these funds . . . of the time value of money," "inadequately compensate [the investor] resulting in an increased risk, and "ultimately increase[e] [Duke Energy Carolinas'] cost of capital." The

Commission held that the extent to which certain costs would, "had they not been accounted for in an [Asset Retirement Obligation] and deferred," have "been operating or other expenses" did not matter given that, once they had been capitalized and deferred, those costs "los[t] for ratemaking purposes the attributes of . . . 'expenses' deemed recoverable through [rates] then in effect that do not qualify for a return." Moreover, the Commission further determined that many of the relevant costs were, "[u]nder any analysis, . . . not expenses but capital items"; that, "[h]ad [Duke Energy Carolinas] not sought establishment of an [Asset Retirement Obligation] and deferral, it is incorrect that they would not have been added" to rate base; and that the Public Staff was "unable" "to support its position that deferred [Asset Retirement Obligation] costs are 'expenses.'" The Commission stated that it was "unnecessary to determine" whether the costs in question would have been eligible for inclusion in rate base in light of ordinary ratemaking principles and concluded that, "[i]n its discretion, as expressly authorized by [N.C.G.S. §] 62-133(d)," it had the authority to allow Duke to earn a return on the unamortized balance of its deferred coal ash costs.

As it had in the related Duke Energy Progress case, the Commission determined that "both GAAP and FERC accounting guidance require the recognition of a liability (the [Asset Retirement Obligation]) upon the requisite triggering event—the legal obligation to retire the [Duke Energy Carolina's] coal ash basins"—and that "[r]ecognition of the liability carries with it recognition of a corresponding asset—the

capitalized cost of settling the liability, which under both GAAP and FERC rules is considered part of the property, plant and equipment for the assets that must be retired." In addition, the Commission concluded, in reliance upon this Court's decision in *VEPCO*, that the costs in question were properly included in rate base as working capital. In view of the fact that the relevant costs were "intended to provide utility service in the present or in the future through achieving their intended purpose," which was "environmental compliance," "the retirement of the ash impoundments," and "the final storage location of the residuals from the generation of electricity," the Commission concluded that the costs associated with the coal ash basins at issue in this case, including those that will close as a result of the CCR Rule and CAMA (with the exception of the high priority sites), "will remain," which means that "they will remain used and useful, because they will still store coal ash, a byproduct of electricity generation."

The Commission disagreed with the Public Staff's determination that $2.1 million in legal expenses associated with the defense of coal ash-related environmental litigation and $1.5 million in groundwater extraction and treatment costs associated with the Belews Creek facility should be disallowed based upon the same reasoning that led the Commission to reach a similar conclusion in the Duke Energy Progress case. The Commission rejected the Public Staff's proposal that the Commission disallow $98 million in compliance costs which the Public Staff contended exceeded the cost of other reasonable alternatives on the grounds that the

testimony of the Public Staff witnesses in support of these proposed disallowances "missed or overlooked pertinent facts and real world conditions," "lack[ed] . . . credibility," and failed to "effectively [ ] support their positions."

The Commission determined that "[t]he vast majority of these costs would have been incurred irrespective of management inefficiency in order to comply with [the CCR Rule] requirements" and "would have been required irrespective of the harms that constitute other alleged mismanagement." The Commission noted that "[Duke Energy Carolinas] undertook steps toward CCR remediation and incurred costs in anticipation of impending closure" while hesitating "to spend substantial sums until the requirements became clearer" and that, "[h]ad [Duke Energy Carolinas] acted in compliance with assertions that it act more aggressively sooner, it would have cost its consumers" more than the costs that resulted from the course of conduct in which it actually engaged. For that reason, the Commission concluded that, "from a ratemaking perspective," "the question of when the remediation should have taken place . . . is not determinative of whether the costs of the remediation should be recovered through rates and to what extent." In view of the fact that "establishing a past cost in this case would be a near impossibility," the Commission declined to penalize Duke Energy Carolinas for its decision to wait until the adoption of the CCR Rule before undertaking the coal ash basis closure process, particularly given that "no attempt ha[d] been made by any party" to determine what the costs would have been if remediation had been undertaken at an earlier time.

Finally, in addressing Duke Energy Carolinas' alleged violations of the 2L Rules, the Commission determined that DEQ "does not agree that the existence of exceedances without evidence that they are caused by coal ash contamination pose[s] a risk to environment or human health so as to require immediate remediation." For that reason, the Commission concluded that Duke Energy Carolinas' "failure to take the costly actions" suggested by the intervenors "falls well short of mismanagement." On the other hand, the Commission determined that a mismanagement penalty in the amount of $70 million was appropriate in this case for reasons similar to those that underlay the imposition of a similar penalty in the Duke Energy Progress proceeding.

Once again, Commissioners Brown-Bland and Clodfelter dissented, in part, from the Commission's decision. As an initial matter, Commissioner Clodfelter stated that he would have disallowed "a substantial amount of [coal ash] costs" in determining Duke Energy Carolinas' cost of service for North Carolina retail ratemaking purposes on the grounds that they had either been imprudently incurred or had not, as the result of the utility's negligence, been included in the cost of service in prior general rate cases. Secondly, Commissioner Clodfelter would have refrained from allowing Duke Energy Carolinas to earn a return on the unamortized balance of the deferred coal ash costs on the grounds that the relevant statutory provisions did not authorize the allowance of such a return and that "the record presented in this case does not and cannot support allowance of a return as a matter of

Commission discretion." Finally, Commissioner Clodfelter opposed the proposed increase in the residential Basic Facilities Charge on the grounds that there was "no evidence in the record to support any such increase" and that the increase "unfairly discriminates among different classes of customers."

Similarly, Commissioner Brown-Bland expressed opposition to the approval of the increased residential Basic Facilities Charge. Aside from her belief that the record did not support the approved increase and that this increase was "unfairly and discriminatorily upon only the residential class of customers," Commissioner Brown-Bland noted that the Commission had arbitrarily chosen "a random number between the two ends offered" by the parties and that the approved residential Basic Facilities Charge "just happen[ed] to be the same as the fixed residential [Basic Facilities Charge] adopted in" the Duke Energy Progress order despite the fact that the two utilities had different cost structures and the fact that Duke Energy Progress' cost of service exceeded that of Duke Energy Carolinas. Commissioner Brown-Bland echoed Commissioner Clodfelter's concerns regarding the Commission's "fail[ure] to engage in the exercise of determining waste coal ash removal costs directly (much less indirectly) attributable to instances of imprudence on [Duke Energy Carolinas'] part," stating that the record "permit[ted] identification and disallowance of specific discrete costs and/or cost increases caused by identifiable and known acts of imprudence" and that the "better course of action" would have been for the Commission to undertake the difficult task of determining which expenses were and

were not prudently incurred instead of "avoid[ing] the exercise" altogether. According to Commissioner Brown-Bland, the Commission's approach resulted in an "arbitrary monetary amount without rational basis" given that "a one-time management penalty does not provide an adequate substitute for the exercise of the Commission's" statutory ratemaking authority.

### 3. Appellate Proceedings

The Attorney General and the Sierra Club noted an appeal to this Court from the Commission's orders in both cases, while the Justice Center, et. al., and the Sustainable Energy Association (collectively, the environmental intervenors) noted an appeal from the Commission's order in the Duke Energy Carolinas proceeding. The Public Staff noted a cross-appeal to this Court from both of the Commission's orders. At the request of all parties, the two cases were consolidated for purposes of briefing and argument by order of this Court.

## II. Substantive Legal Analysis

### A. Standard of Review

In an appeal taken from an order entered by the Commission, "the rates fixed or any . . . order made by the Commission under the provisions of [Chapter 62] shall be *prima facie* just and reasonable." N.C.G.S. § 62-94(e). A reviewing court is limited to "decid[ing] all relevant questions of law, interpret[ing] constitutional and statutory provisions, and determin[ing] the meaning and applicability of the terms of any Commission action." N.C.G.S. § 62-94(b). The reviewing court "may affirm or reverse

the decision of the Commission, declare the same null and void, or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are: (1) [i]n violation of constitutional provisions," "(2) [i]n excess of statutory authority or jurisdiction of the Commission," "(3) [m]ade upon unlawful proceedings," "(4) [a]ffected by other errors of law," "(5) [u]nsupported by competent, material and substantial evidence in view of the entire record as submitted, or (6) [a]rbitrary or capricious," *id.*, with "due account [to] be taken of the rule of prejudicial error." N.C.G.S. § 62-94(c).

The Commission is responsible for determining the weight and credibility to be afforded to the testimony of any witness, including any expert opinion testimony, *State ex rel. Utilities Commission v. Edmisten*, 291 N.C. 575, 584, 232 S.E.2d 177, 182 (1977), with the Commission's decision being entitled to great deference given that its members possess an expertise in utility ratemaking that makes them uniquely qualified to decide the issues that are presented for their consideration. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48, 103 S. Ct. 2856, 2869, 771 L. Ed. 2d 443, 461 (1983) (stating that "[e]xpert discretion is the lifeblood of the administrative process"). "Assuming adequate findings of fact, supported by competent, substantial evidence," "[t]he Commission's determination, reached pursuant to the mandate of [N.C.G.S. §] 62-133 and to the statutory procedural requirements, may not be reversed" even if "we would have reached a different

conclusion upon the evidence." *State ex rel. Utils. Comm'n v. Morgan*, 277 N.C. 255, 266–67, 177 S.E.2d 405, 412–13 (1970). The Commission's conclusions of law, on the other hand, are reviewed *de novo*. *State ex rel. Utils. Comm'n v. N.C. Waste Awareness & Reduction Network*, 255 N.C. App. 613, 615, 805 S.E.2d 712, 714 (2017), *aff'd per curiam*, 371 N.C. 109, 812 S.E.2d 804 (2018).

## B. Coal Ash Costs

The briefs submitted by the parties debate: (1) whether the coal ash costs at issue in these proceedings are properly classified as property used and useful or as operating expenses; (2) whether these costs were reasonably incurred; and (3) whether the Commission's decision to award a return on the unamortized balance of the costs in both of these cases was lawful. We will address each of these issues turn.

## 1. Sufficiency of the Commission's Factual Findings

The Public Staff, the Attorney General, the Sierra Club, and the utilities have advanced a number of arguments for the purpose of challenging the lawfulness of the Commission's decisions regarding the amount of coal ash costs that should be included in the cost of service used to establish the utilities' North Carolina retail rates. However, before we address the parties' substantive arguments, we must address the validity of the Public Staff's contention that, in light of its failure to properly classify the costs at issue in these cases, the Commission's orders fail to contain sufficient findings of fact to satisfy the requirements of N.C.G.S. § 62-79(a) (providing that the Commission's orders must "be sufficient in detail to enable the

court on appeal to determine the controverted questions presented in the proceedings" and "shall include" "[f]indings and conclusions and the reasons or bases therefor upon all the material issues of fact, law, or discretion presented in the record").

In its brief, the Public Staff contends that the Commission made "inconsistent," "contradictory," and "mutually exclusive" conclusions concerning whether the utilities' coal ash-related costs constituted property "used and useful" upon which a return could be earned in accordance with N.C.G.S. § 62-133(b) or deferred operating expenses upon which, in the Public Staff's view, a return could be earned in the Commission's discretion pursuant to N.C.G.S. § 62-133(d). According to the Public Staff, the Commission's inconsistent reasoning "makes it impossible to know the true basis for the decision to deny equitable sharing and allow a return on coal ash costs." In addition, the Public Staff contends that the Commission erroneously determined in the Duke Energy Progress order that, even without a determination of the nature of the relevant coal ash costs, a return could be earned upon them as a matter of law or, in the alternative, in the exercise of the Commission's discretion pursuant to N.C.G.S. § 62-133(d) given that this decision did not constitute a proper "exercise of discretion" and was nothing more than "a mechanism to circumvent judicial review." Moreover, the Public Staff argues that the Commission contradicted itself in the clarification order that it entered in the Duke Energy Progress case, in which it stated that its decision to allow a return upon the unamortized balance of the relevant coal

ash costs rested upon an exercise of the Commission's discretion pursuant to N.C.G.S. § 62-133(d), and had committed a similar error in the Duke Energy Carolinas order by deciding to allow a return upon the unamortized balance of the deferred coal ash costs on the grounds that, "to the extent" that the costs in question constituted capital expenditures, they amounted to property that was "used and useful" for purposes of N.C.G.S. § 62-133(b)(1) and that it had the authority to authorize the utility to earn a return upon the remaining coal ash-related costs pursuant to N.C.G.S. § 62-133(d). According to the Public Staff, treating the unamortized balance of the deferred coal ash costs as both property used and useful and as reasonable operating expenses constitutes "a direct violation of the ratemaking process," quoting *State ex rel. Utilities Commission v. Public Staff*, 333 N.C. 195, 202, 424 S.E.2d 133, 137 (1993) (*Carolina Trace*). In response, the utilities argue that "this distinction is essentially academic" and "is not material to the outcome of this appeal."

The language in which the traditional ratemaking formula set forth in N.C.G.S. § 62-133(b) is couched has led the parties to raise a number of issues concerning how the coal ash costs at issue in these cases should be classified for ratemaking purposes. The Commission resolved the classification issue in the Duke Energy Progress case by deciding, in its discretion, that it had the authority to allow the utility to earn a return upon the unamortized balance of the relevant coal ash costs pursuant to either N.C.G.S. § 62-133(b)(1) or N.C.G.S. § 62-133(d) and by deciding in the Duke Energy Carolinas case that, regardless of whether the relevant

coal ash costs constituted property "used and useful or operating" expenses, it had the authority to allow the company to earn a return upon the unamortized balance of those costs pursuant to N.C.G.S. § 62-133(d). In view of the fact that "[t]he purpose of the findings required by [N.C.G.S.] § 62-79(a) is to provide the reviewing court with sufficient information to allow it to determine the controverted questions presented in the proceedings," *State ex rel. Utilities Commission v. Conservation Council of North Carolina*, 312 N.C. 59, 62, 320 S.E.2d 679, 682 (1984), and the fact that we are able discern the nature and extent of the Commission's decision from its findings and conclusion, we hold that the Commission's findings in both orders are sufficiently specific to satisfy the requirements of N.C.G.S. § 62-79(a).

## 2. Reasonableness of the Costs

The Attorney General[11] argues that "utilities have the burden to show that their costs were reasonably incurred," citing N.C.G.S. §§ 62-75 and 134(c), and asserts that, once another party has offered "affirmative evidence . . . that challenges the reasonableness of [the utility's] expenses," quoting *Conservation Council*, 312 N.C. at 64, 320 S.E.2d at 683, "the utility must prove that its costs were reasonably incurred." As a precondition for the inclusion of any particular cost in the regulated cost of service, the Attorney General contends that the utility must show that the costs in

---

[11] The Sierra Club "adopts and incorporates by reference" the arguments advanced by the Attorney General relevant to the reasonableness of the utilities' coal ash-related costs, as will be discussed in more detail below.

question are "known and measurable" and "reasonable and prudent," citing N.C.G.S. § 62-133(b)(1) and *Thornburg I*.

In the Attorney General's view, the Commission erred by concluding that the intervenors had failed to adequately challenge the reasonableness of the costs at issue in these cases. According to the Attorney General, the intervenors presented affirmative evidence demonstrating that the utilities had, for decades, unreasonably placed coal ash in unlined basins, resulting in "nearly 6000 test results that showed violations of 2L [R]ules." The Attorney General argues that such violations "could have been prevented" given that the utilities "[have known] for years how to stop [their] ash from contaminating groundwater: putting the ash in *lined* landfills, as opposed to unlined ponds," and that, by failing to act upon the basis of such "insights," the utilities had incurred costs which "could have [been] avoided," such as the cost of excavating coal ash that "could have already [been] put in lined landfills years earlier" and transporting such coal ash to off-site landfills.

In addition, the Attorney General asserts that the record contains evidence tending to show that the utilities had failed to manage their unlined coal ash basins in a reasonable manner so as to "eventually result[ ] in the spill at [the] Dan River plant" and the enactment of CAMA, which was introduced a mere three months after the Dan River spill and "singles out" the coal ash basins associated with the utilities' coal-fired generating facilities for accelerated closure. According to the Attorney General, the enactment of "CAMA caused [the utilities] to incur costs that [they]

would not otherwise have incurred, such as the cost of complying with CAMA's basin-closure deadlines." The Attorney General asserts that the Commission *agreed* that Duke Energy Carolinas' mismanagement of the coal ash basins at its Dan River plant contributed to the enactment of CAMA before stating that it was unable to "precisely 'identify and quantify' how many of [the utilities'] costs were unreasonable," with this "inconclusiveness mean[ing] that [the utilities] did not meet [their] burden to show that [the] costs were reasonable," citing *State ex rel. Utilities Commission v. Duke Power Co.*, 285 N.C. 377, 389, 206 S.E.2d 269, 277–78 (1974) (*Duke Power Co. I*).

The Attorney General further contends that, although the evidence elicited by the intervenors was "more than enough to require [the utilities] to prove that [they] incurred [their] coal ash costs reasonably," the Commission erroneously required the intervenors to "identify specific and discrete instances of imprudence"; "identify prudent alternatives to the [utilities'] actions"; and "quantify the precise economic effect of the [utilities'] imprudence" before determining that the intervenors had failed to satisfy this standard. In spite of the fact that the standard upon which the Commission relied "flowed from this Court's decision" in *Thornburg II*, the Attorney General asserts that the costs in question in that case had been developed by an independent auditor assigned to scrutinize the challenged utility costs with the agreement of the utility and the Public Staff and had not been used to determine whether other intervenors had adduced sufficient evidence to require the utility to

affirmatively establish the reasonableness of the costs that it sought to have included in the regulated cost of service.

The Attorney General argues that the Commission committed various errors in determining that the utilities had managed their coal ash basins in a reasonable manner. The Attorney General cites *Glendale Water*, 317 N.C. at 40–41, 343 S.E.2d at 907–08, for the proposition that "breaking environmental laws is unreasonable," arguing that the Commission had improperly failed to acknowledge that the utilities had committed thousands of documented "violations of the 2L [R]ules" based upon an erroneous determination that an exceedance of limitations specified in the 2L Rules does "not [constitute] proof of illegality" and that the "2L [R]ules are violated only when a polluter fails to clean up contaminated groundwater." In the Attorney General's view, an exceedance for the purpose of the 2L Rules, which he describes as "strict liability regulations," citing *Rudd v. Electrolux Corp.*, 982 F. Supp. 355, 365 (M.D.N.C. 1997), results in a violation of 15A N.C. Admin. Code 2L.0103(d) (stating that"[n]o person shall conduct . . . any activity which causes the concentration of any substance" in groundwater to exceed the limitations set out in the 2L Rules).

The Attorney General asserts that the Commission's conclusion that it "lack[ed] authority to assess independently whether a utility has acted unreasonably by breaking the law" given that the utilities had neither admitted to violating nor had been found in violation of the 2L Rules constituted an "erroneous[ ] abdicat[ion] [of] its dut[ies]" pursuant to N.C.G.S. §§ 62-133(b)(3), (c), citing *State ex rel. Utilities*

*Commission v. N.C. Power*, 338 N.C. 412, 419–22, 450 S.E.2d 896, 900–02 (1994); *Carolina Water*, 335 N.C. at 503, 439 S.E.2d at 132; *State ex rel. Utilities Commission v. Edmisten*, 291 N.C. 451, 464, 232 S.E.2d 184, 191–92 (1977). According to the Attorney General, the only reason that the utilities were not found to have violated the 2L Rules was the enactment of CAMA, which resulted from the utilities' mismanagement of their coal ash basins and obviated the necessity for the environmental regulators to determine whether violations had occurred as long as the utilities complied with CAMA and the applicable implementing regulations.

In the Attorney General's view, the mismanagement penalties imposed upon the utilities were not adequate "substitute[s]" for a disallowance of challenged coal ash costs given that the Commission's authority to sanction a utility for mismanagement "is distinct from the Commission's duty under [N.C.G.S. §] 62-133(b)(3) to protect consumers by disallowing costs that are not reasonable." On the contrary, the Attorney General argues that "a utility's misconduct can serve as a basis *both* for penalizing the utility *and* for separately reducing rates on other statutory grounds," citing *State ex rel. Utilities Commission v. General Telephone Co.*, 285 N.C. 671, 684, 208 S.E.2d 681, 698 (1974).[12]

---

[12] The Attorney General also argues that the Commission's mismanagement penalties against both utilities were "illusory" given that they "simply reduced a return that [the utilities] never should have received in the first place."

Similarly, the Public Staff argues that the Commission failed to adequately consider certain environmental violations in determining the reasonableness and prudence of the utilities' costs for North Carolina retail ratemaking purposes. After referencing the disallowances that it had proposed relating to groundwater extraction and treatment costs at the Sutton and Belews Creek facilities, the Public Staff argues that the Commission erred by failing to adequately consider the record evidence concerning these and other environmental violations and by failing to make findings and conclusions relating to that evidence in violation of N.C.G.S. § 62-79(a)(1). More specifically, the Public Staff contends that the record contained ample evidence that the utilities had committed environmental violations, with that evidence including: (1) the testimony of certain Public Staff witnesses that the costs to remediate off-site groundwater contamination at the Sutton and Belews Creek facilities would not have been incurred *but for* the environmental violations"; (2) the text of a settlement agreement between DEQ and the utilities in which the latter agreed to remediate "offsite groundwater impacts" at the Sutton facility "consistent with 15A [N.C. Admin. Code §] 2L.106"; (3) groundwater monitoring data provided by Duke Energy Progress; (4) testimony by Mr. Wells and Duke Energy Carolinas witness Julius A. Wright that certain extraction and treatment costs were the direct result of environmental violations; (5) a Notice of Violation issued to Duke Energy Progress by DEQ asserting that the utility had committed environmental violations; (6) a DEQ press release announcing that Duke Energy Progress was being held accountable for

coal ash-related groundwater pollution by means of a settlement agreement; and (7) the text of the Joint Factual Statement signed by Duke Energy Progress in the federal criminal case "acknowledg[ing]" certain environmental impacts of the Sutton facility on a nearby community. According to the Public Staff, the Commission failed to make the required findings and conclusions concerning the extent to which environmental violations had occurred on the grounds that such findings would be inappropriate "in the absence of a guilty finding against the [utilities] or an admission of guilt by the [utilities]," with the Commission's decision to "simply defer[ ] to another state agency on a matter that relates to an issue properly before the Commission," citing *Carolina Trace* and *State ex rel. Utilities Commission v. Cooper*, 366 N.C. 484, 489–91, 494–95, 739 S.E.2d 541, 545–48 (2013) (*Cooper I*), constituting a failure to comply with the relevant ratemaking statutes.

The Public Staff contends that the Commission also erred by concluding that CAMA would have required groundwater extraction and treatment at the Sutton and Belews Creek facilities regardless of the extent to which environmental violations had actually occurred at those locations. In the Public Staff's view, exceedances of the limitations set out in the 2L Rules become violations pursuant to 15A N.C. Admin. Code § 02L.0106 only if their existence was the fault of the utility, with the utility only being required to perform "corrective action" or "remediation" in the event that the exceedance constitutes a violation. As a result, the Public Staff contends that, to the extent that the utilities were required to extract and treat groundwater that was

contaminated as the result of an exceedance, those costs would not have otherwise been required pursuant to CAMA and should not be recouped in rates.

In response, the utilities argue that the correct legal standard for purposes of determining the reasonableness and prudence of costs pursuant to N.C.G.S. § 62-133(b) is the one that the Commission articulated in its 1988 order in Docket Nos. E-2, Subs 333 and 537, and that this Court upheld in *Thornburg II*, which focuses upon "whether management decisions were made in a reasonable manner and at an appropriate time on the basis of what was reasonably known or reasonably should have been known at the time." In addition, the utilities assert that, "[e]ven if there is evidence in the record" that rebuts the presumption that the coal ash costs at issue in these cases had been reasonable and prudently incurred, they had elicited "substantial" and "compelling" evidence demonstrating that: (1) they "had managed [their respective] coal ash basins in the manner required by applicable regulations and consistent with industry standards prior to the promulgation of the CCR Rule and the enactment of CAMA"; (2) "the change in law wrought by the CCR Rule and CAMA caused [them] to manage coal ash differently"; (3) "[they] prudently and at reasonable cost conformed [their] practices to the new legal requirements"; and (4) no intervenor had "specif[ied] how the Compan[ies] should have acted differently in managing [their] coal ash, at which sites it should have taken those actions, and how much those actions would have cost the [utilities]." In view of the fact that the Commission found in their favor with respect to this issue, the utilities argue that

the task of a reviewing court is "not to determine whether there is evidence to support a position the Commission did not adopt" but, instead, to determine "whether there is substantial evidence, in view of the entire record, to support the position that the Commission *did* adopt," quoting *State ex rel. Utilities Commission v. Eddleman*, 320 N.C. 344, 355, 358 S.E.2d 339, 347 (1987).

Similarly, the utilities argue that the Attorney General "did not and could not allege that [they] had committed any act of imprudence related to the actual costs being sought for recovery in the proceedings before the Commission given that Mr. Wittliff, an expert witness testifying on behalf of the Attorney General, had stated that the relevant costs had been reasonably and prudently incurred and had failed to "identify any specific costs that could have been lower or should be disallowed." The utilities assert that the Attorney General's contention that they should have installed liners at their unlined coal ash basins before being required to do so "put [them] in an impossible position" given that any such action "could have been called into question" as "premature" prior to a complete understanding of the applicable environmental requirements. In addition, the utilities contend that the Attorney General's claim that they had the burden of disproving the appropriateness of the proposed cost disallowances constituted a "remarkable position" unsupported by any legal authority. Finally, the utilities dispute the validity of the Attorney General's contention that, since imprudent action on the part of Duke Energy Carolinas "caused the enactment of CAMA," the cost of complying with CAMA should be excluded from

the cost of service for ratemaking purposes on the grounds that "legislative intent can only be determined from the legislation itself," citing *Electric Supply Co. of Durham v. Swain Electrical Co.*, 328 N.C. 651, 657, 403 S.E.2d 291, 295 (1991), and *Styres v. Phillips*, 277 N.C. 460, 472, 178 S.E.2d 583, 590 (1971), and that no such intent can be discerned from an examination of the relevant statutory provisions.

According to the utilities, the Commission was free to reject the remaining prudence challenges raised by the Public Staff as well. For instance, the utilities contend that the Commission properly determined that a number of the Public Staff's disallowance recommendations were "infected by hindsight" and "unfeasible" and that a settlement agreement with an environmental regulator was not tantamount to an admission of liability. In the utilities' view, the Commission addressed the Public Staff's evidence concerning alleged environmental violations without "erroneously abdicat[ing] its duty to assess whether illegal conduct is unreasonable and disallow costs related to illegal conduct." In fact, the utilities assert that the Commission "expressly rejected" the Public Staff's proposed disallowances after giving "careful[ ] consideration" to the relevant evidence.

In spite of the fact that North Carolina utilities have the burden of proving that the costs upon which their rates are based are reasonable and prudent, the reasonableness and prudence of those costs is "presumed" unless the Commission or an intervenor adduces sufficient evidence to cast doubt upon their reasonableness or prudence, at which point the burden to make an affirmative showing of the

reasonableness of the costs in question shifts to the utility. *State ex rel. Utils. Comm'n v. Intervenor Residents of Bent Creek/Mt. Carmel Subdivisions,* 305 N.C. 62, 76, 286 S.E.2d 770, 779 (1982) (*Bent Creek*). In order to satisfy this burden of production, an intervenor must offer affirmative evidence tending to show that the expenses that the utility seeks to recover "are exorbitant, unnecessary, wasteful, extravagant, or incurred in abuse of discretion or in bad faith or that such expenses exceed either the cost of the same or similar goods or services on the open market or the cost similar utilities pay to their affiliated [utilities] for the same or similar goods or services." *Id.* at 76–77, 286 S.E.2d at 779. If a utility expense is "properly challenged," "[t]he Commission has the *obligation* to test the reasonableness of such expenses." *Id.* at 76, 286 S.E.2d at 779. In addition, "[i]f there is an absence of data and information from which either the propriety of incurring the expense or the reasonableness of the cost can readily be determined, the Commission may require the utility to prove their propriety and reasonableness by affirmative evidence." *Id.* at 75, 286 S.E.2d at 778.

The essential thrust of the intervenors' challenge to the validity of the Commission's determination with respect to the reasonableness of the utilities' coal ash costs varies from one party to the other. On the one hand, the Attorney General's "reasonableness" argument rests upon the existence of evidence tending to show that the utilities should have begun to eliminate the use of unlined coal ash basins earlier than they actually did. On the other hand, the Public Staff's "reasonableness" argument rests upon those portions of the record that depict specific instances of what

the Public Staff contends to be environmental non-compliance. We do not find either of these arguments persuasive given the state of the record and the findings and conclusions contained in the Commission's orders.

In addressing the Attorney General's contention that the utilities unreasonably polluted groundwater in violation of the 2L Rules by placing coal ash in unlined basins, the Commission found the testimony of Mr. Wells to be instructive in the Duke Energy Progress order. Mr. Wells testified that the utilities' "ash basins were built between 1956 and 1985" and that, "[a]t that time, unlined basins were the primary technology for treating ash transport water throughout the country." In addition, Mr. Wells noted that "[i]nitially, ash basins were not regulated under federal or state solid waste laws"; that "[u]tility surface impoundments eventually became regulated as wastewater treatment units under the Clean Water Act after it was significantly reorganized and expanded in 1972"; and that DEQ's predecessor promulgated the 2L Rules in 1984. According to Mr. Wells, "there was no obligation in the 2L [R]ules to *monitor* groundwater quality," with those rules only imposing an obligation "to take corrective action once exceedances had been identified." As a result, according to Mr. Wells, Duke Energy Progress "was under no universal obligation to monitor for groundwater impacts" associated with coal ash basins pursuant to the 2L Rules. Mr. Wells testified that, in the mid-2000s, Duke Energy Progress "began more comprehensively sampling groundwater resulting in the identification of more exceedances" while DEQ "began systematically adding

groundwater to NPDES permits as they were reissued or modified" starting around 2008. Based upon this and similar evidence, the Commission rejected the intervenors' assertions that the utilities should have begun the coal ash remediation process prior to the adoption of the CCR Rule and the enactment of CAMA, a decision that was well within the scope of its statutory authority in light of the record evidence.

Similarly, in rejecting the Attorney General's argument that Duke Energy Progress had failed to satisfy evolving industry standards and should have done more than merely comply with the environmental regulations as they existed at the time, the Commission noted that Mr. Wittliff, who presented testimony on behalf of the Attorney General, had testified that "industry standard is compliance." Although Mr. Wittliff admitted that "there were a number of [utilities] that were doing exactly what [Duke Energy Progress] did," he also stated that "it was clear in the '80s that the trend was towards lined ponds" and that, by 1988, forty percent of coal ash basins had been lined even though that approach was not "a cheap solution" and could "be fairly pricy." Upon being pressed to identify "any other ways that [Duke Energy Progress] did not comply with industry standards," Mr. Wittliff reiterated his emphasis upon the necessity for compliance with the requirements of its NPDES permits and then stated that "that's where I would leave it." As a result, we hold that the Commission's determination that the Attorney General had failed to adduce sufficient evidence to rebut the presumption that Duke Energy Progress' coal ash costs were reasonably and prudently incurred on the grounds that it should have

begun using lined coal ash basins earlier than it did had adequate evidentiary support.[13]

The Commission relied heavily on the testimony of Mr. Kerin in addressing a similar issue in the Duke Energy Carolinas proceeding. Mr. Kerin testified that, "[u]ntil recently, coal has been the historic 'go-to' fuel choice for base-load, least-cost reliable service," with the industry standard being the use of unlined basins for the purpose of storing coal ash. Mr. Kerin stated that, "from 1974 to 2015, ash basins were a lawful and effective way of meeting the wastewater treatment requirements under the [Clean Water Act]" and "[had] been effective at treating wastewater to meet NPDES permit limits." For that reason, Mr. Kerin asserted that, "[i]n the absence of any regulatory directive to do so, [Duke Energy Carolinas] reasonably did not pursue and should not have pursued regulatory closure or retrofitting for any site that was still generating ash and that maintained its NPDES permit." At the time that the CCR Rule was promulgated and CAMA was enacted, Duke Energy Carolinas began preparing to comply with the new requirements.

---

[13] The fact that the record contains evidence that it would have been advisable for a utility to have taken specific action relating to a particular generating facility at an earlier time than that action was actually taken does not require us to make a different decision with respect to the "reasonableness" issue. Aside from the fact that evidence relating to a specific generating facility has no logical relation to the reasonableness of costs incurred at other facilities and would not, for that reason, support a finding that the utility's coal ash costs, considered in their entirety, were unreasonable, the ultimate question raised by such evidence is simply whether the utility should have made a different policy-based decision than the one that it actually made. As has been discussed in the text of this opinion, the Commission adequately addressed this policy-related "reasonableness" issue in its order in these cases.

In rebutting Mr. Wittliff's contention that the number of lined basins had been increasing by 1988 and 1999, Mr. Kerin testified that Duke Energy Carolinas last constructed a new coal ash basin in 1982. In addition, Mr. Kerin stated that, "while [Mr. Wittliff had] cite[d] an increase in the percentage of basins that were lined from 17 to 28 percent between 1975 and 1995, that [figure] still represents a minority of the new basins being constructed that were lined." In response to Mr. Wittliff's suggestion that Duke Energy Carolinas should have built new lined impoundments to store its coal ash, Mr. Kerin stated that this suggestion "ignores the fact that the construction of new lined impoundments would have entailed significant expense to [Duke Energy Carolinas], while not removing the need to maintain the existing unlined impoundments." In Mr. Kerin's opinion, acting on the basis of Mr. Wittliff's suggestion "before [such measures] [were] consistent with industry standards" "would have put [Duke Energy Carolinas] at risk of disallowance of those costs." Mr. Kerin also pointed to Mr. Wittliff's testimony in the Duke Energy Progress case in which he responded in the negative when asked if Duke Energy Progress had acted imprudently when it began sluicing coal ash to unlined impoundments in view of the fact that "[t]he law allowed them to do it, and the law continued to allow them to do it, even though there was . . . concern." As a result, the record contains ample evidentiary support for the Commission's determination in the Duke Energy Carolinas proceeding that the intervenors had failed to elicit sufficient evidence to satisfy the burden of production imposed upon them in *Bent Creek*.

In spite of the fact that, as the Commission put it, the utilities' actions constituted "at least a contributing factor" to enactment of CAMA, we are unable to hold that, as a matter of law, utility mismanagement constituted the "primary cause of CAMA" or that "CAMA would not have been passed or that its requirements other than accelerated deadlines would have been less onerous but for [the utilities'] mismanagement." As this Court has stated on many occasions, "the cardinal principle of statutory construction is that the words of the statute must be given the meaning which will carry out the intent of the Legislature" and that the legislative "intent must be found from the language of the act, its legislative history and the circumstances surrounding its adoption which throw light upon the evil sought to be remedied." *Milk Commission v. Food Stores*, 270 N.C. 323, 332–33, 154 S.E.2d 548, 555 (1967). CAMA simply does not contain any language from which we can determine that the General Assembly's decision to enact its provisions stemmed from mismanagement on the part of either utility. Had the General Assembly wished to make such a statement, it certainly could have done so. As a result, we are unable to accept the Attorney's General invitation to require the disallowance of all of the coal ash-related costs at issue in these proceedings on the grounds that they necessarily resulted from utility imprudence.

We reach a similar conclusion with respect to the more nuanced "reasonableness" argument advanced in the Public Staff's brief. As the record reflects, Public Staff witness Jay Lucas testified in the Duke Energy Progress case,

even though "some environmental violations are clearly due to [Duke Energy Progress'] negligence or mismanagement, there are other actual and potential environmental violations that are not easily characterized as either plainly imprudent or plainly reasonable on [Duke Energy Progress'] part." In Mr. Lucas' view, any attempt to calculate the incurred costs associated with environmental violations "could be extremely complex and somewhat speculative" given that doing so would involve "a lot of estimations and assumptions over a long period of time, leaving doubts about accuracy." For this reason, the Public Staff concluded that, despite the fact that "there is some degree of [Duke Energy Progress] culpability for costs" "due to non-compliance with environmental violations," for "most" of the costs at issue in that case, such culpability "may fall short of imprudence." In light of this set of circumstances, the Public Staff advanced its equitable sharing proposal rather than attempting to contest the reasonableness and prudence of most of the coal ash-related costs that are at issue in these cases.

The "reasonableness" test enunciated by this Court in *Bent Creek* focuses upon whether the challenged utility costs were "exorbitant, unnecessary, wasteful, extravagant, or incurred in abuse of discretion or in bad faith or that such expenses exceed either the cost of the same or similar goods or services on the open market or the cost similar utilities pay to their affiliated [utilities] for the same or similar goods or services." *Bent Creek*, 305 N.C. at 76–77, 286 S.E.2d at 779. As a result, the required legal analysis is clearly focused upon the extent to which specific costs that

the utility seeks to utilize in establishing its North Carolina retail rates are excessive rather than upon general policy questions of the sort that underlie the Attorney General's broad-based "reasonableness" argument. We have no hesitation in recognizing that it would be difficult, if not impossible, to quantify, in even the most general sense, the costs which the utilities would have incurred had they handled the coal ash stored at their facilities in a manner that differed from what they actually did or if specific alleged environmental violations had not occurred. As the testimony of Mr. Lucas suggests, the Public Staff placed principal reliance upon its "equitable sharing" proposal for this very reason. However, with the exception of the Public Staff's suggested disallowances relating to costs incurred at the Sutton and Belews Creek facilities, we are compelled to agree with the Commission that the intervenors failed to identify and quantify the specific costs that should have been disallowed as unreasonable and imprudently incurred in these cases. In the absence of such evidence, we cannot say that the Commission erred by holding that the intervenors had failed to make a sufficient showing to require the utilities to demonstrate the reasonableness and prudence of their coal ash-related costs in detail.

### 3. Return on the Unamortized Balance

The Public Staff argues that, in order for costs to be includable in rate base and eligible to earn a return, those costs must be for "used and useful" property, which "primarily means 'utility plant' that consists of long-lived physical assets used to provide utility service" and is "largely funded by capital investment," including "brick

and mortar buildings, generators and turbines, poles, meters, and conductors such as transmission, distribution, and service wires that carry electricity from generators to customers." Similarly, the Attorney General argues that the concept of "property" involves "the rights in a valued resource such as land, chattel, or an intangible," and includes "[a]ny external thing over which the rights of possession, use, and enjoyment are exercised," quoting *Property*, BLACK'S LAW DICTIONARY 1410 (10th ed. 2014). Although the Public Staff points out that working capital "has been judicially accepted as an intangible form of 'property' " that may be appropriately included in rate base, citing *VEPCO*, 285 N.C. at 414–15, 206 S.E.2d at 295–96, the Attorney General contends that working capital may only be included in rate base where it "qualifies as used and useful," so that all working capital does not necessarily qualify for inclusion in rate base, citing *Morgan*, 277 N.C. at 273, 117 S.E.2d at 417; *Thornburg II*, 325 N.C. at 486, 385 S.E.2d at 464; *Carolina Water*, 335 N.C. at 507, 439 S.E.2d at 135, given that "this Court has never recognized any exceptions to the 'used and useful' requirement" and that "there is no working-capital exception" or any exception "for funds supplied by investors" to the definition of "rate base" embodied in N.C.G.S. § 62-133(b)(1).

According to the Public Staff, property is "used and useful" if it is "in service for the production or delivery of utility service," citing *Carolina Water*, and is not "excess or overbuilt for the needs of current customers" so as to be "greater than necessary to provide service even if it is being used," citing *Carolina Trace*. In the

same vein, the Attorney General contends that property is not used and useful if it is not used to provide *current* service or has been abandoned, citing *Carolina Trace* and *Carolina Water*. On the other hand, the Public Staff contends that costs that are properly categorized as operating expenses, rather than as property "used and useful," include "payments for goods or services that are consumed at or close to the time payment is made," "the depreciation of used and useful property at a rate corresponding to its useful life," and "income tax expense." Among other things, the Public Staff points out that operating expenses include "wages, salaries, fuel, maintenance, advertising, research and charitable contributions" and "annual charges for depreciation and operating taxes," quoting Charles F. Phillips, Jr., *The Regulation of Public Utilities 177* (1993). On the basis of similar logic, the Attorney General asserts that costs such as dewatering coal ash basins, treating contaminated water from coal ash basins, excavating coal ash, and putting excavated coal ash in landfills constitute operating expenses rather than the cost of property "used and useful." Although both of them agree that the utilities are entitled to earn a return on the reasonable original cost of "used and useful" property, the Public Staff and the Attorney General differ with respect to the issue of whether the Commission possesses the authority to award a return on deferred operating expenses.

In arguing that the Commission has the statutory authority to allow a utility to earn a return on the unamortized balance of costs that would ordinarily be categorized as operating expenses, the Public Staff suggests that N.C.G.S. § 62-133(d)

allows the Commission, in the exercise of its discretion, to allow utilities to earn a return upon such costs, citing *Thornburg I* and *State ex rel. Utilities Commission v. Carolina Utility Customers Ass'n*, 348 N.C. 452, 458–59, 500 S.E.2d 693, 698–99 (1998) (*CUCA*). In the Public Staff's view, this Court's decisions in *Thornburg II*, *Carolina Trace*, and *Carolina Water* do not deprive the Commission of the right to allow a utility to earn a return upon the unamortized balance of deferred operating expenses given that "the extent of [N.C.G.S. §] 62-133(d) discretion does not appear to have been an issue directly before the Court in those cases." As a result, the Public Staff contends that the discretion granted by N.C.G.S. § 62-133(d) provides a separate basis for allowing a utility to earn a return on the unamortized balance of deferred operating expenses as long as the Commission considers all relevant facts and circumstances, including whether certain costs should be disallowed and as long as the Commission's order complies with the findings requirement enunciated in N.C.G.S. § 62-79(a) and reflects "a logical sequence of evidence supporting findings that in turn support conclusions."

The Attorney General, on the other hand, argues that "North Carolina law makes clear that the Commission has no discretion to give [a return on costs which are] not used and useful for providing service to customers now or within a reasonable time," citing *Carolina Trace, Carolina Water, and Thornburg II*. After acknowledging that N.C.G.S. § 62-133(d) "gives the Commission discretion on certain other issues," the Attorney General argues this "discretion . . . does not extend to the makeup of a

utility's rate base," "is not a grant to roam at large in an unfenced field," quoting *State ex rel. Utilities Commission v. Public Service Co.*, 257 N.C. 233, 237, 125 S.E.2d 457, 460 (1962), and "is not nearly as broad as the discretion the Commission purported to exercise" in these cases.

According to both the Public Staff and the Attorney General, the Commission failed to determine which coal ash-related costs were properly characterized as property used and useful and which should be treated as deferred operating expenses.[14] In the Public Staff's view, "[t]he record evidence shows that coal ash costs at issue in this case are largely in the nature of operating expenses" given that they consist of costs "associated with operating, maintaining, and upgrading environmental equipment," with the Commission, in the words of Commissioner Clodfelter's dissent, having "lump[ed] all tasks, all waste units, all time periods, and all plants together and allow[ed] a return on the expenditures without further qualification." Although the Commission provided an example of a cost that was properly considered capital in nature, consisting of the cost of the landfill constructed by Duke Energy Progress at the Sutton facility, the Public Staff contends that this "isolated example . . . does not support a universal conclusion that all [coal ash-related] costs are capital costs" and argues that costs associated with inspections,

---

[14] The Public Staff notes that, in the Duke Energy Progress order, the Commission concluded that all closure costs were property "used and useful," while it concluded in the Duke Energy Carolinas order that some closure costs related to property "used and useful" without specifying which costs fell into which category.

maintenance, well sampling, coal ash processing, "[d]ewatering, excavation, transport, and offsite disposal at another company's facility are on their face operational activities" rather than "investments in plant or facilities used or useful to provide electric service to present and future customers."[15]

Similarly, the Attorney General argues that the costs associated with the closure of the unlined coal ash basins "mainly involve preparing closure plans for coal-ash impoundments, treating contaminated groundwater, excavating coal ash, transporting it to landfills, and disposing of it." According to the Attorney General, the Commission and the utilities both recognized that "a significant portion" of their coal ash costs consisted of operating expenses. After failing to "explain its reasons for concluding that [the utility's] coal-ash costs are used and useful" in the Duke Energy Progress order, the Attorney General contends that the Commission erred by determining in the Duke Energy Carolinas order that the relevant costs were "used and useful" given that those costs were associated with "property [which] might have been used and useful for past service" rather than property that was "used and useful" in providing current service. According to the Attorney General, nine of the utilities' sixteen coal-fired electric generating facilities had been retired by the time that the applications in these cases were filed, with "more than half" of the costs that the

---

[15] The Public Staff also notes that, in the Duke Energy Progress proceeding, the utility failed to "itemize the costs in any detail" and that "this lack of detail alone means there is not substantial evidence in the record for the Commission to decide that *all* the coal ash costs are 'property used and useful.'"

utilities sought to include in cost of service in these cases being related to retired generating facilities. Moreover, the Attorney General contends that many of the costs relating to facilities that continue to operate are used to store coal ash which was created "years or decades ago" or to coal ash ponds that "have been closed for years."

The Attorney General argues that the Commission's orders reflect a "confus[ion]" about the nature of the applicable legal standard and a failure to distinguish between the legal principles applicable to the inclusion of operating expenses, which must merely be reasonable, and costs associated with "used and useful" property, which must satisfy a higher legal standard, in the cost of service used to establish the utilities' rates, citing *Thornburg II*, 325 N.C. at 493, 385 S.E.2d at 468. In other words, the Attorney General argues that, even "reasonable" costs may not be included in rate base if they were not expended to procure property "used and useful" in providing current service. *Id.*

The Attorney General[16] and the Public Staff[17] both take issue with the Commission's determination that some or all of the relevant coal ash-related costs constituted working capital. According to the Public Staff, Duke Energy Progress

---

[16] According to the Attorney General, it is "[un]clear whether the Commission actually concluded that [the utilities'] coal-ash costs were working capital."

[17] The Public Staff disputed the validity of the Commission's determination that no party challenged the inclusion of coal ash costs in "working capital" given that its equitable sharing proposal, "which depends on no return for unamortized coal ash costs," is "legally incompatible" with treating the relevant costs as working capital and that Public Staff witness Michael A. Maness testified in the Duke Energy Carolinas proceeding that labeling the relevant costs in that manner did not convert them into working capital.

witness Laura Bateman sponsored an exhibit that labeled certain costs as working capital in reliance upon the testimony of Dr. Wright, who had previously stated that the relevant costs constituted "used and useful" "utility plant." The Public Staff contends that the testimony of Dr. Wright and Ms. Bateman are contradictory given that "utility plant" and "working capital" are two separate and distinct categories of "used and useful" property. In addition, the Public Staff contends that the Commission "shifted to a different legal conclusion" with respect to this issue in the Duke Energy Carolinas order by determining that the relevant coal ash costs were "just like 'classic' working capital" given that these funds "were furnished by [Duke Energy Carolinas] and its investors." According to the Public Staff, "classic working capital is entitled to a return" pursuant to N.C.G.S. § 62-133(b)(1) while "expenses that are 'like' working capital only in the sense that they may be paid from investor-supplied funds" could only be eligible to earn a return in the exercise of the Commission's discretion pursuant to N.C.G.S. § 62-133(d). The Public Staff asserts that "the nature of past coal ash expenditures is incompatible with the definition of 'working capital'" in light of the fact that the monies in question do not represent "funds needed to finance ongoing utility service" or "relate to the carrying cost for funding of future utility operations."

The Attorney General contends that the fact that the coal ash costs at issue in these cases "have nothing to do with 'the Compan[ies'] forward-looking obligation to provide utility service'" compels the conclusion that "the Commission's analysis of

working capital here negates the statutory command that only used and useful assets may be included in a utility's rate base," citing N.C.G.S. § 62-133(b)(1). Furthermore, the Attorney General notes that any determination that some or all of the relevant costs constitute working capital lacks sufficient evidentiary support given that "no witness for [either utility] actually testified that its coal-ash expenditures were funded by working capital"; that the Commission had relied upon Duke Energy Progress' placement of the relevant costs "in a working-capital section in [its] books"; and that one of Duke Energy Carolinas' own witnesses "testified directly that the company does not believe that booking coal-ash costs in a working-capital account, by itself, is enough to turn those costs into part of [Duke Energy Carolinas'] rate base." According to the Attorney General, the utilities "offered no evidence that [they] needed to draw on working capital to fund [their] post-2014 coal-ash costs."

The Public Staff and the Attorney General each contend that the Commission erred by concluding that the accounting method utilized by the utilities in recording their coal ash costs automatically "converted" those costs into amounts eligible for inclusion in rate base. In the Public Staff's view, "many of the expenditures made by [the utilities] for coal ash compliance are fundamentally operating expenses" that are not "transformed into property used and useful that *must* be allowed to earn a return just because FERC and GAAP guidance" provides for capitalizing the costs in question in an Asset Retirement Obligation. On the contrary, the Public Staff argues that "the statutory classification of 'property used and useful' is independent of GAAP

and FERC accounting guidance," citing to a section of Commissioner Clodfelter's dissent in the Duke Energy Carolinas order in which Commissioner Clodfelter expressed the opinion that the Commission had "conflated concepts of financial statement presentation with the classification of costs for ratemaking purposes," that the language from ASC 410-20 upon which the Commission and the utilities had relied was "irrelevant," and that nothing in the FERC Uniform System of Accounts "compel[s] inclusion of the capitalized amount of the [A]sset [R]etirement [O]bligation in rate base; quite the contrary."

The Public Staff contends that the fact that the costs at issue in these cases had been deferred for accounting purposes did not convert the resulting asset that was shown on the utilities' books into property "used and useful" for ratemaking purposes and that the Commission's decision to the contrary conflicts with our decision in *Thornburg I*.[18]  Instead, the Public Staff contends that "it is proper ratemaking to treat deferred costs as a form of operating expense," which *could* be amortized in the future rather than "as rate base," citing *Thornburg I* and the Commission's decision in Docket No. G-5, Sub 327.  The Public Staff argues that "many" of the costs at issue in this case "are costs of operating the sites in compliance

---

[18] The Public Staff acknowledges that it never disputed the utilities' contention that Asset Retirement Obligation accounting was mandatory for its coal ash costs; instead, it simply took issue with their decision to "opt for special ratemaking treatment (deferral) after the [Asset Retirement Obligation] was created," which the Public Staff described as a "depart[ure] from the method that has been approved by the FASB and FERC."

with environmental regulations" that "do[ ] not become 'property used and useful' simply because [the costs] ha[ve] been incurred for environmental compliance."

Finally, the Public Staff argues that a capitalized expense remains an operating expense for ratemaking purposes, with the fact that the capitalization process changes the timing with which the costs in question are included in cost of service for ratemaking purposes being irrelevant to the question of whether those costs constitute "used and useful" property. According to the Public Staff, "nothing in the law . . . requires a return on such costs to protect investors from being deprived of the time value of money" despite the Commission's numerous contrary conclusions. For that reason, the Public Staff suggests that the Commission must determine if there are "other material facts of record" that call for the denial of a return in order to achieve just and reasonable rates, with the utilities' environmental violations being the sort of facts that the Commission should have considered in determining the level of coal ash costs that should have been included in the utilities' North Carolina retail rates.

In the Attorney General's view, ASC 410-20 merely "requires publicly traded companies to record an [Asset Retirement Obligation] whenever they have a legal obligation to incur costs to retire a long-lived asset and that obligation can be quantified," such as the coal ash costs at issue in these cases. The Attorney General contends that "the existence of an [Asset Retirement Obligation] does not require a finding that [the utilities'] coal-ash removal costs are 'property used and useful . . . in

providing the service to be rendered to the public'" and that, even if it did, such a result would be "in conflict with the statutory language and structure of [N.C.G.S. §] 62-133."

According to the utilities, the Public Staff has provided an overly narrow definition of "property," with a more accurate definition sweeping in "all assets necessary to provide electricity to the public" and including "cash that should be kept on hand to pay the utility's bills as they become due." In the utilities' view, the extent to which property is "used and useful" "does not turn on whether the property generates electricity"; instead, the critical factor is "whether it serves the public and was paid by debt or equity investors" rather than "through rates that were set in anticipation of normal operating expenses."

Even though operating expenses are typically recovered through established rates and are not statutorily entitled to a return, the utilities contend that the Commission may, in its discretion, allow a return when "extraordinary expenses arise that justify deferral accounting" in the next general rate case when those costs were initially covered by shareholder funds, citing *VEPCO*. According to the utilities, "[a] substantial difference exists between operating expenses that are built into rates and are paid by customers," which cannot receive a return given that "the utility does not need to attract investor capital to fund those expenses," as compared to "extraordinary costs that must be advanced by debt and equity investors" and upon

which a return could be authorized in the Commission's discretion in order to avoid a "competitive disadvantage in raising investment funds in the future."

The utilities argue that "the modification of the coal ash basin system" at issue in these cases "was paid for with shareholders' funds" and that these funds constituted working capital that was "necessary and appropriate for providing electricity to customers" and was, for that reason, properly deemed "used and useful" pursuant to *VEPCO*. According to the utilities, the cases upon which the Attorney General relies relate to abandoned power plants while the present proceedings have nothing to do with "excessive facilities tied to nuclear units that were never completed and never used to generate[ ] electricity (e.g., *Thornburg*)" and "do[ ] not involve abandoned utility plants and equipment that no longer result in costs to the utility (e.g., *Carolina Trace* and *Carolina Water*)." On the contrary, the utilities argue that these cases involve capital funds advanced by investors that "have a direct relationship to power generation—the [utilities'] system[s] to address coal ash residue resulting from electricity generation."

As a separate matter, the utilities contend that "the vast majority" of the costs at issue in these proceedings "stand as long-term assets" and "improvements to real property," including new or modified coal ash basins that are "directly related to . . . power generation" and that "benefit the utility's customers." According to the utilities, 18 C.F.R. § 101, Electric Plant Instruction No. 3, provides that many construction costs constitute "capital costs because they are associated with the

system being built," including "contract work, labor, materials and supplies, transportation of employees and equipment, general administration attributable to the construction, engineering services, insurance, legal costs and environmental studies." The utilities contend that "much of [the] construction costs for the coal ash basins" are contained within these categories, such as those relating to "environmental, health and safety studies associated with the construction, infrastructure costs, landfill construction, engineering closure plans, modification to power plants to accommodate basin modifications, mobilization costs and installation of water treatment systems."

The utilities argue that their accounting practices ensure that the costs at issue were "eligible for deferral and amortization and for earning on the unamortized balance" and that, "even if the remediation costs are [Asset Retirement Obligation] expenditures, they are eligible for ratemaking treatment as though they are used and useful assets." According to the utilities, the accounting and reporting requirements prescribed by the FERC and the Securities and Exchange Commission require utilities to record Asset Retirement Obligations "when a change in the law creates a legal obligation to perform the retirement activities," quoting 68 Fed. Reg. 19610, 19611 (April 21, 2003). In the event that a utility records an Asset Retirement Obligation, that amount is treated as "electric utility plant" and is shown as both an asset and a liability on the utility's balance sheet, citing 68 Fed. Reg. at 19611. The utilities contend that these principles allow them to "capitalize the asset retirement

costs" given that those costs constitute an "integral part of the costs of the particular asset that gives rise to the asset retirement obligations, rather than separate and distinct assets," quoting 68 Fed. Reg. at 19615.  In view of the fact that the new regulations governing the disposal of coal ash required them to close their existing coal ash basins, the utilities claim that they were "required to follow the accounting requirements relating to [Asset Retirement Obligations]."  As a result, given that "the expenditures at issue are no different from the costs to build the utility plant and . . . stand as the 'public utility's property used and useful,' " quoting N.C.G.S. § 62-133(b)(1), and the fact that the relevant costs constituted capitalized amounts funded by the shareholders, the utilities contend that the Commission properly allowed them to earn a return upon the unamortized balance of the deferred coal ash-related costs.

The "ultimate question for determination" in any utility case is what "a reasonable rate to be charged by the particular utility company for the service it proposes to render in the immediate future" would be in light of the statutory procedures prescribed for the Commission in N.C.G.S. § 62-133.  *Morgan*, 277 N.C. at 267, 177 S.E.2d at 413.  As a general proposition, the procedures delineated in N.C.G.S. § 62-133(b), in which a test period is established, the utility's investment in utility plant and working capital as of the end of the test period is determined, the utility's reasonable operating expenses during the test period are ascertained, and a reasonable return upon the utility's rate base is identified, provide a workable framework that can be used to establish just and reasonable rates.  The

circumstances revealed by the record in these cases are, however, anything but ordinary, with the coal ash-related costs that the utilities incurred between 1 January 2015 and 31 December 2017 not being readily susceptible to traditional ratemaking analysis for a number of reasons.[19] As a result, these cases compel us to definitively determine the scope of the authority granted to the Commission pursuant to N.C.G.S. § 62-133(d), which the Commission used as the ultimate justification for its decision to allow the utilities to earn a return upon the unamortized portion of the deferred coal ash costs at issue in these cases.

This Court has, of course, discussed the manner in which N.C.G.S. § 62-133(d) should be interpreted and applied in several prior cases, a number of which are discussed in detail in the parties' briefs. After carefully reviewing the relevant decisions of this Court, we have been unable to find anything that precludes the Commission from deferring certain extraordinary costs, amortizing them to rates, and allowing the utility, in the exercise of the Commission's discretion, to earn a

---

[19] Although we need not examine this issue in any detail, we note that the costs at issue in these cases do not appear to relate to a single test period as defined in N.C.G.S. § 62-133(c) and seem to consist of a combination of both costs associated with the decommissioning and construction of new utility facilities includable in rate base pursuant to N.C.G.S. § 62-133(b)(1) and costs that relate to the operation of those facilities that would ordinarily be treated as operating expenses pursuant to N.C.G.S. § 62-133(b)(3). While the Commission appears to have accepted the argument that these costs could be treated as working capital, the costs at issue in these cases, unlike the items traditionally treated as working capital, do not relate to a single test period. As a result, for all of these reasons, we have no hesitation in concluding that the costs in question do not readily fit within the confines of the traditional ratemaking principles enunciated in N.C.G.S. § 62-133.

return upon the unamortized balance in reliance upon N.C.G.S. § 62-133(d) in circumstances like those revealed by the present record.

Although the Attorney General contends that the approach adopted by the Commission in these cases is precluded by our prior decisions in *Thornburg II*, *Carolina Trace*, and *Carolina Water*, we agree with the Public Staff that the extent to which the Commission had the discretion to act as it did in these cases was not before the Court in any of those decisions. In *Thornburg II*, for example, we held that certain deferred nuclear plant cancellation costs had to be removed from rate base and treated in the same way that other abandoned plant costs had been treated, a process that involved the amortization of the related costs without a return on the unamortized balance. 325 N.C. at 497–98, 385 S.E.2d at 470–71. *Thornburg II* did not, however, make any reference to the application and interpretation of N.C.G.S. § 62-133(d).

Similarly, in *Carolina Trace*, we held that "[t]here is no statutory authority anywhere within Chapter 62 that permits the Commission *to include in rate base* any completed plant (as opposed to construction work in progress) that is not 'used and useful' within the meaning of this term as determined by our case law" (emphasis added). 333 N.C. at 203, 424 S.E.2d at 137. However, the dispute between the parties in *Carolina Trace* revolved around the application and interpretation of N.C.G.S. § 62-133(b)(1) rather than N.C.G.S. § 62-133(d).

Finally, in *Carolina Water*, we stated that, "[i]f facilities are not used and useful, they cannot be included in rate base," 335 N.C. at 508, 439 S.E.2d at 135, and that "[c]osts for abandoned property may be recovered as operating expenses through amortization" even though "a return on the investment may not be recovered by including the unamortized portion of the property *in rate base.*" (emphasis added). *Id.* Once again, however, our decision in *Carolina Water Service* made no mention of the Commission's authority pursuant to N.C.G.G. § 62-133(d). As a result, given that none of these decisions and others like them involved the interpretation or application of N.C.G.S. § 62-133(d), they shed no light upon the extent of the Commission's authority pursuant to that specific statutory provision.

Our decisions interpreting and applying N.C.G.S. § 62-133(d) set out some of the principles that underlie this portion of North Carolina's statutory ratemaking framework. The first occasion upon which we had an opportunity to interpret and apply what is now N.C.G.S. § 62-133(d) came in *Public Service Co.*, 257 N.C. 233, 125 S.E.2d 457, which was decided pursuant to former N.C.G.S. § 62-124. Former N.C.G.S. § 62-124 (1960) stated that, "[i]n fixing any maximum rate or charge," the Commission "shall" consider "all other facts that will enable it to determine what are reasonable and just rates." In *Public Service Co.*, we reversed a trial court judgment that affirmed an order in which the Commission refused to allow a natural gas utility to increase its rates in the face of a price increase by the utility's sole supplier of natural gas. In reaching this result, we stated that "[t]he Legislature properly

understood that, at times, other facts may exist, bearing on value and rates, which the Commission should take into account in addition to those specifically detailed in" the ratemaking statute and that former N.C.G.S. § 62-124 "[gave] the Commission the right to consider *all other facts* that will enable it to determine what are reasonable and just rates" (emphasis in original), citing N.C.G.S. § 62-124. *Id.* at 237, 125 S.E.2d at 460. We did, however, caution the Commission that "[t]he right to consider 'all other facts' is not a grant to roam at large in an unfenced field" and determined that the "other facts" upon which the Commission was entitled to rely had to "be established by evidence, be found by the Commission, and be set forth in the record to the end the utility might have them reviewed by the courts." *Id.*

Similarly, in *State ex rel. Utilities Commission v. Edmisten*, we recognized that, "[w]hile the Commission is limited, particularly by [N.C.G.S. § 62-133(b)], to a consideration of certain ultimate facts, it may consider many other evidentiary facts relevant thereto which may not be specifically listed in this section" pursuant to N.C.G.S. § 62-133(d). 291 N.C. 327, 345, 230 S.E.2d 651, 662 (1976). In upholding the Commission's authority to allow an electric utility to implement a temporary fuel adjustment clause in the exercise of its discretion, we recognized that "[N.C.G.S. § 62-133(d)] expressly empowers the Commission to 'consider all other material facts of record that will enable it to determine what are reasonable and just rates.' " *Id.* (citing *Morgan*, 277 N.C. 255, 177 S.E.2d 405).

Shortly thereafter, in *State ex rel. Utilities Commission v. Edmisten*, 299 N.C. 432, 437, 263 S.E.2d 583, 588 (1980), in reversing the Commission's refusal to adopt rolled-in rates for an electric utility, we recognized that, "[a]lthough it is not for an appellate court to dictate to the Commission what weight it should give to material facts before it" in accordance with N.C.G.S. § 62-133(d), "a summary disposition which indicates that the Commission accorded only minimal consideration to competent evidence constitutes error at law and is correctable on appeal," citing *Utilities Commission v. Piedmont Natural Gas Co.*, 254 N.C. 536, 119 S.E. 2d 469 (1961) and N.C.G.S. § 62-94. In light of that basic principle, we held that the Commission erred by failing to "consider whether a rate schedule computed as if" two wholly owned subsidiaries of the same parent company were one utility "would be in the best interests of the customers." *Id.* at 438, 263 S.E.2d at 588.

A few years later, this Court stated in *State ex rel. Utilities. Commission v. Duke Power Co.*, that, in N.C.G.S. § 62-133(d), that "the legislature recognized and understood that there would be other facts and circumstances of record which the Commission might rightly consider in addition to those specifically detailed in [N.C.G.S. § 62-133]," 305 N.C. 1, 26, 287 S.E.2d 786, 801 (1982) (*Duke Power Co. II)*, before indicating that "the 'other material facts of record' considered by the Commission in fixing reasonable and just rates must be found and set forth in its order so that the reviewing court may see what these elements are." *Id.* at 27, 287 S.E.2d at 801. In the same vein, we opined in *State ex rel. Utilities Commission v.*

*Nantahala Power & Light Co.*, that "N.C.G.S. § 62-133(d) has been construed as a device permitting the Commission to take action consistent with the overall command of the general rate statutes, but not specifically mentioned in those portions of the statute under consideration in a given case," citing *Duke Power Co. II* and *Utilities Commission v. Public Staff*, 58 N.C. App. 453, 293 S.E. 2d 888 (1982), *modified and aff'd*, 309 N.C. 195, 306 S.E.2d 435 (1983), and that "the fixing of 'reasonable and just' rates involves a balancing of shareholder and consumer interests," *State ex rel. Utilities Commission v. Nantahala Power & Light Co.*, 313 N.C. 614, 690–91, 332 S.E.2d 397, 442 (1985).  As a result, we held that the Commission was entitled to treat "the effect of the FERC-filed power supply contracts on Nantahala's costs of service" and "the entire historical development of the Nantahala-Tapoco electric system and the intercorporate allocation of the costs and benefits associated therewith" as material facts of record pursuant to N.C.G.S. § 62-133(d) in determining the utility's rates.  *Id*. at 701, 332 S.E.2d at 448.

Finally, in *Thornburg I*, we cited N.C.G.S. § 62-133(d) in determining that the Commission was entitled to allow a utility to include abandoned nuclear plant costs in rates as an operating expense, 325 N.C. at 478, 385 S.E.2d at 459, noting that the Commission's decision was supported by N.C.G.S. § 62-133(d), which ensured that "the Commission would not be bound by a strict interpretation of the operating expense component" set forth in N.C.G.S. § 62-133(c).  *Id*.  Thus, this Court's prior decisions, while failing to delineate the exact contours of the Commission's authority

pursuant to N.C.G.S. § 62-133(d), have clearly indicated that N.C.G.S. § 62-133(d) is available to the Commission for the purpose of dealing with unusual situations and that the authority granted to the Commission pursuant to N.C.G.S. § 62-133(d) is not limited by the more specifically stated ratemaking principles set out elsewhere in N.C.G.S. § 62-133(b).[20]   Simply put, if the Commission's authority pursuant to N.C.G.S. § 62-133(d) could only be exercised in a manner that coincided with the Commission's authority as delineated in the other provisions of N.C.G.S. § 62-133, the enactment of N.C.G.S. § 62-133(d) would have been a purposeless undertaking.

After carefully examining our reported decisions construing N.C.G.S. § 62-133(d), we conclude that this statutory provision provides the Commission with an opportunity to consider facts that, while not specifically relevant to the ordinary ratemaking determinations required by N.C.G.S. § 62-133(b), should necessarily be considered in establishing rates that are just and reasonable to both the utility and the using and consuming public.   For that reason, we reject the notion that the traditional rules governing the inclusion of costs in a utility's rate base pursuant to N.C.G.S. § 62-133(b)(1) and in a utility's operating expenses pursuant to N.C.G.S. § 62-133(b)(3) limit the scope of the Commission's authority pursuant to N.C.G.S.

---

[20] As we acknowledge in more detail below, the Commission's authority to pursuant to N.C.G.S. § 62-133(d) is not unlimited.  Any attempt to restrain the Commission's discretion pursuant to N.C.G.S. § 62-133(d) by confining its use to narrow deviations from the ordinary ratemaking processes set out in the remainder of N.C.G.S. § 62-133 strikes as unworkable given the difficulty of determining when such a departure would be sufficiently limited as to be permissible and when it would not.

§ 62-133(d), with any such determination being fundamentally inconsistent with the apparent legislative intent to use N.C.G.S. § 62-133(d) to provide a "safety valve" available to the Commission when ordinary ratemaking standards prove inadequate. However, as our earlier admonition that the predecessor to N.C.G.S. § 62-133(d) did not allow the Commission to "roam at large in an unfenced field" clearly indicates, N.C.G.S. § 62-133(d) does not give the Commission license to ignore the ordinary ratemaking standards set out elsewhere in N.C.G.S. § 62-133 in cases in which the use of those principles, without the necessity to consider "other facts," allows for the establishment of just and reasonable rates for the utility in question. Instead, N.C.G.S. § 62-133(d) provides the Commission with limited authority to take a holistic look at the cases that come before it in order to ensure that the limitations inherent in the ordinary ratemaking standards enunciated in N.C.G.S. § 62-133 do not preclude the Commission from carrying out its ultimate obligation to establish rates that are just and reasonable in extraordinary instances in which the traditional ratemaking standards set out in N.C.G.S. § 62-133 are insufficient. As a result, consistently with the results reached in the decisions that we have summarized above, we hold that the Commission may employ N.C.G.S. § 62-133(d) in situations involving (1) unusual, extraordinary, or complex circumstances that are not adequately addressed in the traditional ratemaking procedures set out in N.C.G.S. § 62-133; (2) in which the Commission reasonably concludes that these circumstances justify a departure from the ordinary ratemaking standards set out in N.C.G.S. § 62-

133; (3) determines that a consideration of these "other facts" is necessary to allow the Commission to fix rates that are just and reasonable to both the utility and its customers; and (4) makes sufficient findings of fact and conclusions of law supported by substantial evidence in light of the whole record explaining why a divergence from the usual ratemaking standards would be appropriate and why the approach that the Commission has adopted would be just and reasonable to both utilities and their customers.

An examination of the extensive record that is before us in these cases satisfies us that the Commission did not, with a single exception set out in more detail below, err in using its authority to consider "other facts" pursuant to N.C.G.S. § 62-133(d) by allowing the amortization of deferred coal ash costs to rates and to allow the utilities to earn a return on the unamortized balance. The Commission's findings, which have adequate evidentiary support, establish that the enactment of CAMA forced the utilities to confront an "extraordinary and unprecedented" issue involving the potential expenditure of billions of dollars in order to address a significant environmental problem. In light of the "magnitude, scope, duration and complexity" of the anticipated costs, the Commission determined that deferral of the necessary compliance costs would be appropriate and that these costs, including a return on the unamortized balance, should be amortized to rates over a period that the Commission deemed to be reasonable. In view of the unusual nature and complexity of the costs at issue in this proceeding and the circumstances under which they were incurred,

the usual ratemaking standards set out in N.C.G.S. § 62-133 did not readily lend themselves to a decision that resulted in the establishment of just and reasonable rates for both the utilities and their customers. Finally, the Commission made detailed findings and conclusions explaining the nature of the manner in which it proposed to consider the relevant "other facts" and the reasons that it believed that its decision was fair to both the utilities and their customers. As a result, we hold that, in light of the specific facts and circumstances disclosed by the record developed before the Commission in these cases and the detailed explanation that the Commission gave for reaching its decision, the Commission did not err in approving the basic ratemaking approach that was utilized in these proceedings

### 4. Equitable Sharing

The Public Staff contends that the Commission failed to address all of the material facts relating to the reasonableness of the utilities' coal ash costs for purposes of N.C.G.S. § 62-133(d) before rejecting its "equitable sharing" proposal. As part of this process, the Public Staff urged the Commission to adopt its equitable sharing proposal in order to adequately address the utilities' "culpability for extensive environmental violations resulting from its coal ash management." The Public Staff argues that, even though the utilities' culpability for environmental violations was a material fact of record that the Commission should have addressed in the course of deciding whether to adopt its equitable sharing proposal, the Commission failed to

make findings and conclusions that adequately addressed its equitable sharing proposal.

The Public Staff begins by noting that, while the Duke Energy Progress order describes the Public Staff's equitable sharing proposal as resting upon the utilities' extensive "history of approval of sharing of extremely large costs that do not result in any new generation of electricity for customers," its "repeated references" to the utilities' environmental violations should have "le[ft] no doubt that [the existence of these violations] was a material reason for [its] equitable sharing proposal." Similarly, the Public Staff contends that, in its Duke Energy Carolinas order, the Commission erroneously concluded that the utilities' alleged environmental violations did not constitute part of the "real rationale for equitable sharing" and "that environmental violations [could] only be relevant to prudence" even though a finding of imprudence would have "justif[ied] a total disallowance of the associated costs" pursuant to N.C.G.S. § 62-133(b).

In addition, the Public Staff asserts that the Commission evaluated its equitable sharing proposal by considering "whether the costs were reasonable and prudent," "whether they were used and useful," and "what outcome would be fair and equitable." According to the Public Staff, the use of this standard precluded the implementation of an equitable sharing arrangement pursuant to N.C.G.S. § 62-133(d) given that the approach adopted in the Commission's order would appear to make "full cost recovery with a return . . . mandatory as a matter of law (apart from

mismanagement penalties) once costs have been determined to be prudent and 'used and useful.' "[21]  Although both orders "hint[ed]" at the possibility of adjusting rates in its discretion pursuant to N.C.G.S. § 62-133(d), "other parts of the [o]rders reject[ed] that possibility as a legal conclusion."

In the Public Staff's view, the Commission's determination that the concept of equitable sharing had no support in the decisions of this Court rested upon a misinterpretation of *Thornburg I* and *Thornburg II*.  More specifically, the Public Staff asserts that the Commission misinterpreted *Thornburg I* to mean that "equitable sharing applies *only* to costs that are not 'used and useful' and that equitable sharing therefore does not apply to coal ash costs" in spite of the fact that "[n]othing in *Thornburg I* or *Thornburg II* suggests that] N.C.G.S. § 62-133(d) limits the type of 'material facts' or remedies that may be considered to achieve reasonable and just rates."

The Public Staff contends that our decision in *Thornburg II* "support[s]" the idea of equitable sharing of excess plant costs which were not properly deemed to be "used and useful."  According to the Public Staff, this Court did not reject the Commission's equitable sharing decision in *Thornburg II* on the grounds that the Commission lacked the authority to implement such a proposal; instead, the Public

---

[21] In the Public Staff's view, the mismanagement penalties imposed in these cases "remed[y] a different problem" —the acts which resulted in federal criminal plea—and are "no alternative" to the Public Staff's equitable sharing proposal, which was based upon "separate and more extensive state law violations."

Staff contends that we rejected the specific equitable sharing arrangement that was at issue in that case, which involved the inclusion of nuclear plant cancellation costs in rate base on the grounds that such a regulatory treatment of those costs violated N.C.G.S. § 62-133(b)(1). In other words, the Public Staff contends that "*Thornburg II* does not stand for the proposition that the Commission lacks the discretionary authority to effectuate an equitable sharing between ratepayers and shareholders" and actually "upholds [the existence of] that authority," a result "which is consistent with N.C.G.S. § 62-133(d) and the Public Staff's equitable sharing recommendation."

The Public Staff contends that, contrary to the Commission's conclusion that allowing equitable sharing in these cases would result in an unconstitutional taking of utility property, there are "instances where the utility is not allowed full cost recovery or is required to share revenues with its ratepayers," a result that is "within the police power of the state," citing *State ex rel. Utilities Commission v. N.C. Natural Gas Corp.*, 323 N.C. 630, 642–45, 375 S.E.2d 147, 154–56 (1989) and *State ex rel. Utilities Commission v. Carolina Water Service*, 225 N.C. App. 120, 135–36, 738 S.E.2d 187, 197–98 (2013). According to the Public Staff, "[u]tility shareholders . . . are not guaranteed a return on their money," with "equitable sharing [serving to] balance the interests of [the utilities] who bear some responsibility for coal ash costs due to their years of non-compliance with groundwater and surface water environmental regulations, against the interests of ratepayers who are being asked

to pay a second time for disposal of coal ash after the [utilities'] initial disposal efforts proved inadequate for environmental protection."

According to the Public Staff, the Commission failed to make findings relating to numerous environmental violations, including: (1) at least 2,857 groundwater exceedances caused by Duke Energy Progress' coal ash basins that the Public Staff claimed to have resulted from violations of the applicable DEQ regulations; (2) the existence of "unauthorized seeps that [Duke Energy Carolinas] has admitted and 3,091 groundwater violations confirmed by [Duke Energy Carolinas'] own groundwater monitoring data"; (3) admissions to "nearly 200 distinct seeps" that the Public Staff claims to constitute unpermitted discharges in violation of N.C.G.S. § 143-215.1; (4) the presence of "seventeen admittedly engineered toe drains" that were not authorized by NPDES permits and that had been "deliberately constructed by [Duke Energy Progress] to allow drainage from its ash basins without regulatory approval and in violation of [N.C.G.S.] § 143.215.1"; (5) the presence of "twelve engineered seeps at [Duke Energy Carolinas'] coal-fired plants for which [it] did not yet have NPDES permits"; and (6) admissions by Duke Energy Carolinas that unauthorized seeps had occurred at four of its coal-fired plants.

In response, the utilities argue that the Commission had properly rejected the Public Staff's equitable sharing proposal for two separate reasons. First, the utilities aver that N.C.G.S. § 62-133(d) "does not give the Utilities Commission unbridled discretion to reduce rates" and must be read "in light of the other subsections of the

statute" which, collectively, provide the Commission with "a specific formula for setting rates for a public utility," citing N.C.G.S. §§ 62-133(b) and (c). According to the utilities, the adoption of the position advanced by the Public Staff would "eviscerate" the guiding standards set forth by N.C.G.S. §§ 62-133(b) and (c) so as to "rais[e] grave constitutional concerns." Moreover, the utilities argue that the evidence upon which the Public Staff has relied in support of its equitable sharing proposal "bear on the elements of the ratemaking formula or other specific provisions of [the] Public Utilities Act," with the facts upon which the Public Staff relies being "not material." Instead, the utilities contend that the Public Staff's equitable sharing proposal was "arbitrary" and "devoid of any determining principle," citing *Sanchez v. Town of Beaufort*, 211 N.C. App. 574, 580, 710 S.E.2d 350, 354 (2011), a conclusion with which the Commission agreed in finding that the Public Staff's proposal was "standard-less" and "insufficient[ly] justif[ied]." The utilities point to the Public Staff's "dramatic departure" from the position that it took in Docket No. E-22, Sub 532, in which the Public Staff "stipulated that, because [the utility's] expenditures had been prudently incurred and were investor-funded, [the utility] should be entitled to recover these costs through rates over a five-year period and also receive a rate of return on the unamortized balance."

According to the utilities, neither *Thornburg I* nor *Thornburg II* support the Public Staff's equitable sharing proposal. The utilities argue that, in *Thornburg I*, this Court rejected an intervenor's argument that operating expenses must have a

nexus to property used and useful and that, as long as the expenses were "reasonable," the Commission has the authority to allow their inclusion in the cost of service for ratemaking purposes. Although this Court upheld the Commission's decision in *Thornburg I*, that case involved an entirely different category of costs from those at issue here. The utilities contend that, in *Thornburg II*, this Court held that expenditures relating to "excessive" facilities "were not 'used and useful' and could not be included in rate base," with its decision in that case being susceptible to the interpretation that the Commission is entitled to "abandon[ ] the precise directives of [N.C.G.S. §] 62-133," "which require a return on property used and useful."

Secondly, the utilities contend that the Commission properly rejected the Public Staff's equitable sharing proposal on the grounds that the Commission did not abuse its discretion by determining that a further downward adjustment in the utilities' rates would not be reasonable and appropriate. In the utilities' view, the Commission simply "declined in these cases to exercise whatever discretion the Public Staff insists it possesses" to order an additional downward adjustment beyond the mismanagement penalty and explained throughout "[v]irtually the entire[ty]" of both order's majority decisions "why the circumstances of these cases do not make a further downward adjustment appropriate."

As we have already noted, our prior decisions clearly indicate that N.C.G.S. § 62-133(d) "expressly empowers" the Commission to consider all material facts of record in setting just and reasonable rates, *Edmisten*, 291 N.C. at 345, 230 S.E.2d at

662, with the existence of this authority being coupled with a concomitant obligation on the Commission's part to consider all potentially relevant facts in formulating its decision. *See State ex rel. Utils. Comm'n v. General Tel. Co.*, 12 N.C. App. 598, 611, 184 S.E.2d 526, 534 (1971), *modified*, 281 N.C 318, 189 S.E.2d 705 (1972); *Duke Power Co. II*, 305 N.C. at 18, 287 S.E.2d at 796–97; *Edmisten*, 299 N.C. at 438, 263 S.E.2d at 588. After carefully reviewing the record, we are not persuaded that the Commission fulfilled its duty to consider *all* of the material facts of record revealed in the record in determining whether to adopt the ratemaking approach proposed by the utilities and to reject the Public Staff's equitable sharing proposal utilizing the authority granted to it pursuant to N.C.G.S. § 62-133(d). More specifically, the Public Staff expressly requested the Commission to consider evidence of environmental violations in evaluating its equitable sharing proposal in accordance with N.C.G.S. § 62-133(d). However, the Commission declined to adopt the Public Staff's equitable sharing proposal on the grounds, at least in part, that it had no role in determining whether the alleged environmental violations upon which the Public Staff's proposal rested had actually occurred. Instead, the Commission appears to have refused to consider the alleged environmental violations upon which the Public Staff's proposal rested, at least in part, on the grounds that the Commission's role was limited to making cost of service-related determinations and did not extend to ascertaining whether environmental violations had occurred, with the making of this determination having been left, in the Commission's view, to environmental

regulators and courts of general jurisdiction unless a showing of management imprudence had been made.

Although the Commission is not, of course, statutorily charged with making definitive decisions concerning the extent, if any, to which the utilities committed environmental violations, we do believe that it was required, for ratemaking purposes, to evaluate the extent to which the utilities committed environmental violations in determining the appropriate ratemaking treatment for the challenged coal ash costs even if any such environmental violations did not result from imprudent management. In other words, given that the Commission decided to invoke its statutory authority to consider "other facts" in determining the rates that should be established for the utilities, it was required to consider *all* material facts of record in making that determination including, in these cases, facts pertaining to alleged environmental violations such as non-compliance with NPDES permit conditions, unauthorized discharges, and groundwater contamination from the coal ash basins in violation of the 2L Rules and to incorporate its decision with respect to the nature and extent of the utilities' violations, if any, in determining the appropriate ratemaking treatment for the challenged coal ash costs.[22] Instead of

---

[22] We agree with the Commission's determination that the fact that the utilities entered into a settlement agreement with the Department of Water Quality does not, standing alone, constitute evidence that an environmental violation had occurred. *See* N.C. R. Evid. 408. Similarly, we agree with the Public Staff and the Commission that the existence of a settlement agreement which does not speak to the issue of liability does not constitute evidence of wrongdoing.

conducting the required evaluation, the Commission appears to have determined that it lacked the authority to comment upon the nature and extent of any environmental violations that the utilities may or may not have committed. Moreover, even though the utilities are correct in noting that the Public Staff's equitable sharing proposal was not consistent with or subject to the detailed standards set out in the ordinary ratemaking procedures prescribed by N.C.G.S. § 62-133, the same is true of the Commission's decisions to allow the deferral of the relevant coal ash costs and the amortization of the deferred costs, including a return on the unamortized balance, to rates despite the fact that some percentage of those costs would not be eligible for inclusion in rate base pursuant to N.C.G.S. § 62-133(b)(1). Although the Commission remains free, at the conclusion of the proceedings on remand and after complying with the limitations upon its authority pursuant to N.C.G.S. § 62-133(d) set forth above, to reject the Public Staff's equitable sharing proposal, it may only do so after considering all of the potentially relevant facts and circumstances, *see Duke Power II*, 305 N.C. at 21, 287 S.E.2d at 798, and explaining the manner in which it has chosen to exercise its discretion by making appropriate findings and conclusions that have adequate evidentiary support.[23] In the event that the Commission concludes, on

---

[23] For this reason, the fact that the Commission may have had other criticisms of the Public Staff's "equitable sharing" proposal does not support a decision to affirm this portion of the Commission's orders given the Commission's failure to consider all relevant "material facts" as required by N.C.G.S. § 62-133(b)(1). In other words, the Commission is not entitled to consider the potential adverse impacts upon a utility's capital costs in applying N.C.G.S. § 62-133(d) without also considering other all of the potentially relevant facts, such as

remand, to adopt the Public Staff's equitable sharing proposal, either as proposed or in some modified form, it may adjust other portions of its order including those relating to the proposed management penalty, in order to ensure that the utilities' rates are "just and reasonable" as that term is used in the Public Utilities Act and satisfy applicable constitutional standards, which set an absolute floor under and ceiling upon the Commission's authority. As a result, those portions of the Commission's orders rejecting the Public Staff's equitable sharing proposal are reversed and these cases are remanded to the Commission for further proceedings consistent with this opinion, including consideration of the Public Staff's equitable sharing proposal.

## 5. Discharges to Surface Waters

In addition to adopting the arguments advanced by the Attorney General in challenging the Commission's decision with respect to the ratemaking treatment of the utilities' coal ash costs, the Sierra Club contends that the costs in question cannot be included in the cost of service used for North Carolina retail ratemaking purposes pursuant to N.C.G.S. § 62-133.13 given that those costs resulted from discharges to the surface waters of North Carolina in violation of State or federal surface water quality standards. According to the Sierra Club, the record contained "overwhelming evidence" establishing that: (1) "seeps at [the utilities'] coal ash ponds discharged

---

whether the manner in which the utility managed and operated its coal ash facilities resulting in environmental violations.

polluted wastewater into adjacent surface waters"; (2) that "discharges from unauthorized seeps contained coal ash constituents at concentrations above water quality standards"; and (3) that "dewatering and pond closure would abate the illegal discharges," so that the costs in question "are not recoverable from ratepayers."

The Sierra Club urges this Court to reject the Commission's determination that N.C.G.S. § 62-133.13 did not apply to the costs at issue in these cases on the grounds that those costs had been incurred to comply with federal and State law rather than as the result of unlawful discharges as "unsupported by any evidence in the record, let alone competent, material, and substantial evidence," citing N.C.G.S. § 62-94(b)(5) and *CUCA*, 348 N.C. 452, 460, 500 S.E.2d 693, 699 (1998), and as an "arbitrary and capricious" decision, citing *State ex rel. Utilities Commission v. NUI Corp.*, 154 N.C. App. 258, 266, 572 S.E.2d 176, 181–82 (2002). In addition, the Sierra Club argues that the utilities "did not present evidence that the closure of any of its ponds was required by the CCR Rule" and that, "[i]rrespective of CAMA," the closure costs had been incurred in accordance with Special Orders on Consent addressing discharges from unpermitted seeps and a Superior Court determination that the closure of the utilities' ponds would eliminate these seeps. The Sierra Club further asserts that a determination to the contrary would have the effect of "nullify[ing] the applicability of" N.C.G.S. § 62-133.13, given that "the legislature knew full well that all of [the utilities'] ponds would be required to close" at the time that it enacted N.C.G.S. § 62-133.2 as part of CAMA. In the Sierra Club's view, the enactment of CAMA was a

"direct response" to the utilities' "failure to operate its coal ash ponds in a safe and reasonable manner."

In response, the utilities argue that N.C.G.S. § 62-133.13 has no application to these cases given that it relates to unlawful discharges that "result[ed] in a violation of state or federal *surface* water quality standards" that occurred on or after 1 January 2014. In essence, the utilities contend that, while such prohibitions ensured that the costs relating to the Dan River spill were not included in the cost of service used for ratemaking purposes, the General Assembly did not intend to preclude the inclusion of the cost of abating the seeps associated with the utilities' coal ash basins in the costs upon which their rates were based. The utilities note that "the Commission went to great lengths to identify expenditures resulting from seeps that were alleged to have resulted in water quality issues" and that any such costs "independent of the requirements of the CCR Rule and CAMA" had been "expressly disallowed." Accordingly, the utilities assert that, with the exception of the costs reflected in these disallowances, "no seepage caused [the utilities] to incur any 'unjustified costs to comply with current laws and regulations.'"

We agree with the Commission's determination that N.C.G.S. § 62-133.13 does not bar the inclusion of the costs at issue in these cases in the utilities' cost of service for North Carolina ratemaking purposes given that the relevant statutory provision specifically defines "unlawful discharges" as "a discharge that results in a violation of State or federal surface water quality standards" and that the Commission

determined, on the basis of adequate evidentiary support, that the costs at issue in these cases stemmed from the utilities' compliance with the CCR Rule, CAMA, and certain consent agreements requiring them to take corrective actions that were consistent with one or both of those regulatory requirements. In addition, the Commission determined in the Duke Energy Carolinas order that it "is a function of basic science" that "there will be a natural flow from an unlined basin into groundwater" as part of the "normal operation" of the basins so that, "except in limited fashion," "[Duke Energy Carolinas'] past coal ash management practices did not cause it to incur in the [relevant timeframe] unjustified costs to comply with current laws and regulations." In its Duke Energy Carolinas order, the Commission identified expenditures related to seeps and water quality issues associated with the coal ash basins located at the Dan River, Riverbend, Allen, Marshall, and Cliffside facilities and determined that the abatement of these seeps had been handled through the judgment entered in the federal criminal case or consent orders entered as the result of agreements between the utilities and DEQ. As a result, the Commission properly determined that the costs to which the Sierra Club's argument is directed were "independent of the requirements of the CCR Rule and CAMA," that the Commission had expressly disallowed "any activities employed to resolve these seeps," and that N.C.G.S. § 62-133.13 does not preclude the inclusion of the relevant coal ash costs in the cost of service used to establish the utilities' North Carolina retail rates.

### C. Basic Facilities Charge

The environmental intervenors contend that the Commission erred by authorizing Duke Energy Carolinas to increase the Basic Facilities Charge for the residential rate class from $11.80 to $14.00 while leaving the facilities charges against other classes unchanged. Among other things, the environmental intervenors argue that this component of the Commission's order was not supported by competent, material, and substantial evidence so as to be subject to reversal pursuant to N.C.G.S. § 62-94(b)(5). According to the environmental intervenors, since no party advocated the establishment of a $14.00 per month customer charge, that figure constituted an arbitrary number that "most likely" was adopted because it was identical to the figure incorporated into a joint stipulation that the Commission approved in the Duke Energy Progress proceeding, so that the Commission's decision to utilize that figure reflected a failure to weigh the testimony of each witness concerning the amount of the charge and to explain the weight that should be given to that testimony, citing *State ex rel. Utilities Commission v. Cooper*, 367 N.C. 644, 649, 766 S.E.2d 827, 830 (2014) (*Cooper II*). The environmental intervenors claim that, even though "each link in the chain of reasoning must appear in the order itself," quoting *Eddleman*, 320 N.C. at 352, 358 S.E.2d at 346, "[t]here is no such chain linking evidence in the record to the Commission's decision to set the [c]harge at $14.00," a fact that establishes that the Commission erroneously afforded "only

minimal consideration to competent evidence," quoting *State ex rel. Utilities Commission v. Thornburg*, 314 N.C. 509, 511, 334 S.E.2d 772, 773 (1985).

In addition, the environmental intervenors argue that the Commission's decision to increase the residential Basic Facilities Charge contravened various provisions of the Public Utilities Act, citing N.C.G.S. § 62-2(a)(3a), (4), (5); N.C.G.S. § 62-155(a) (stating that "[i]t is the policy of the State to conserve energy through efficient utilization of all resources"); and *State ex rel. Utilities Commission v. Simpson*, 295 N.C. 519, 524, 246 S.E.2d 753, 757 (1978). According to the environmental intervenors, the Commission's decision was "inconsisten[t]" with the statutory "policy directives" contained in the Public Utilities Act, which state that rates should "promote conservation," "demand reduction," and encourage efficiency, and failed to "consider" intervenor testimony explaining that the residential Basic Facilities Charge should remain unchanged in order to avoid "penaliz[ing] customers who have taken steps to conserve energy." The environmental intervenors argue that the increased residential Basic Facilities Charge "unfairly impacts low-income and minority ratepayers," who "tend to use less electricity than the average household," citing *Cooper I*, 366 N.C. at 495, 739 S.E.2d at 548 and N.C.G.S. § 62-133(a), with the Commission having treated these considerations as nothing more than "a mere afterthought." The environmental intervenors assert that the Commission's finding that the approval of a $14.00 residential Basic Facilities Charge would "moderat[e] the impact of [the] increase on low-income customers to the extent that they are high-

usage customers such as those residing in poorly insulated manufactured homes" was merely "conclusory" and devoid of "evidentiary support in the record," quoting Commissioner Clodfelter's dissent, and had been "refuted by the testimony of [environmental intervenor witness John] Howat" "that low-income customers tend to have lower-than-average electricity usage."

The environmental intervenors take issue with the Commission's decision to utilize the Minimum System Methodology proposed by Duke Energy Carolinas in determining the level at which the residential Basic Facilities Charge should be established. According to the environmental intervenors, the Minimum System Methodology approach "resulted in hypothetical grid cost estimates that do not comport with [Duke Energy Carolinas'] actual, original costs of used and useful property" given its assumption " 'that a minimum system . . . would have the same number of poles, conductor feet, and transformers' as installed in the real-world grid" when, in fact, "the equipment imagined under [that methodology] would be capable of serving more than the minimal demand of customers" and that "the customer-related percentage of the distribution system [derived using the Minimum System Methodology] is effectively driven by . . . *non-existent facilities*." As a result, the environmental intervenors argue that the Minimum System Methodology "turns foundational ratemaking principles upside down"; "serves as a poor proxy for the actual, used and useful distribution grid"; and "violate[s] [Duke Energy Carolinas'] obligation to base rates on an ascertainment of the original costs of utility property

that is used and useful in providing service to the public," citing N.C.G.S. § 62-133(b)(1). The environmental intervenors contend that the Commission has, in prior decisions, rejected the use of the Minimum System Methodology, with its failure to "acknowledge[e] or explain[ ] its prior, contrary decisions" demonstrating "lack of careful consideration" and "reasoned judgment" and rendering its decision to adopt that methodology in this case "arbitrary and capricious," citing *Thornburg*, 314 N.C. at 515, 334 S.E.2d at 776. The environmental intervenors argue that "there was not even a scintilla of evidence to support" the Commission's decision with respect to the Basic Facilities Charge issue, particularly given that it ordered an overall revenue reduction for Duke Energy Carolinas, citing *Cooper II*, 367 N.C. at 438, 758 S.E.2d at 640, pointing to the "common-sense principle that an adjustment to the Basic Facilities Charge should bear some logical relationship to the overall change in rates."

Finally, the environmental intervenors argue that the Commission's order was "unduly discriminatory" given that it approved an increase in the residential Basic Facilities Charge while leaving similar rates for other customer classes unchanged, citing N.C.G.S. § 62-140(a); *State ex rel. Utilities Commission v. North Carolina Textile Manufacturers Ass'n*, 313 N.C. 215, 222, 328 S.E.2d 264, 269 (1985); and *CUCA*, 348 N.C. at 468, 500 S.E.2d at 704. According to the environmental intervenors, "[t]he Commission did not point to any competent, material and substantial evidence of a difference in conditions between customer classes to support its determination to increase the residential [c]harge while leaving the non-

residential [c]harges the same" and only offered "murky generalizations and a vague reference to evidence in the record" in support of this decision.

In response, the utilities argue that Commission's decision to increase the residential Basic Facilities Charge to $14.00 had the necessary evidentiary support given that the figure adopted by the Commission was within the range recommended by the various witnesses and the fact that the Commission "is not limited to specific rates advocated by the parties and is," instead, "allowed to fix a rate based on the evidence presented, just as a jury in assessing an amount of damages is not limited to only specific amounts demanded by a plaintiff or defendant," citing *Duke Power Co. II*, *State ex rel. Utilities Commission v. Public Staff*, 323 N.C. 481, 493, 374 S.E.2d 361, 367 (1988), and *Legacy Data Access, Inc. v. Cadrillion, LLC,* 889 F.3d 158, 168 (4th Cir. 2018). In the utilities' view, the environmental intervenors seek to "box in the Commission and take away any room for the Commission as a regulatory body to use its expertise, discretion, or subjective judgment," a result which is "simply not the law in the State of North Carolina," citing *Duke Power Co. II*, 305 N.C. at 7, 287 S.E.2d at 790. On the contrary, the utilities contend that "the Commission does not have to provide an equation or create a graph on how it set the [Basic Facilities Charge] for the residential rate classes at $14.00" and point out that, "[i]n *Duke Power Co. [II]*, this Court did not require that the Commission provide a direct link or detail" as to the specific return on equity that it approved in that proceeding, citing *id*. at 30, 287 S.E.2d at 803.

The utilities contend that the record contained "overwhelming evidence" supporting the Commission's decision to increase the residential Basic Facilities Charge, with this evidence resting upon Duke Energy Carolinas' cost of service study, which indicated that the charge in question should be set at $23.78 even though Duke Energy Carolinas only proposed to increase it to $17.79 in order "to moderate any effect of the increase on low-usage customers." In addition, the utilities point to the fact that Duke Energy Carolinas witness Michael Pirro testified that an increase in the residential Basic Facilities Charge was necessary because "it is important that [Duke Energy Carolinas'] rates reflect cost causation to minimize subsidization of customers within the rate class."

The utilities deny that the validity of the Commission's determination with respect to the appropriate level of the residential Basic Facilities Charge is controlled by this Court's decision in *Eddleman* on the grounds that, in *Eddleman*, this Court rejected an argument that the Commission's mislabeling of findings and conclusions did not constitute prejudicial error "so long as the order reflected a basic understanding of how the decision-making process is supposed to work." The utilities argue that, in this case, there is "no issue about whether the Commission . . . mislabel[ed] its findings of fact and conclusions of law." Similarly, the utilities deny that this case is controlled by *Cooper II*, in which this Court required the Commission to demonstrate that it had actually weighed the evidence and exercised its

independent judgment without adopting any requirement that the Commission explain the weight to be given to the testimony of any specific witness.

The utilities acknowledge that the record contains considerable evidence concerning the potential effect of the proposed increase in the residential Basic Facilities Charge upon energy conservation and upon low-income households. On the other hand, the utilities note that the Commission also heard extensive evidence regarding "the need for the rates in the residential rate classes to more adequately reflect cost causation" and point out that, "[a]s the administrative agency vested by the General Assembly with 'broad powers to regulate public utilities and to compel their operation in accordance with the policy of the State,' these are the kinds of policy choices the Commission has been entrusted to make," citing *State ex rel. Utilities Commission v. Public Staff*, 123 N.C. App. 623, 625, 473 S.E.2d 661,663 (1996). For that reason, the utilities contend that the Commission "must have room to exercise its discretion and judgment," quoting *Eddleman*, 320 N.C. at 379, 358 S.E.2d at 361, and did so in this case, having fully considered the policy pronouncements set forth in N.C.G.S. § 62-2(a), 3(a), (4), and (5) and N.C.G.S. § 62-155(a) and the evidence presented by the environmental intervenors in the course of determining that the importance of adopting residential rates that reflect the underlying cost of service outweighed the concerns expressed by the environmental intervenors.

The utilities argue that the Commission "clearly considered the impact of any increase . . . on low-income customers because it authorized a lesser increase" than

the one that had been proposed by Duke Energy Carolinas "to moderate the impact of such increases" upon the affected customers. The utilities claim that the Commission simply "gave greater weight" to the evidence presented by Duke Energy Carolinas' witnesses than it did to the evidence supported by the environmental intervenors. In addition, the utilities argue that the Commission's decision to decrease the overall revenue that Duke Energy Carolinas was entitled to collect from customers was "primarily due to the impact of the Federal Tax Cuts and Jobs Act of 2017 lowering the corporate income tax rate," a consideration that "ha[d] no effect on the underlying cost to serve customers or the significant gap between that cost to serve and the [Basic Facilities Charge] for the residential rate classes."

The utilities also argue that the Minimum System Methodology "has served as a foundation for establishing the flat monthly [Basic Facilities Charge] by electric utilities since the early 1970s" and that "the Commission ha[d] never rejected the use" of this methodology in supporting its Basic Facilities Charge decisions. On the contrary, the Commission "simply did not award . . . the full amount of costs designated as customer-related by the cost of service study using [the Minimum System Methodology]" in previous orders given Duke Energy Carolinas' failure to request approval for a residential Basic Facilities Charge that mirrored the amount shown to be appropriate in its cost of service study. In addition, the utilities argue that the environmental intervenors had "completely miscast the nature of the [Minimum System Methodology,]" deny that it "is . . . an appraisal mechanism or

determinant of the costs or value of utility assets," and contend that it "is a method for allocating the actual distribution system costs into the portion of those costs that are customer related . . . and the portion that are demand related" that did not violate N.C.G.S. § 62-133(b)(1).

Finally, the utilities argue that the Commission's decision to approve an increase in the residential Basic Facilities Charge was not unduly discriminatory and rested upon "reasonable differences between the residential and non-residential rate classes," citing N.C.G.S. § 62-140(a) (stating that "[n]o public utility shall, as to rates or services, make or grant any unreasonable preference or advantage to any person or subject any person to any unreasonable prejudice or disadvantage" and that "[n]o public utility shall establish or maintain any unreasonable difference as to rates or services either as between localities or as between classes of service"). According to the utilities, N.C.G.S. § 62-140(a) does not prohibit mere "preferences, advantages, prejudices, disadvantages, differences or discrimination in setting rates," citing *State ex rel. Utilities Commission v. Bird Oil Co.*, 302 N.C. 14, 22, 273 S.E.2d 232, 237 (1981), with the real question being "not whether the differential is merely discriminatory or preferential," but rather "whether the differential is an unreasonable or unjust discrimination." The utilities note that this Court held in *State ex rel. Utilities Commission v. Nello L. Teer Co.*, 266 N.C. 366, 146 S.E.2d 511 (1966), that the charging of different rates for services rendered did not constitute a per se violation of N.C.G.S. § 62-140 and stated in *State ex rel. Utilities Commission*

*v. Carolina Utilities Customers Ass'n*, 351 N.C. 223, 524 S.E.2d 10 (2000), that utilities may treat customers differently "so long as the variance in charges bears a reasonable proportion to the variance in conditions," quoting *id.* at 243, 524 S.E.2d at 24, based upon the quantity of use, the time of use, the manner of service, and the cost of rendering the various services, citing *id.* at 244, 524 S.E.2d at 24, coupled with a consideration of competitive conditions, the consumption characteristics of the several classes, and the value of service to each class, citing *North Carolina Textile Manufacturers Ass'n*, 313 N.C. at 222, 328 S.E.2d at 269. After noting that the burden lies with the party seeking to challenge the validity of a Commission-approved rate, citing *id.*; *State ex rel. Utilities Commission v. Edmisten*, 314 N.C. 122, 132, 333 S.E.2d 453, 460 (1985), *vacated sub nom. Nantahala Power & Light Co. v. Thornburg*, 477 U.S. 902, 106 S. Ct. 3268, 91 L. Ed. 2d 559 (1986), the utilities argue that the environmental intervenors had failed to satisfy the applicable burden of proof given the presence in the record of evidence demonstrating the existence of "material differences" between the rate classes in this case and the "greater disparity between the [Basic Facilities Charge] and the true cost of service in the residential rate schedules as compared to the non-residential rate schedules."

We do not find the environmental intervenors' challenge to the lawfulness of the Commission's decision to authorize Duke Energy Carolinas to increase its residential Basic Facilities Charge to $14.00 to be meritorious. Duke Energy Carolinas witness Janice Hager testified that the Minimum System Methodology was

"one of two [methodologies set out] in the [National Association of Regulatory Utility Commissioners] Cost of Service manual for allocation of distribution costs," both of which "result in the assignment of distribution costs to customers." Ms. Hager emphasized that each of North Carolina's three major electric utilities "have a long history of using minimum system studies to identify the portion of distribution costs that are customer related" and opined that the "theory" underlying the Minimum System Methodology is "sound and consistent with cost causation which is the bedrock of [cost of service] studies." According to Ms. Hager, the Minimum System Methodology "allowed [Duke Energy Carolinas] to classify the distribution system into the portion that is customer-related (driven by number of customers) and the portion that is demand-related (driven by customer peak demand levels)" based upon the assumption that "[e]very customer requires some minimum amount of wires, poles, transformers, etc. to receive service."

Ms. Hager testified that Duke Energy Carolinas "develop[ed] its minimum system study . . . to consider what distribution assets would be required if every customer had only some minimum level of usage," thereby allowing "the utility to assess how much of its distribution system is installed simply to ensure that electricity can be delivered to each customer, regardless of the customer's frequency of use." Ms. Hager stated that, unless a minimal component of the utility's distribution system was treated as a customer-related cost, "low use customers could avoid paying for the infrastructure necessary to provide service to them which is

counter to cost causation principles." In the event that these minimum system costs were allocated on a demand, rather than a customer-related, basis, Ms. Hager contended that "customers with higher usage [would be] subsidizing those with lower usage."

According to Mr. Pirro, "[t]he [proposed] base rate increase [was] allocated to the rate classes on the basis of rate base," an "allocation methodology [that] distributes the increase equitably to the classes while maintaining each class' deficiency or surplus contribution to return." Mr. Pirro testified that, in designing the proposed rates, Duke Energy Carolinas took into consideration "concern[s] regarding the size of the increase and . . . the impact of the [increase] on its customers" while "better reflect[ing] all customer-related costs" in order to reduce "customer cross-subsidization." According to Mr. Pirro, Duke Energy Carolinas' "current rates significantly understate the current cost of service related to the customer component of cost."

In Mr. Pirro's view, the proposed increase in Duke Energy Carolinas' residential Basic Facilities Charge would "better recover customer-related cost identified in the unit cost study for the residential rate class." According to Mr. Pirro, "[c]ustomer-related costs are unaffected by changes in customer consumption and therefore should be paid by each participant, regardless of their consumption." Mr. Pirro asserted that "[r]esidential customer-related revenue not recovered in the Basic Facilit[ies] Charge is shifted to energy rates causing high usage customers to

subsidize rates of lower usage customers," with a decision to leave these costs in the energy charges serving to "overinflate" the savings resulting from the energy-related component of the utility's rates. Mr. Pirro disputed the validity of any assertion that the proposed increase in the residential Basic Facilities Charge would discourage appropriate energy efficiency efforts in light of the fact that a failure "to properly recover customer-related cost via a fixed monthly charge provides an inappropriate price signal to customers and fails to adequately reflect cost causation" and that "[s]hifting customer-related cost to the [kilowatt-hour] energy rate [would] further exacerbate[ ] this concern and over-compensate[ ] energy efficiency and distributed generation for the cost avoided by their actions."

Mr. Pirro testified that the "goal" that Duke Energy Carolinas sought to achieve with its proposed rate design, which increased the residential Basic Facilities Charge by "approximately 50 percent of the difference between the current rate . . . and the customer-related cost . . . identified in the unit cost study," was to "use cost causation" along with "the concept of gradualism to effectively recover costs as they are incurred," with any decision to "defer[ ] a larger increase at this time merely shift[ing] the need to increase the Basic Facilit[ies] Charge to a future rate case proceeding." In addition, Mr. Pirro stated that, while the utility was "mindful of the impact of any rate increase on our customers, particularly low-income customers," it "applies cost causation principles to the extent possible" and believes that "[t]here are

other means of addressing the financial needs of low-income customers which are more effective than biasing the rate design."

In light of the great deference that we owe to the Commission's decisions with respect to rate design issues, *North Carolina Textile Mfrs. Ass'n*, 313 N.C. at 222, 328 S.E.2d at 269, we hold that the record evidence is more than sufficient to support the Commission's decision to increase the residential Basic Facilities Charge from $11.80 to $14.00 in order to more accurately reflect cost-causation principles by removing a certain level of fixed costs from energy-related charges and assigning them among customers on a per customer rather than a per kilowatt hour basis. Although the environmental intervenors challenge the Commission's decision to approve the use of the Minimum System Methodology for cost assignment purposes, the testimony of Ms. Hager provides ample justification for the decision in question. In deciding to approve the use of the Minimum System Methodology, the Commission "recognize[d] that any approach to classifying costs has virtues and vices" while noting that it "[was] not persuaded . . . that the minimum system analysis employed by [Duke Energy Carolinas] [was] flawed in a way that preclude[d] the Commission from accepting it as appropriate for cost allocation in this proceeding." Similarly, while the environmental intervenors urged the Commission to utilize a cost allocation methodology that assigned no portion of the utility's distribution system costs on a per customer, rather than a demand or energy-related basis, the Commission was well within the scope of its statutory authority in determining that a portion of the

cost of its distribution system should be assigned on a per customer basis in light of the existence of record evidence tending to show that no customer could receive service in the absence of a minimal level of distribution facilities. The record also reflects that the Commission gave further heed to the concerns expressed by the environmental intervenors relating to the use of the Minimum System Methodology by concluding that "a more focused and explicit evaluation of options for distribution system cost allocation and an assessment of the extent to which any single allocation methodology is being consistently applied by the utilities" should be conducted in future general rate proceedings and directing the Public Staff "to facilitate discussions with the electric utilities to evaluate and document a basis for continued use of minimum system," "to identify specific changes and recommendations as appropriate," and to "submit a report on its findings and recommendations to the Commission" by the end of the first quarter of 2019.

At the end of the day, "[i]t is not this Court's duty to evaluate the accuracy of complex statistical models, conflicting methodologies, and the opposing expert opinions drawn therefrom," with this being, instead, "the duty of the Commission which has special knowledge, experience and training best suited to make such determinations." *State ex rel. Utils. Comm'n v. Carolina Utility Customers Ass'n,* 323 N.C. 238, 251, 372 S.E.2d 692, 699–700 (1988). In the event that this Court was to determine, as a matter of law, that the Commission is required to adopt a cost allocation methodology that refrained from assigning a portion of the cost of Duke

-117-

Energy Carolinas' distribution system on a customer-related, rather than a demand or energy-related basis, on the basis of the evidentiary record developed in this case, we would be trespassing into territory that the General Assembly has assigned to the Commission and depriving that body of its statutorily-required opportunity to use its expertise in determining such technical issues as whether a portion of the cost of the utility's distribution system should be treated as customer-related or demand-related costs and how best to assign those costs among the various components of individual rate schedules at the conclusion of the ratemaking process. As a result of the fact that the arguments for and against the use of the Minimum System Methodology "are essentially fact based and are more properly made to the Commission than to this Court," *id.* at 251, 372 S.E.2d at 699, we find no error of law in the Commission's decision to use that approach in designing Duke Energy Carolinas' residential Basic Facilities Charge.

The environmental intervenors' remaining challenges to the Commission's decision to approve an increase in the residential Basic Facilities Charge are equally unavailing. Although the General Assembly has stated that "it is declared to be the policy of the State of North Carolina" to "promote adequate, reliable, and economical utility service, N.C.G.S. § 62-2(a)(3); to "avoid[ ] wasteful, uneconomic, and inefficient use of energy," N.C.G.S. § 62-2(a)(4); to "encourage and promote harmony between public utilities, their users, and the environment," N.C.G.S. § 62-2(5); and "to conserve energy through efficient utilization of all resources," N.C.G.S. § 62-155(a),

the General Assembly has also stated that it is the policy of the State of North Carolina to "[t]o provide just and reasonable rates and charges for public utility services without unjust discrimination, undue preferences, or advantages," N.C.G.S. § 62-2(4). An examination of the relevant statutory provisions, which are couched as policy pronouncements rather than specific statutory mandates, demonstrates that the Commission is required to attempt to further multiple, potentially conflicting, policy goals in carrying out its work. In view of the fact that the Commission is frequently called upon to choose between regulatory alternatives that further differing policy objectives, the ultimate question is whether the Commission appropriately balanced the competing regulatory policy goals that it is required to further in exercising its regulatory discretion given the state of the evidentiary record rather than whether its decision furthered a particular policy goal to the maximum extent possible. Thus, the Commission would not have committed any error of law in the event that it elected, based upon adequate evidentiary support, to place principal emphasis upon the need to eliminate existing cross-subsidies among customers and customer classes as compared to placing maximum price pressure upon energy use in making any particular ratemaking decision.

In addition, the Commission did not commit any error of law by adopting a specific dollar figure for Duke Energy Carolinas' residential Basic Facilities Charge that was not advocated for by any particular party to this proceeding. In this case, the record reflects that the $14.00 per month figure to which the environmental

intervenors object had the effect of moving the utility's residential Basic Facilities Charge what the Commission believed to a more cost-justified level in a gradual way in an attempt to reduce the amount of cross-subsidization inherent in the existing rate structure while mitigating the practical concerns that led the environmental intervenors to object to Duke Energy Carolinas' original proposal. The adoption of such an approach is well within the confines of the Commission's statutory authority. Similarly, the fact that the exact dollar figure at which the Commission established Duke Energy Carolinas' residential Basic Facilities Charge was identical to the dollar value set out in the stipulation between Duke Energy Progress and the Public Staff does not show the existence of any legal defect in the Commission's decision given that the evidence would have supported a higher residential Basic Facilities Charge than the Commission actually adopted and given that the figure chosen by the Commission represented a gradual increase in the residential Basic Facilities Charge toward a more cost-justified level in an effort to effectuate multiple regulatory goals, including the avoidance of overly drastic changes in a utility's rate structure at any single point in time.

As the Commission's decision to refrain from setting the utility's residential Basic Facilities Charge at the exact figure shown in the cost of service study suggests, the Commission's order demonstrates that it was well aware of the potential impact of this rate change upon certain categories of residential customers, particularly low-income customers. However, the determination that the benefits to be obtained as

the result of the establishment of what it believed to be a more cost-justified rate schedule outweigh other relevant considerations is a decision that the Commission, in the exercise of its regulatory discretion, is entitled to make as long as its order contains adequate findings and conclusions and as long as those findings and conclusions have sufficient evidentiary support. In further recognition of the concerns expressed by the environmental intervenors, the Commission also concluded that there are "more effective" means of managing low-income customers' needs and "encourage[d] [Duke Energy Carolinas] . . . to identify low-income customers" who were likely to have difficulty with the increased rates "in order to provide assistance." As a result, the record reflects that the Commission adequately considered the interests of adversely affected customers in deciding to approve the establishment of a $14.00 per month Basic Facilities Charge for Duke Energy Carolinas' residential customers.

The Commission also adequately addressed the environmental intervenors' argument that its decision to increase the residential Basic Facilities Charge while leaving the Basic Facilities Charges for other customer classes unchanged was unduly discriminatory in violation of N.C.G.S. § 62-140. In response to this contention, the Commission noted that the utility's non-residential rate schedules were more complex than its residential rate schedules, with this statement being supported by evidence tending to show that many non-residential rate schedules contain a "demand charge" that reflects the "kilo-watt . . . capacity the power

company must maintain to meet the [maximum] demand or requirement of the customer, though not used*." State ex rel. Utils. Comm'n v. Carolinas Committee for Industrial Power Rates, etc.*, 257 N.C. 560, 562, 126 S.E.2d 325, 327 (1962). Aside from making non-residential rate schedules more complex than residential rate schedules, the Commission noted that the use of a demand charge may serve to align non-residential rates more closely with cost-causation considerations than residential rates. In addition, the Commission found that the same divergence between appropriate cost-causation principles and the actual design of the utility's residential rates reflected in Duke Energy Carolinas' existing residential Basic Facilities Charge was not present in the utility's non-residential rates given that those rates generally included a demand, as well as a customer-related, component. As a result, for all of these reasons, we hold that the Commission did not commit any error of law by approving an increase in Duke Energy Carolinas' residential Basic Facilities Charge.[24]

### III.  Conclusion

Thus, for all of these reasons, we conclude that the Commission did not err by: (1) allowing the inclusion of a large majority of the utilities' coal ash costs in the cost

---

[24] Although we affirm the Commission's conclusions with respect to this issue in this case, we note that the Commission's rate design decisions do not have *res judicata* effect and may be revisited in future general rate proceedings. *Duke Power Co. I*, 285 N.C. at 395, 206 S.E.2d at 281; *State ex rel. Utils. Comm'n v. Edmisten*, 294 N.C. 598, 603, 242 S.E.2d 862, 866 (1978); *Thornburg I*, 325 N.C. at 469, 385 N.C. at 454.

of service used for the purpose of establishing the utilities' North Carolina retail rates; (2) interpreting N.C.G.S. § 62-133(d) to authorize the Commission, in the exercise of its discretion, to allow a return on the unamortized balance of the deferred operating expenses; and (3) increasing Duke Energy Carolinas' residential Basic Facilities Charge from $11.80 to $14.00. On the other hand, we hold that the Commission erred by rejecting the Public Staff's equitable sharing proposal without properly considering and making findings and conclusions concerning "all other material facts" as required by N.C.G.S. § 62-133(d). As a result, we affirm the Commission's decisions, in part, and reverse and remand the Commissions' decisions for further proceedings not inconsistent with this decision, in part.

AFFIRMED, IN PART; REVERSED AND REMANDED, IN PART.

Justice NEWBY concurring in part and dissenting in part.

I agree with most of the majority's analysis. I disagree, however, with the majority's conclusion that the Commission erred by rejecting the Public Staff's equitable sharing proposal in both the Duke Energy Progress (DEP) rate case and the Duke Energy Carolinas (DEC) rate case without, in the majority's view, properly considering and making findings and conclusions concerning "all other material facts" pursuant to N.C.G.S. § 62-133(d), specifically including the alleged environmental violations. To the contrary, the Utilities Commission considered all the evidence and chose not to assess further penalties, other than the $100,000,000 that it had already imposed, against the utilities in the respective orders. As such, the Utilities Commission did not abuse its discretion when choosing to reject the Public Staff's proposal. Moreover, the majority's approach seems to untether the Utilities Commission from its statutorily delineated discretion to make these determinations, which raises separation of powers concerns. Essentially, the majority seems to promulgate an unbridled approach contrary to the statutorily defined discretion and authority afforded to the Utilities Commission in its own, unique capacity. Therefore, I concur with the majority's opinion in part and dissent in part.

The Utilities Commission did not abuse its discretion in rejecting the Public Staff's equitable sharing proposal in both of its orders, the DEP Order as well as in the DEC Order. Notably, the Utilities Commission's discretionary determination is

reviewed by this Court for an abuse of discretion. *See State ex rel. Utils. Comm'n v. Public Staff-North Carolina Utils. Comm'n*, 123 N.C. App. 623, 627, 473 S.E.2d 661, 664 (1996) ("Exercise of discretionary powers of the Commission will not be reversed by reviewing courts except upon a showing of 'capricious, unreasonable, or arbitrary action or disregard of law.' " (quoting *State ex rel. North Carolina Utils. Comm'n v. Carolina Coach Co.*, 261 N.C. 384, 391, 134 S.E.2d 689, 695 (1964))). Moreover, "the weighing of the evidence and the exercise of judgment thereon within the scope of [the Utilities Commission] authority are matters for the Commission." *Carolina Coach Co.*, 261 N.C. at 391, 134 S.E.2d at 695 (citing *State ex rel. Utils. Comm'n v. Fredrickson Motor Express*, 232 N.C. 180, 59 S.E.2d 582 (1950)). Simply put, a reviewing court's authority is limited. *State ex rel. Utils. Comm'n v. Gen. Tel. Co. of Se.*, 281 N.C. 318, 336–37, 189 S.E.2d 705, 717 (1972).

"Neither such finding of fact nor the Commission's determination of what rates are reasonable may be reversed or modified by a reviewing court merely because the court would have reached a different finding or determination upon the evidence." *Id.* at 337, 189 S.E.2d at 717 (citing *State ex rel. Utils. Comm'n v. Morgan, Att'y Gen.*, 277 N.C. 255, 177 S.E.2d 405 (1970); *State ex rel. North Carolina Utils. Comm'n v. Southern Railway Co.*, 267 N.C. 317, 148 S.E.2d 210 (1966); *State ex rel. Utils. Comm'n v. S. Ry. Co.*, 254 N.C. 73, 118 S.E.2d 21 (1961); *State ex rel. Utils. Comm'n v. Gulf-Atl. Towing Corp.*, 251 N.C. 105, 110 S.E.2d 886 (1959)). While the Commission certainly must consider all statutory enumerated elements, "[t]he

Legislature has . . . designated the Commission to do the weighing of these elements, and the reviewing court may not set aside the Commission's determination of 'fair value' merely because the court would have given the respective elements different weights and would, therefore, have arrived at a different 'fair value.' " *Id.* at 339, 189 S.E.2d at 719 (quoting *Morgan, Att'y Gen.*, 277 N.C. at 267, 177 S.E.2d at 413; then citing *State ex rel. Utils. Comm'n v. State and Utils. Comm'n v. Tel. Co.*, 239 N.C. 333, 344, 349, 80 S.E.2d 133, 140–141, 144 (1954); and then citing *State ex rel. North Carolina Utils. Comm'n v. Westco Tel. Co.*, 266 N.C. 450, 457, 146 S.E.2d 487, 491–92 (1966)).

Under the proper abuse of discretion standard of review, it cannot be said that the Utilities Commission's decision was so arbitrary that it could not be the result of a reasoned decision. The Utilities Commission's thorough orders demonstrate that it knew and was well aware of the alleged environmental violations. While the Utilities Commission need not and could not decide the merits of the alleged violations, it certainly took the underlying facts into account. The evidence admitted and the resulting orders show that the Utilities Commission properly considered all of the allegations. The Commission even noted it was "unable to find DEP faultless in the dilemma." The Commission stated that these circumstances of mismanagement resulted in its decision to impose $70,000,000 and $30,000,000 management penalties in the two orders.

Specifically, in the DEP rate case, the Commission decided to allow amortization of the deferred costs "over five years with a full return on the unamortized balance," but it did so after making a downward adjustment for a management penalty. Moreover, in the DEC rate case, the Utilities Commission explained that, other than adjusting for a management penalty, it would not be appropriate for the Commission to exercise its discretion to make a further downward adjustment. In doing so, the Commission explained its decision:

> No witness argues that the Commission lacks the discretion to follow the precedent it established in [early rate cases,] where it addressed the issue of amortizing deferred ARO CCR remediation costs over five years and a return on the unamortized balance. No witness argues that the law forbids the Commission to authorize a return on the unamortized balance. The Commission chooses to exercise its discretion and authority under N.C.[G.S.] § 63-133(d) and follow its precedent here—amortize the ARO costs over five years and authorize a return on the unamortized balance . . . . The Commission will not accept the Public Staff equitable sharing argument primarily because the Commission determines in its discretion that amortization of the deferred ARO costs over 25 years is inequitable . . . .

The Commission clearly explained that, despite recognizing the alleged fault of the Utilities in their management of these situations, when considering rate setting, rates that do not allow a utility to recoup reasonable costs jeopardizes the financial strength of the utility, which results in higher rates for ratepayers over time and diminished quality of services that the utility must provide. Thus, the Commission's decisions certainly were not without reason and explanation; it

therefore cannot be said that the Commission abused its discretion in allowing a downward adjustment in imposing management penalties, just not to the extent and in the way that the Public Staff requested. To the extent that the applicable statute gave the Utilities Commission a degree of discretion, it understood that it possessed the discretion and exercised the discretion appropriately, explaining its choice to do so.

Neither the Public Staff nor the majority can point to a factor that was not considered in either order. Instead, the Public Staff recommended that the Utilities Commission disallow the Utilities from recovering 50% of the coal ash closure costs in the DEP rate case, and 51% of costs in the DEC rate case. The Public Staff could offer no explanation for selecting the 50% and 51% disallowances. Contrary to the Public Staff's inability to explain its recommended percentages for disallowances, the Commission did explain why the Public Staff's recommendation of a 51% disallowance in the Duke Energy Carolinas rate case was arbitrary:

> [T]he concept is standard-less, and, therefore, from the Commission's view arbitrary for purposes of disallowing identifiable costs—there is no rationale that supports a substantially large 51% disallowance. The Public Staff chose a desirable equitable sharing ratio, then backed into the mechanism to achieve that level of disallowance, leaving the allocation subject to an arbitrary and capricious attack, particularly as it provides no explanation as to why the "equitable" split for DEP in the 2018 DEP Case was in its view 50-50, while the "equitable" split in this case is 51-49. As the Commission held in the 2018 DEP Case, the "Public Staff provides insufficient

justification for the 50/50 [split] as opposed to 60/40 or 80/20 . . . ." 2018 DEP Rate Order, p. 189.

Therefore, it does not appear that the Utilities Commission thought it lacked the authority to weigh all factors presented, nor do the Commission's orders show a willful decision to ignore the Public Staff's argument with regard to the environmental concerns. To the contrary, after carefully considering the Public Staff's recommendations as a whole, the Utilities Commission rejected the Public Staff's recommendation since the Commission already imposed a downward adjustment in the form of management penalties. Therefore, contrary to the majority's conclusion, these cases need not be remanded to the Utilities Commission because it did not abuse its discretion.

Further, the majority's approach in remanding the case to consider additional factors broadens the statutorily delineated discretion that the Utilities Commission has, thereby raising constitutional concerns about separation of powers. By statute, the Utilities Commission does not have unbridled discretion. When the General Assembly delegated some of its legislative authority to the Utilities Commission, the legislature properly set forth "adequate guiding standards to govern the exercise of the delegated powers." *Adams v. N.C. Dep't of Nat. and Econ. Res.*, 295 N.C. 683, 697, 249 S.E.2d 402, 410 (1978). "In fixing rates to be charged by a public utility, the Commission is exercising a function of the legislative branch of government." *Gen. Tel. Co. of Southeast*, 281 N.C. at 336, 189 S.E.2d at 717. The General Assembly,

however, limited the Utilities Commission's discretion by setting forth specifically enumerated factors to consider when fixing rates, stated in section 62-133 of the General Statutes. The Commission must comply with the statutory requirements. *Id.* at 336, 189 S.E.2d at 717.

In addition to the specifically enumerated factors set forth in section 62-133, the statute also provides that "[t]he Commission shall consider all other material facts of record that will enable it to determine what are reasonable and just rates." N.C.G.S. § 62-133(d) (2019). The Utilities Commission should set forth the factors considered "so that the reviewing court may see what these elements are and determine the authority of the Commission to consider them as 'relevant to the present fair value.' The statute does not contemplate that the Commission may 'roam at large in an unfenced field' in the selection of such 'other facts.' " *Gen. Tel. Co. of Southeast*, 281 N.C. at 340, 189 S.E.2d at 719 (quoting *State ex rel. Utils. Comm'n v. Pub. Serv. Co.*, 257 N.C. 233, 237, 125 S.E.2d 457, 460 (1962)). While the Commission must consider the factors as enumerated in the statute, and failure to do so warrants reversal, so long as it does so, determining the weight given to those factors when reaching its conclusion is certainly within the Commission's authority and is not the role of a reviewing court. *Id.* at 358–59, 189 S.E.2d at 731.

Here the Commission held over a month of hearings and considered testimony and thousands of pages of exhibits. While the General Assembly has instructed that the Commission shall consider all material facts, this instruction must be read in the

context of the entire statute, part of which directs the Commission to follow a specific formula when it sets rates for public utilities. *See* N.C.G.S. § 62-133(b), (c) (2019). These statutory guiding principles enable the Utilities Commission to constitutionally fulfill its role. The Public Staff's position, which essentially asks the Commission to deny a fair rate of return in its unbridled discretion, simply cannot be adopted without the Utilities Commission roaming outside the clear statutory requirements. Thus, allowing the Utilities Commission this type of unfettered discretion implicates separation-of-powers principles, which require that the legislature give specific, detailed guidelines to the Utilities Commission in exercising its legislative function of setting rates. Notably, the Commission reasoned that adopting unsupported percentages as set forth by the Public Staff would equate to the Commission acting arbitrarily and capriciously, which the Commission cannot do.[1] Therefore, the Commission's decision to reject the Public Staff's recommendation was within its statutorily defined discretion.[2]

---

[1] Moreover, the Utilities Commission certainly knew and understood the decision it made in *Dominion*, where it agreed to the Public Staff's stipulation about Dominion's ability to recover costs and receive a rate of return. *In re Application of Va. Elec. & Power Co., d/b/a Dominion N.C. Power, for Adjustment of Rates and Charges Applicable to Elec. Util. Serv. in N.C., Order Approving Rate Increase and Cost Deferrals and Revising PJM Regulatory Conditions,* Docket No. E-22, Sub 532 (December 22, 2016) (available through https://starw1.ncuc.net/NCUC/page/Orders/portal.aspx by searching docket number and date). If the Utilities Commission decides this case differently, the Commission could be charged with making an arbitrary and capricious decision, departing from a prior decision with very similar facts.

[2] The Commission reached its decision by thoroughly explaining its reliance on *Thornburg I* and *Thornburg II*, both of which dealt at least in part with plants that were

Thus, I disagree with the majority's conclusion that the Commission erred by rejecting the Public Staff's equitable sharing proposal without, in its view, properly considering and making findings and conclusions concerning "all other material facts." Both orders should be affirmed. Therefore, I respectfully concur in part and dissent in part.

---

never used at all. *See State ex rel. Utils. Comm'n v. Thornburg*, 325 N.C. 463, 385 S.E.2d 451 (1989) (*Thornburg I*); *State ex rel. Utils. Comm'n v. Thornburg*, 325 N.C. 484, 385 S.E.2d 463 (1989) (*Thornburg II*). This Court on appeal concluded that the Utilities Commission did not have the authority to effectuate any sort of "equitable sharing" position in its decision; either the plants and the relevant equipment were used and useful, and therefore should be included in rate base, or they were not. Therefore, the Utilities Commission here acted within the appropriate scope when determining that, after allowing a management penalty, that certain costs should be allowed based on the statutory criteria that control the Utilities Commission's ability to act.

Justice EARLS concurring in part and dissenting in part.

Starting for a moment with the basics of what this case involves, the law of North Carolina tasks us with the duty to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of any Commission action." N.C.G.S. § 62-94(b) (2019). In so doing, this Court may:

> affirm or reverse the decision of the Commission, declare the same null and void, or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:
> (1) In violation of constitutional provisions, or
> (2) In excess of statutory authority or jurisdiction of the Commission, or
> (3) Made upon unlawful proceedings, or
> (4) Affected by other errors of law, or
> (5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted, or
> (6) Arbitrary or capricious.

*Id.* Further, we must take into account the policy of the State described by the General Assembly in statute, as well as the purposes of the laws it writes. *See, e.g.*, *State ex rel. Utils. Com. v. Morgan*, 277 N.C. 255, 266, 177 S.E.2d 405, 412 (1970) (taking account of the "clear purpose of chapter 62 of the General Statutes" as well as that chapter's declaration of policy to reject an interpretation of N.C.G.S. § 62-133(b) proposed by a utility). To that end, I observe that it is "the policy of the State of North Carolina," *inter alia*, to "provide fair regulation of public utilities in the

interest of the public" and to "encourage and promote harmony between public utilities, their users and the environment." N.C.G.S. § 62-2(a) (2019). "To these ends, therefore, authority shall be vested in the North Carolina Utilities Commission to regulate public utilities generally, their rates, [and their] services and operations . . . in the manner and in accordance with the policies set forth in this Chapter." *Id.* § 62-2(b). The Commission is required to "fix such rates as shall be fair both to the public utilities and to the consumer." *Id.* § 62-133(a).

In this case the intervenors allege that the utilities have caused significant harm to the environment through their operations. The majority has already described some of the history of that harm, including the 2014 incident at Dan River resulting in between 30,000 and 39,000 tons of coal ash being discharged into the river, as well as the nine criminal violations to which the utilities pleaded guilty in federal court. Against the backdrop of new legislation requiring the utilities to address discharges at their coal ash basins, close all of their unlined coal ash basins, and change their coal ash management practices, *see* N.C.G.S. § 130A-309.211–.214, the utilities petitioned the Commission for permission to defer their compliance expenses. The utilities noted that, if they were required instead to "write off billions of dollars of costs for accounting purposes," their investors would receive a return on their investment of approximately 7.5% rather than the approximately 10.3% they would otherwise receive. This is the context of the decision before us—whether to affirm orders from the Commission which place the weight of coal ash cleanup costs

on North Carolina energy customers so that investors in Duke Energy Progress and Duke Energy Carolinas receive a higher return on their investment.

I concur in the majority's conclusion that the orders entered by the North Carolina Utilities Commission are sufficient to satisfy the requirements of N.C.G.S. § 62-79(a) (2019) because the orders are "sufficient in detail to enable the court on appeal to determine the controverted questions presented." *See* N.C.G.S. § 62-79(a). Further, I concur in the majority's conclusion that the decision to increase the Basic Facilities Charge levied by Duke Energy Carolinas for some classes of customers is supported by sufficient evidence in the record.

I also agree, in part, with the majority's discussion of the Commission's conclusions with respect to cost recovery. The Commission ultimately found that the coal ash expenditures made by Duke Energy Progress, LLC, and Duke Energy Carolinas, LLC, were reasonable and prudent within the meaning of the statute so as to permit cost recovery in rates. The intervenors argued that all of these costs should have been disallowed because the utilities unreasonably decided to store coal ash in unlined basins, and further mismanaged those basins, resulting in environmental damage and increased cost to consumers. While the intervenors make a strong policy argument, the majority was correct on the law to reject such a broad claim. I write separately on this point, however, because I disagree with the majority's ultimate conclusion. In my view, the Commission erred by determining that the

intervenors failed to produce evidence sufficient to trigger the utilities' burdens of persuasion that the costs were reasonable.

Further, I disagree with the majority's analysis concerning the extent of the Commission's discretionary authority pursuant to N.C.G.S. § 62-133(d) (2019) to allow the utilities to earn a return on the unamortized portion of their deferred coal ash costs.[1] While I agree with the majority's ultimate determination that the Commission did not appropriately utilize its discretion, which is expressed in the majority's remand for a more fulsome consideration of the Public Staff's equitable sharing proposal, I would hold that the Commission's authority is limited by the express terms of that statute and does not extend so far as the majority allows. As a result, I respectfully dissent from that portion of the majority's opinion.

**Cost recovery**

When the Commission is setting rates for a public utility, part of what it must do is determine the utility's "reasonable operating expenses." N.C.G.S. § 62-133(b)(3). When the Commission calculates the total amount of revenue that the utility will be allowed to recover from consumers through rates, the reasonable operating expenses are included in that figure. *Id.* § 62-133(b)(5). However, a utility may only recover those operating expenses which are reasonable and prudent. *See, e.g., State ex rel.*

---

[1] No part of the majority's opinion suggests that the coal ash expenditures were properly included in rate base as property used and useful, and therefore entitled to a return. *See* N.C.G.S. § 62-133(b)(1), (4). While the majority does not discuss this aspect of the case in detail, I elaborate on the issue below.

*Utils. Comm'n v. Eddleman*, 320 N.C. 344, 368, 358 S.E.2d 339, 355 (1987). While we presume that a utility's costs are reasonable, *State ex rel. Utils. Comm'n v. Conservation Council of N.C.*, 312 N.C. 59, 64, 320 S.E.2d 679, 683 (1984), the presumption is overcome if a challenger produces affirmative evidence that the costs "are exorbitant, unnecessary, wasteful, extravagant, or incurred in abuse of discretion or in bad faith or that such expenses exceed either the cost of the same or similar goods or services on the open market or the cost similar utilities pay to their affiliated companies for the same or similar goods or services," *State ex rel. Utils. Comm'n v. Intervenor Residents of Bent Creek/Mt. Carmel Subdivisions*, 305 N.C. 62, 76–77, 286 S.E.2d 770, 779 (1982) (*Bent Creek*). If this happens, the utility must satisfy its burden of persuasion to show that the costs are reasonable. *Id.* at 75–76, 286 S.E.2d at 778–79.

The majority holds that the Commission did not err when it determined that the Attorney General and other intervenors did not produce evidence to overcome the presumption of reasonableness for the utilities' costs. This may be true on a broad basis, in the sense that the intervenors did not produce evidence which would indicate that all of the utilities' costs were imprudent. As it relates to the utilities' decisions to utilize unlined coal ash basins in the first place, the intervenors largely produced evidence suggesting that the utilities' practices were shortsighted, motivated by near-term profit, or insufficiently sensitive to environmental concerns. Certainly, history has demonstrated that the utilities were insufficiently concerned with the

environmental impacts of their actions, as evidenced by the extensive record of groundwater seepage, coal ash spills, and other negative environmental effects of the utilities' practices. Further, the evidence demonstrated that, at least in some cases, the utilities ignored the risk of environmental harm. For example, the record in the Duke Energy Progress rate case includes a report, prepared in 2004, regarding a long-term strategy for coal ash at the utility's L.V. Sutton Steam Electric Plant. The report identified problems at the plant, including (1) that an unlined coal ash basin was nearing capacity and would be full within two years, (2) that a nearby test monitoring well was showing high levels of arsenic, and (3) that environmental regulatory pressure was increasing on coal ash storage practices. The report outlined a number of long-term solutions, none of which had been implemented as of 2014. However, the statutory definition of reasonable operating expenses does not relate to the general reasonableness of the overall course of action but only to the reasonableness of the costs incurred. *See Bent Creek,* 305 N.C. at 76-77, 286 S.E.2d at 779.

I conclude that the Commission did err in its reasonableness determination because there was specific evidence produced that the particular costs incurred were exorbitant. "For rate-making purposes, the reasonable operating expenses of the utility must be determined by the Commission." *State ex rel. Utils. Comm'n v. N.C. Textile Mfrs. Ass'n.*, 309 N.C. 238, 239, 306 S.E.2d 113, 114 (1983) (per curiam) (citing N.C.G.S. § 62-133(b)). Where affirmative evidence is offered to challenge the reasonableness of incurred expenses, "[t]he Commission has the *obligation* to test the

reasonableness of such expenses." *Bent Creek*, 305 N.C. at 76, 286 S.E.2d at 779. While the majority blesses wholesale the Commission's determinations that the intervenors failed to come forward with sufficient evidence, a closer examination of the record reveals that appropriate evidence was presented.

For example, consider the 2004 report in the record of the Duke Energy Progress rate case pertaining to coal ash management strategies at the L.V. Sutton Steam Electric Plant. The report noted that the plant was permitted for two coal ash basins, one of which was full and the other of which would be full within two years. The report also recognized that the basins "will eventually have to [be] emptied and placed in a lined containment to eliminate the leaching of the ash products into the ground water system." As noted previously, the report presented a number of long-term solutions for managing the facility's coal ash. These included the following options:

- doing nothing;

- increasing the capacity of the newer basin and building a new one in seven years;

- building a new basin more immediately;

- stacking dry ash at the facility and building a vertical dike to increase capacity at the plant;

- using the coal ash to build a golf course;

- using the coal ash to build a wildlife preserve and public park;

- using the coal ash to build an industrial park;

- stacking the dry ash and processing it for sale in cement manufacturing;

- shipping the ash to a landfill or storage facility; and

- using new technology to expand the capacity of the existing coal ash basins.

Significantly, the report also included a section labeled "Economic Analysis." That section stated the following for the "do nothing" approach:

> The economic components of this alternative are all negative and are a direct result of not having any available space in the existing ash pond. The cost figures are derived from the loss of generation from the plant until 2012, at which time the ash would be shipped for the DOT project and allow the plant to continue operation at that time.

> This alternative would not alleviate the potential emergent projects associated with the unlined 1983 ash pond, or the pre-ash pond disposal site, and the monitoring well issues. The economic evaluation for this alternative will reflect a negative impact based on the cost of these projects and the probability of their occurrence.

Out of the ten alternatives listed in the report, the "do nothing" approach was ranked very near the bottom of the list in an "Economical Ranking."

This is precisely the type of evidence that we identified in *Bent Creek* as "affirmative evidence [that] is offered by a party to the proceeding that challenges the reasonableness of expenses." *See Bent Creek*, 305 N.C. 62, 76–77, 286 S.E.2d 770, 779 (1982). Faced with evidence that the utilities identified and ignored problems which would lead to greater expenses in the future, the Commission was required to "test

the reasonableness of such expenses" when they were presented by the utilities for cost recovery. *Id.* at 76, 286 S.E.2d at 779.

The Commission did not take the approach required of it to determine whether the expenses that the utilities sought to recover were reasonably incurred. A more appropriate approach is demonstrated in the dissents of Commissioner Clodfelter in both the Duke Energy Progress and Duke Energy Carolinas rate cases, where he examined the evidence pertaining to each facility to determine whether the utilities had incurred reasonable costs. As Commissioner Brown-Bland noted in her dissent to the Duke Energy Progress order, the approach taken by the Commission, "without further analysis, does not reasonably assure that the rates fixed for the Company's service are 'fair to both the public utility[y] and to the consumer,' and that the rate set by the Commission and to be received by the Company is just and reasonable." The Commission and the majority of this Court, by failing to undertake a detailed consideration of the costs proposed by the utilities, wrongly ignore the 2004 report and other evidence suggesting that the costs proposed for recovery by the utilities were not reasonably incurred.

The majority states that it agrees with the Commission's determination that the intervenors failed to quantify the specific effect of these improprieties. However, neither the Commission nor the majority cite authority from this Court or the General Statutes for such a requirement. Having been presented with evidence that the utilities' expenses were unreasonable, the Commission should have required the

utilities to prove that they were entitled to cost recovery. *Bent Creek*, 305 N.C. at 76, 286 S.E.2d at 779. For that reason, I dissent from the majority's conclusions that the intervenors did not satisfy the burden of production.

**Investment return**

*Property used and useful*

While the Commission allowed a return on the unamortized balance of the utilities' coal ash expenditures, such a return was not permitted as a result of the expenditures' inclusion in the utilities' rate base. *See, e.g.*, N.C.G.S. § 62-133(b)(1) (defining rate base to include the "original cost or the fair value under G.S. 62-133.1A of the public utility's property used and useful"); *State ex rel. Utils. Comm'n v. Thornburg*, 325 N.C. 463, 475, 385 S.E.2d 451, 458 (1989) (*Thornburg I*) (explaining that a utility may receive a return on property used and useful, but may not receive a return on reasonable operating expenses). Upon review of the Commission's orders in this case, I am convinced that further clarification is needed on what, in an ordinary ratemaking case, is properly included in rate base and reasonable operating expenses, respectively.

When calculating the rates that a utility may charge the public, the Commission must first determine the total revenues that the utility is entitled to obtain through rates charged to customers. N.C.G.S. § 62-133(b). In other words, the Commission has to figure out how much total money the utility gets from people who are paying for (in this case) electricity. To do this, the Commission uses a formula

that has been prescribed by the General Assembly through statute. We have

previously explained the formula:

> This statute requires the Commission to determine the utility's rate base (RB), its reasonable operating expenses (OE), and a fair rate of return on the company's capital investment (RR). These three components are then combined according to a formula which can be expressed as follows:
>
> (RB X RR) + OE = REVENUE REQUIREMENTS

*Thornburg I*, 325 N.C. at 467 n.2, 385 S.E.2d at 453 n.2. "[R]ate base," we explained,

"is the reasonable cost of the utility's property which is used and useful in providing

service to the public, minus accumulated depreciation, and plus the reasonable cost

of the investment in construction work in progress." *Id.* So, when the Commission is

determining how much money a utility can charge to consumers, the first thing that

it must do is figure out how much "used and useful" property (otherwise known as

rate base) the utility has, and to multiply the value of that property by a fair rate of

return. This is what it means to say that a utility receives a rate of return on its

property used and useful. However, the utility does not receive a rate of return on its

reasonable operating expenses, which the statute distinguishes from property used

and useful. *See* N.C.G.S. § 62-133(b); *accord Thornburg I*, 325 N.C. at 475, 385 S.E.2d

at 458 ("While this statute makes clear that the rates to be charged by the public

utility allow a return on the cost of the utility's property which is used and useful

within the meaning of N.C.G.S. § 62-133(b)(1), the statute permits recovery but no

return on the reasonable operating expenses ascertained pursuant to subdivision

(3).").

Our prior decisions have provided further clarity on what is and is not included

in rate base, and therefore on what the Commission may allow a return. In one case,

we considered whether the Commission erred in allowing a utility to include amounts

invested in plant facilities servicing abandoned power generation units. *State ex rel.*

*Utils. Comm'n v. Thornburg*, 325 N.C. 484, 486, 385 S.E.2d 463, 464 (1989)

(*Thornburg II*). There, the utility had built a facility with four nuclear generation

power units while it turned out that only one was necessary to meet the needs of its

customers. *Id.* at 487, 385 S.E.2d at 464. Determining that the Commission had erred

by including the costs of the abandoned power generation units in rate base and

allowing a return, we noted:

> The statute sets out a two-part test for the Commission to
> use in deciding what goes into the *rate base* for all costs
> except costs of construction work in progress. The
> Commission must: (1) determine the *reasonable* original
> cost of the property and (2) determine if the property is
> "used and useful, or to be used and useful within a
> reasonable time after the test period." If the costs in
> question do not meet both parts of the test, the costs may
> not be included in the *rate base* for ratemaking purposes.

*Id.* at 491, 385 S.E.2d at 466–67 (citations omitted). Because the amount that the

utility sought to include in rate base "was spent to build *excess* common facilities," we

concluded that they could not be included in rate base. *Id.* at 495, 385 S.E.2d at 469.

This was because "[i]f the facilities are *excess*, as a matter of law, they cannot be considered 'used and useful' as that term is used in N.C.G.S. § 62-133(b)(1)." *Id.*

Similarly, we considered in another case whether a wastewater treatment plant that "was not in service at the end of the test year and, in fact, would never again be in service" was includable in rate base. *State ex rel. Utils. Comm'n v. Carolina Water Serv.*, 335 N.C. 493, 507, 439 S.E.2d 127, 135 (1994) (*Carolina Water*). We stated, reviewing our prior decisions:

> If facilities are not used and useful, they cannot be included in rate base. Including costs in rate base allows the company to earn a return on its investment at the expense of the ratepayers. We do not allow such a return for property that will not be used or useful within the near future. Costs for abandoned property may be recovered as operating expenses through amortization, but a return on the investment may not be recovered by including the unamortized portion of the property in rate base.

*Id.* at 508, 439 S.E.2d at 135 (citations omitted). We concluded that the wastewater treatment plant was no longer used and useful and held that "no portion of its costs may be included in rate base." *Id.*

Where a pipeline built to serve a former customer was later used as a storage facility, to the benefit of current customers, we have determined that the property was used and useful and properly included in rate base. *State ex rel. Utils. Comm'n v. N.C. Textile Mfrs. Ass'n*, 313 N.C. 215, 229–30, 328 S.E.2d 264, 273 (1985). Moreover, where a generating unit "is needed to enable [a utility] to meet the load on its system, and does not represent excess generating capacity," *Eddleman*, 320 N.C.

at 355, 358 S.E.2d at 347, the unit is appropriately included in rate base as property used and useful, *Id.* at 362, 358 S.E.2d at 351–52.

In each case where we consider whether property is used and useful, the delineating factor is whether that property is currently useful for the provision of current service to customers. In *Thornburg II*, we concluded that excess common facilities should be excluded from rate base because they were not being used to provide service to customers. 325 N.C. at 495, 385 S.E.2d at 469. Similarly, in *Carolina Water*, a wastewater treatment plant was not properly included in rate base because it was no longer being used to provide service to customers and would not be used in the future. 335 N.C. at 507–08, 439 S.E.2d at 135. By contrast, in *Textile Manufacturers Association*, we determined that a pipeline was properly included in rate base because it was being used as a storage facility, benefiting customers, notwithstanding the fact that it was not being used to its full capacity. 313 N.C. at 229-30, 328 S.E.2d at 273. Finally, in *Eddleman*, we determined that a generating unit that was being used as reserve capacity to handle the peak energy use of current customers was properly included in rate base as property used and useful. 320 N.C. at 355–60, 358 S.E. 2d at 347–50. Moreover, in each case, we considered whether *property* could be included in rate base. *See* N.C.G.S. § 62-133(b)(1) (including "the reasonable original cost or the fair value . . . of the public utility's property used and useful" in the calculation of rate base).

The Commission seems to have confused this analysis. For example, the Commission writes in its Duke Energy Carolinas order:

> Costs are not recoverable simply because they are incurred by the utility. The utility must show that the costs it seeks to recover are (1) "known and measurable"; (2) "reasonable and prudent"; and (3) where included in rate base "used and useful" in the provision of service to customers. . . . But once it has shown that these metrics are met, the utility should have the opportunity to recover the costs so incurred. This is what North Carolina's ratemaking statute requires. . ., and to do otherwise would amount to an unconstitutional taking.

Later, the Commission writes that "if the expenditures [of a utility] do support and provide service to customers, the costs are 'used and useful.'"

However, the Commission's references to "costs" and "expenditures" are broader than the General Assembly has prescribed, and broader than any case from this Court has previously allowed. Only "the cost of the public utility's property" receives a rate of return under the statutory ratemaking formula. N.C.G.S. § 62-133(b)(5). Similarly, our decisions on rate base have stated the figure includes "the reasonable cost of the utility's property which is used and useful in providing service to the public." *Thornburg I*, 325 N.C. at 467 n.2, 385 S.E.2d at 453 n.2; *accord Carolina Water*, 335 N.C. at 508, 439 S.E.2d at 135 ("There is no statutory authority for including in rate base costs from a completed plant that is no longer used and useful within the meaning of this term as determined by our case law."). As a result, to the extent that the Commission determined that the utilities coal ash expenditures were includable in rate base as property used and useful, it erred as a matter of law.

*Discretionary authority pursuant to N.C.G.S. § 62-133(d)*

While the foregoing applies to the ordinary ratemaking case, the majority notes that the rate cases below involved extraordinary and unusual circumstances, triggering the Commission's obligation to "consider all other material facts of record that will enable it to determine what are reasonable and just rates." *See* N.C.G.S. § 62-133(d). The majority sets out a new, four-part test to evaluate the Commission's use of discretion pursuant to that provision. The majority holds that the Commission may utilize its authority under N.C.G.S. § 62-133(d) to "consider other material facts of record" in its determination of "reasonable and just rates" when (1) the rate case involves unusual, extraordinary, or complex circumstances not adequately addressed by the remainder of the statute, (2) the Commission reasonably concludes that a departure from the ordinary ratemaking process is justified, (3) the Commission determines that it must consider "other facts" to produce reasonable and just rates, and (4) the Commission makes sufficient factual findings and legal conclusions supported by substantial record evidence on a review of the whole record which explain (a) why the Commission is diverging from the usual ratemaking process and (b) why its adopted approach is reasonable and just to the utility and consumers.

This is an admirable procedural rule which the Commission must now follow before utilizing its discretionary authority under the statute. The rule helpfully states the categories of information that the Commission must include in its order. However, the majority's new rule provides no guidance on the substantive limits of the

Commission's discretionary authority.[2] It also provides the Commission with little guidance as to when the Commission may appropriately use its discretionary authority to adjust the traditional ratemaking process, providing only the undefined standard of "unusual, extraordinary, or complex circumstances." As I read our prior decisions, the Commission's authority pursuant to N.C.G.S. § 62-133(d) is informed and limited by the remainder of that statute.

In *State ex rel. Utilities Commission v. Duke Power Company*, we held that the Commission acted within its statutory power when, pursuant to N.C.G.S. § 62-133(d), it reduced a utility's rate base to offset accumulated depreciation expense, avoiding "a windfall to [the utility] and a penalty to its customers." 305 N.C. 1, 19, 287 S.E.2d 786, 797 (1982). This adjustment, we explained, was necessary to preserve "the overall scheme of G.S. § 62-133." *Id.* at 15, 287 S.E.2d at 794.

---

[2] The majority's analysis on this point highlights the extent to which the test could be improved as a guiding tool. The majority, analyzing the Commission's orders, notes only that the Commission appropriately identified the utilities' rate cases as unusual and that it contained detailed findings of fact and conclusions of law. According to the majority's test, such a finding triggers the use of the Commission's discretionary authority under N.C.G.S. § 62-133(d). It does not, however, explain why the Commission's particular use of its discretionary authority, here the decision to allow a rate of return on extraordinary operating costs, was appropriate. I also note that the majority's conclusion that "the Commission did not err in approving the basic ratemaking approach that was utilized in these proceedings" directly conflicts with the majority's later holding, that the Commission erred in rejecting the Public Staff's equitable sharing proposal. The proposal included disallowing a return on the unamortized portion of the coal ash expenditures. Both of the Commission's decisions (to allow a return and to reject the proposal) implicate the Commission's authority under N.C.G.S. § 62-133(d).

In *Thornburg I*, we blessed the Commission's decision, pursuant to N.C.G.S. § 62-133(d), to liberally construe the statutory provision allowing cost recovery of reasonable operating expenses to include abandonment losses. 325 N.C. at 476, 385 S.E.2d at 458. We noted that the Commission is permitted by that section of the statute "to consider 'all other material facts of record' beyond those specifically set forth in the statute," and stated that this authority meant that "the Commission would not be bound by a strict interpretation of" the other parts of the statute when it utilized this discretion. *Id.* at 478, 385 S.E.2d at 459.

In *State ex rel. Utilities Commission v. Carolina Power & Light Company*, we affirmed the Commission's exercise of discretionary authority pursuant to N.C.G.S. § 62-133(d) because the exercise of that authority gave effect to the intent of the legislature and was consistent with the explicit language of N.C.G.S. § 62-133(c). 320 N.C. 1, 13, 358 S.E.2d 35, 42 (1987).

In each of these cases, we affirmed the Commission's use of its discretionary authority under N.C.G.S. § 62-133(d) because doing so gave effect to the rest of the ratemaking statute. In each case, the Commission's exercise of discretion, while departing slightly from the straightforward calculation prescribed by the remainder of Section 62-133, nevertheless complemented the structure of that statute and was necessary to avoid the "defeat of the overall scheme of G.S. § 62-133." *Duke Power Co.*, 305 N.C. at 15, 287 S.E.2d at 794. This is consistent with our admonition that "N.C.G.S. § 62-133(d) has been construed as a device permitting the Commission to

take action *consistent with the overall command of the general rate statutes, but not specifically mentioned in those portions of the statute under consideration in a given case." State ex rel. Utils. Comm'n v. Nantahala Power & Light Co.*, 313 N.C. 614, 690–91, 332 S.E.2d 397, 442 (1985) (emphasis added). As a result, it is incorrect for the majority to state that the Commission's authority pursuant to N.C.G.S. § 62-133(d) is not limited by the rest of that statute. To the contrary, the Commission's use of N.C.G.S. § 62-133(d) must be consistent with the overall scheme of the ratemaking structure set out by the General Assembly.

Having discussed the overreaching nature of the general grant of authority the majority has given the Commission, I must emphasize that the specific outcome reached by the Commission below is in direct contradiction of both the statute and our prior decisions. Pursuant to the overall scheme of N.C.G.S. § 62-133, "the rates to be charged by the public utility allow a return on the cost of the utility's property which is used and useful within the meaning of N.C.G.S. § 62-133(b)(1)," and "the statute permits recovery but no return on the reasonable operating expenses ascertained pursuant to subdivision (3)." *Thornburg I*, 325 N.C. at 475, 385 S.E.2d at 458. "Including costs in rate base allows the company to earn a return on its investment at the expense of the ratepayers." *Carolina Water*, 335 N.C. at 508, 439 S.E.2d at 135. By concluding that the Commission may depart from these fundamental principles, the majority expands the discretionary authority permitted under N.C.G.S. § 62-133(d) beyond any semblance of the legislative intent evidenced

by the text. Where the ratemaking statute specifically limits application of a rate of return to property used and useful, the Commission's discretion to consider other relevant facts cannot be interpreted so broadly as to achieve the opposite result. *State ex rel. Utils. Comm'n v. Gen. Tel. Co.*, 281 N.C. 318, 336, 189 S.E.2d 705, 717 (1972) ("The Commission, however, does not have the full power of the Legislature but only that portion conferred upon it in G.S. Chapter 62. In fixing the rates to be charged by a public utility for its service, the Commission must, therefore, comply with the requirements of that chapter, more specifically, G.S. 62-133.").

Our decision in *Carolina Water* is particularly instructive. There, the Commission treated an out-of-service wastewater treatment plant "as an extraordinary property retirement," determining "that the unrecoverable costs should be amortized over ten years with the unamortized portion being included in rate base." 335 N.C. at 507, 439 S.E.2d at 135. Similarly, here, the Commission permitted amortization over a period of time for a portion of the coal ash expenditures and a return on the unamortized portion. Our conclusion in *Carolina Water* that the unamortized portion of costs that did not represent used and useful property were not entitled to a return should control the decision here.

As the Commission wrote in its DEC order, "[i]f the North Carolina General Assembly had intended to give the Commission the authority to deny otherwise recoverable environmental compliance costs due to some punitive theory of causation, it could have said so—and it did not." Just the same, if the General Assembly had

intended to give the Commission the authority to allow a rate of return on expenses rather than property, "it could have said so—and it did not." "The legislature does not operate in a vacuum," in the Commission's words. "Rather, it operates within the context of N.C. Gen. Stat. § 62-133 . . . [h]ad it intended to disavow the routine cost recovery standard, it can be expected that the legislature would have had to do so explicitly."

As a final note, the majority remands this case to the Commission for reconsideration of the Public Staff's equitable sharing proposal. Because the proposal is consistent with the overall structure of N.C.G.S. § 62-133, it would likely fall within the limits of the Commission's discretionary authority pursuant to subparagraph (d) of that section, as described in our precedents. Further, the Public Staff's proposal more closely conforms to the General Assembly's mandate that "the Commission shall fix such rates as shall be fair both to the public utilities and to the consumer" than do the results reached in the Commission's orders that are being remanded now.

Returning to the basics of why this case matters, by constitutional mandate, it is the "the policy of this State to conserve and protect its lands and waters for the benefit of all its citizenry." N.C. Const. art. XIV, § 5. Although the Constitution provides particular prescriptions intended to achieve that goal, this provision illustrates the state's commitment to environmental protection and enshrines that commitment in our most fundamental source of state law. While the Commission is explicitly charged with "encouraging and promoting harmony between public

utilities, their users and the environment," N.C.G.S. § 62-2(a)(5), that statutory mandate must also be read consistent with the state constitutional protections designed to ensure the State protects its lands and waters.